**2025-1323, -1345**

# United States Court of Appeals
# for the Federal Circuit

WOODWAY USA, INC.,

*Appellant,*

– v. –

LIFECORE FITNESS, LLC, dba Assault Fitness,

*Cross-Appellant.*

*Appeals from the United States Patent and Trademark Office,
Patent Trial and Appeal Board in No. IPR2023-00843.*

## BRIEF FOR APPELLANT

KADIE M. JELENCHICK
SARAH E. RIEGER
FOLEY & LARDNER LLP
777 East Wisconsin Avenue
Milwaukee, Wisconsin 53202
(414) 271-2400
kjelenchick@foley.com
srieger@foley.com

JACK T. CARROLL
FOLEY & LARDNER LLP
150 East Gilman Street, Suite 5000
Madison, Wisconsin 53703
(608) 257-5035
jcarroll@foley.com

*Counsel for Appellant*

APRIL 7, 2025

 COUNSEL PRESS    (800) 4-APPEAL • (624546)

**U.S. Patent No. 10,561,884, Claims 30-34, 37-39, 41, 45-49, 57, and 59.**

30. A manually powered treadmill, comprising:

a frame having a front end and a rear end positioned opposite the front end;

a front shaft coupled to the frame proximate the front end;

a rear shaft coupled to the frame proximate the rear end;

a plurality of bearings coupled to the frame;

a running belt at least partially supported by the plurality of bearings, wherein the running belt comprises a curved running surface; and

a safety device coupled to the frame and the running belt, the safety device having a first rotatable element and a second rotatable element, wherein at least one of the first and second rotatable elements are adapted for rotation relative to the frame;

wherein the running belt and one of the first and second rotatable elements of the safety device freely rotate in a first direction of rotation relative to the other of the first and second rotatable elements of the safety device, but interference between the safety device and at least one of the first and second rotatable elements substantially prevents rotation in a second direction of rotation, opposite the first direction of rotation, of the running belt and the one of the first and second rotatable elements relative to the other of the one of the first and second rotatable elements.

31. The manually powered treadmill of claim 30, wherein the frame includes a left side member, a right side member, and at least one cross-member extending between the left side member and the right side member, wherein the plurality of bearings includes a first plurality of bearings coupled to a left-side of the frame and a second plurality of bearings coupled to a right-side of the frame.

32. The manually powered treadmill of claim 31, wherein the first plurality of bearings and the second plurality of bearings each at least partially define a curved top profile, wherein the curved top profile substantially corresponds to at least a portion of the curved running surface.

33. The manually powered treadmill of claim 30, wherein the first and second rotatable elements of the safety device at least partly form a one-way bearing.

34. The manually powered treadmill of claim 30, further comprising at least one support foot coupled to the frame, wherein the at least one support foot is adjustable to enable an adjustment of the relative vertical incline of at least a portion of the manually powered treadmill in relation to a surface supporting the manually powered treadmill.

37. A manually powered treadmill, comprising:

a frame;

a first plurality of bearings coupled to the frame;

a second plurality of bearings coupled to the frame and spaced a distance from the first plurality of bearings;

a front shaft assembly coupled to the frame;

a rear shaft assembly coupled to the frame;

a running belt at least partially supported by the first plurality of bearings and the second plurality of bearings, the running belt being at least partially disposed about the front and rear shaft assemblies, and comprising a running surface, at least a portion of which is curved; and

a safety device coupled to the frame and the running belt, the safety device having a first rotatable element and a second rotatable element, wherein at least one of the first and second rotatable elements are adapted for rotation relative to the frame;

wherein one of the first and second rotatable elements of the safety device and the running belt freely rotate relative to the other of the one of the first and second rotatable elements of the safety device in a first direction of rotation relative to the frame, however, in a second direction of rotation, opposite the first direction of rotation, interference between the safety device and at least one of the first rotatable element and the second rotatable element substantially prevents rotation of the running belt and the one of the first and second rotatable elements relative to the other of the one of the first and second rotatable elements.

38. The manually powered treadmill of claim 37, wherein the first and second rotatable elements of the safety device at least partly form a one-way bearing.

39. The manually powered treadmill of claim 37, wherein the front shaft assembly comprises a front shaft coupled to frame.

41. The manually powered treadmill of claim 37, wherein the rear shaft assembly comprises a rear shaft coupled to the frame.

45. The manually powered treadmill of claim 37, further comprising at least one support foot coupled to the frame, wherein the at least one support foot is adjustable to enable an adjustment of the relative vertical incline of at least a portion of the manually powered treadmill in relation to a surface supporting the manually powered treadmill.

46. The manually powered treadmill of claim 37, wherein the running belt is at least partially supported by the first plurality of bearings and the second plurality of bearings.

47. The manually powered treadmill of claim 46, wherein each of the first and second pluralities of bearings define a curved top profile and wherein the curved top profile substantially corresponds to at least a portion of the curved portion of the running surface.

48. The manually powered treadmill of claim 37, wherein the frame includes a left side member, a right side member spaced a distance from the left side member, and at least one cross-member extending between the left side member and the right side member.

49. The manually powered treadmill of claim 48, wherein the first plurality of bearings are coupled the left side member and the second plurality of bearings are coupled to the right side member.

57. A method, comprising:

  providing a manually powered treadmill, the manually powered treadmill having a frame with a front end and a rear end;

  providing a plurality of bearings coupled to the frame, wherein the plurality of bearings define at least a portion of a curved top profile;

  disposing a running belt on the plurality of bearings such that the curved top profile of plurality of bearings define at least a portion of a curved running surface of the running belt;

providing a safety device coupled to the frame and to the running belt, the safety device having a first rotatable element and a second rotatable element, wherein at least one of the first and second rotatable elements are adapted for rotation relative to the frame;

permitting rotation of one of the first and second rotatable elements of the safety device and the running belt in a first direction of rotation; and

substantially preventing rotation in a second direction, opposite the first direction, of the running belt and the one of the first and second rotatable elements by interference between the safety device and at least one of the first rotatable element and the second rotatable element.

59. A method according to claim 57, further comprising providing for the adjustment of the vertical incline of at least a portion of the running surface.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

### CERTIFICATE OF INTEREST

**Case Number** 2025-1323; 25-1345

**Short Case Caption** Woodway USA, Inc. v. LifeCORE Fitness, LLC

**Filing Party/Entity** Woodway USA, Inc.

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 01/10/2025

Signature: /s/ Kadie M. Jelenchick

Name: Kadie M. Jelenchick

i

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☑ None/Not Applicable |
| Woodway USA, Inc. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

ii

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☐    None/Not Applicable                    ☐    Additional pages attached

| | | |
|---|---|---|
| Richard J. McKenna | | |
| | | |
| | | |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑  Yes (file separate notice; see below)    ☐  No    ☐  N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable                    ☐    Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

I.     Statement of Related Cases ...................................................................1

II.    Jurisdictional Statement.....................................................................1

III.   Statement of the Issues .....................................................................2

IV.   Statement of the Case .......................................................................2

        A.     Statement of Facts .................................................................6

               1.     U.S. Patent No. 10,561,884.........................................6

               2.     The Prior Art .................................................................8

                        a)     Chickering.........................................................8

                        b)     Magid ...........................................................11

                        c)     Sclater .............................................................13

               3.     Proceedings Before the Board .................................15

V.     Summary of Argument ...................................................................17

VI.   Argument ........................................................................................23

        A.     Standard of Review ..............................................................23

        B.     The Board Erred in Concluding that Chickering Taught a "Curved Running Surface"................................................................25

               1.     The Board's Implicit Construction of "Running Surface" Is Erroneous and Unsupported by Substantial Evidence..........25

                        a)     The Board's conclusions contradict the parties' expert testimony...........................................................25

                        b)     The Board improperly conflated different claim terms..................................................................................29

                 2.     Under the Correct Interpretation of "Running Surface," the Board's Conclusions Contradict Chickering ......................30

C.     The Board Erred in Finding Motivations to Combine and/or Modify in the Challenged Ground ........................................................35

      1.     The Board Erred in Concluding that the Prior Art Did Not Teach Away from the Proposed Combination with Magid ......35

           a)     The Board erred as a matter of law by applying the incorrect legal standard regarding teaching away ..........35

           b)     The Board's conclusion that a POSA would have been motivated to combine Magid with Chickering was erroneous and unsupported by substantial evidence ...................................................................37

                i.     The prior art teaches away from the proposed combination .........................................................37

                ii.     Even if Magid does not rise to the level of teaching away, there is still no motivation to combine ................................................................42

                iii.     The prior art does not support a finding of motivation to combine ..........................................42

      2.     The Board Erred in Finding a Motivation to Combine Sclater with the Other Prior Art Based on Assault's Hindsight Bias-Tainted Arguments .........................................45

      3.     The Board's Analysis Regarding Magid and Sclater Is Inconsistent with its Correct and Well-Reasoned Findings Regarding Lack of Motivation to Combine Schonenberger and Socwell ..............................................................................52

D.     The Evidence of Secondary Considerations, Including the Presumption of Nexus and Unrebutted Evidence of Commercial Success, Outweighs any Evidence of Obviousness ............................53

      1.     The Board Erred as a Matter of Law by Applying the Incorrect Legal Standard Regarding the Presumption of Nexus .............................................................................................54

2. The Board Made Erroneous Factual Findings That Improperly Elevated Attorney Argument Over Unrebutted Evidence ...............................................................................56

3. The Board Erred by Improperly Disregarding Unrebutted and Corroborated Evidence of Nonobviousness.......................60

VII. Conclusion ..........................................................................................62

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acceleration Bay, LLC v. Activision Blizzard Inc.*,
  908 F.3d 765 (Fed. Cir. 2018)................................................................25

*Apple Inc. v. Samsung Elecs. Co., Ltd.*,
  839 F.3d 1034 (Fed. Cir. 2016) ............................................................42

*Arctic Cat Inc. v. Bombardier Rec. Prods.*,
  876 F.3d 1350 (Fed. Cir. 2017) ..................................................... 19, 36

*Chemours Co. FC, LLC v. Daikin Indus.*,
  4 F.4th 1370 (Fed. Cir. 2021) ....................................................... 23, 60

*Chi. Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*,
  677 F.3d 1361 (Fed. Cir. 2012) ............................................................29

*Comcast Cable Commc'ns, LLC v. Promptu Sys. Corp.*,
  838 F. App'x 555 (Fed. Cir. 2021) .......................................................45

*Cuozzo Speed Techs. v. Com. for Intell. Prop.*,
  579 U.S. 261 (2016)................................................................................25

*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*,
  567 F.3d 1314 (Fed. Cir. 2009) ..................................................... 19, 35

*Fox Factory, Inc. v. SRAM, LLC*,
  944 F.3d 1366 (Fed. Cir. 2019) ............................................... 54, 55, 59

*Helmsderfer v. Bobrick Washroom Equip., Inc.*,
  527 F.3d 1379 (Fed. Cir. 2008) ............................................................28

*HTC Corp. v. Cellular Commc'ns Equip., LLC*,
  877 F.3d 1361 (Fed. Cir. 2017) ............................................................23

*Immunex Corp. v. Sanofi-Aventis U.S. LLC*,
  977 F.3d 1212 (Fed. Cir. 2020) ............................................................24

*In re Cuozzo Speed Techs., LLC*,
793 F.3d 1268 (Fed. Cir. 2015) .................................................................25

*In re Fulton*,
391 F.3d 1195 (Fed. Cir. 2004) ............................................................ 19, 36

*In re Gartside*,
203 F.3d 1305 (Fed. Cir. 2000) .................................................................24

*In re Mouttet*,
686 F.3d 1322 (Fed. Cir. 2012) .................................................................24

*In re NTP, Inc.*,
654 F.3d 1279 (Fed. Cir. 2011) ............................................................ 21, 46

*InTouch Techs., Inc. v. VGO Commc'ns, Inc.*,
751 F.3d 1327 (Fed. Cir. 2014) .................................................................45

*J.T. Eaton & Co. v. Atl. Paste & Glue Co.*,
106 F.3d 1563 (Fed. Cir. 1997) .................................................................60

*Metalcraft of Mayville, Inc. v. The Toro Co.*,
848 F.3d 1358 (Fed. Cir. 2017) .................................................................46

*Microsoft Corp. v. Enfish, LLC*,
662 F. App'x 981 (Fed. Cir. 2016) .............................................................44

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) .................................................................24

*Polaris Indus., Inc. v. Arctic Cat, Inc.*,
882 F.3d 1056 (Fed. Cir. 2018) ........................................................ *passim*

*Purdue Pharma L.P. v. Depomed, Inc.*,
643 F. App'x 960 (Fed. Cir. 2016) .................................................... *passim*

*Randall Mfg. v. Rea*,
733 F.3d 1355 (Fed. Cir. 2013) ............................................................ 24, 52

*Rembrandt Wireless Techs., LP v. Samsung Elecs. Co.*,
853 F.3d 1370 (Fed. Cir. 2017) .................................................................42

*Ricoh Co., Ltd. v. Quanta Computer Inc.*,
   550 F.3d 1325 (Fed. Cir. 2008) ..............................................................35

*Securus Techs., Inc. v. Glob. Tel\*Link Corp.*,
   701 F. App'x 971 (Fed. Cir. 2017) ...........................................................44

*Teva Pharms. Int'l GmbH v. Eli Lilly & Co.*,
   8 F.4th 1349 (Fed. Cir. 2021) .......................................................... 54, 55

*TQ Delta, LLC v. Cisco Sys.*,
   942 F.3d 1352 (Fed. Cir. 2019) ..............................................................30

*WBIP, LLC v. Kohler Co.*,
   829 F.3d 1317 (Fed. Cir. 2016) ..................................................... *passim*

## Statutes

28 U.S.C. § 1295(a)(4)(A) ..............................................................................1

35 U.S.C. § 141(c) ..........................................................................................1

35 U.S.C. § 142 ..............................................................................................1

35 U.S.C. § 319 ..............................................................................................1

## Rules

Fed. R. Evid. 801(d)(2)(B)............................................................................59

## Regulations

37 C.F.R. § 42.100(b) ...................................................................................24

37 C.F.R. § 42.102 ..........................................................................................1

# I. STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, Appellant Woodway USA, Inc. ("Woodway") states:

a) No appeal in or from the same proceeding was previously before this or any other appellate court; and

b) The patent at issue in this appeal is also at issue in *Woodway USA, Inc. v. LifeCore Fitness, Inc.*, No. 2025-1431, which originated in the United States District Court for the Southern District of California as *Woodway USA, Inc., v. LifeCORE Fitness, Inc. d/b/a Assault Fitness*, Case No. 3:22-cv-00492.

# II. JURISDICTIONAL STATEMENT

Woodway appeals from the final written decision ("FWD") of the Patent Trial and Appeal Board ("the Board") in *inter partes* review no. IPR2023-00843 directed to U.S. Patent No. 10,561,884 ("the '884 Patent"). *See* 35 U.S.C. § 141(c) and § 319. The Board entered its FWD on October 22, 2024, and issued an errata correcting certain inconsistencies in the FWD on November 20, 2024. Appx1-63. Woodway timely filed its notice of appeal on December 20, 2024. Dkt. 1; *see also* 35 U.S.C. § 142; 37 C.F.R. § 42.102. This Court has jurisdiction pursuant to 35 U.S.C. § 141(c) & § 319, and 28 U.S.C. § 1295(a)(4)(A).

As Patent Owner, Woodway has standing to maintain this appeal.

## III.   <u>STATEMENT OF THE ISSUES</u>

Whether the Board failed to properly interpret the plain and ordinary meaning of "running surface;"

Whether U.S. Patent No. 3,637,206 ("Chickering") in combination with U.S. Patent No. 5,538,489 ("Magid") and a particular disclosure from the reference book Sclater and Nicholas P. Chironis, *Mechanisms & Mechanical Devices Sourcebook* (3d ed. 2001) ("Sclater") renders claims 30-34, 37-39, 41, 45-49, 57, and 59 of the '884 Patent obvious when "running surface" is properly interpreted;

Whether the Board erred in finding a motivation to combine Magid with Chickering when considering the combined teachings of the prior art;

Whether the Board erred in finding a motivation to combine Sclater with Chickering and Magid when considering the combined teachings of the prior art;

Whether the Board applied the incorrect legal standard in determining nexus for purposes of secondary considerations of nonobviousness; and

Whether the Board failed to properly weigh unrebutted evidence of secondary considerations of nonobviousness.

## IV.   <u>STATEMENT OF THE CASE</u>

Woodway appeals from the FWD of the Board in IPR2023-00843, wherein the Board found claims 30-34, 37-39, 41, 45-49, 57, and 59 of the '884 Patent ("the rejected claims") unpatentable as obvious over Chickering in view of Magid and

2

Sclater. *See* Appx56-62. Claims 40, 42-44, and 50-54 of the '884 Patent were not shown as unpatentable. *See* Appx56-62. Woodway does not appeal this portion of the FWD. Appx7199.

Before Woodway introduced its CURVE® line of treadmills in 2009, no one had successfully developed and commercialized a curved, manual treadmill as taught in the rejected claims. A key innovation of the CURVE® treadmill was its ability to harness the force of gravity acting on the user based upon the user's relative position on the running surface for inducing rotation of the running belt. The CURVE® treadmill was an immediate commercial success, and since 2009, Woodway has introduced additional models and sizes in the CURVE® product line, continuously improving on its manual treadmill technology each time while still retaining the original, innovative concept which is embodied in the rejected claims.

While the concept of manual, flat motorless treadmills had been in the public domain for centuries, before Woodway, no one had even recognized, let alone been able to solve, the problem of how to handle the unpredictable rotation movement of the running belt for such a device, particularly when implementing a curved running surface in which both the front and rear portions of the running belt running surface are positioned vertically higher than the central portion of the running belt. Appx4859-4860 at ¶33. While a curved, motorless surface requires free rolling or rotation of the running belt to function as intended, this necessarily means that the

running belt may move in the forward and backward direction when a user is trying to mount or dismount the treadmill absent the addition of significant safety features. Appx4859-4860 at ¶33. Because users commonly mount a treadmill from the rear, when a user steps on the rear portion of the treadmill's running surface, which is curved upward, the user's weight may cause the belt to unexpectedly rotate forward (the opposite of the normal direction of rotation of the running belt). Appx4859-4860 at ¶33. Depending on how quickly and where the user mounts the treadmill, this may create a significant safety hazard as unpredictable belt movement may startle the user, create a temporary feeling of loss of control, or even cause a user to fall. Appx4859-4860 at ¶33.

The rejected claims are all directed to Woodway's innovative means of solving these problems by addressing both the functional advantages of curved, manual treadmills and their previously unrecognized and unresolved safety concerns. These claims combined and improved on a variety of features to create a novel device that solved—for the first time—the problems with curved, manual treadmills that had previously prevented their proliferation in the market. Despite this, Appellee and Cross-Appellant LifeCORE Fitness, LLC, d/b/a Assault Fitness ("Assault") filed a petition for *inter partes* review ("IPR") alleging that claims 30-34, 37-54, 57, and 59 of the '884 Patent ("the challenged claims") are unpatentable over several combinations of prior art references—all of one of which were

previously considered by the United States Patent and Trademark Office. None of these combinations disclosed all of the elements of the challenged claims, nor would a person of ordinary skill in the art ("POSA") have any motivation to make the proposed combinations. Nonetheless, the Board concluded that the rejected claims – a subset of the challenged claims – were unpatentable as obvious over Chickering in view of Magid and Sclater, the combination described in Ground 4 of Assault's IPR petition. Appx29-62. The Board concluded that none of the challenged claims were rendered obvious by the combinations proposed in Grounds 1-3 and that claims 40, 42-44, and 50-54 were not unpatentable as obvious under any ground. Appx14-29; Appx56-62.

In reaching its conclusion regarding the rejected claims, the Board made several fundamental errors. In particular, the Board erred, at least in,

- its application of incorrect legal standards,

- its interpretation of the plain and ordinary meaning of the phrase "running surface,"

- its finding that Chickering disclosed a "curved" running surface,

- its motivation to combine analysis, and

- its rejection of unrebutted evidence of secondary considerations of nonobviousness.

Any one of these errors is enough to warrant reversal.

**A. Statement of Facts**

**1. U.S. Patent No. 10,561,884**

The '884 Patent, titled "Manual Treadmill and Methods of Operating the Same," issued from Application No. 15/958,339, filed on April 20, 2018, which claims priority to Provisional Application No. 61/161,027, filed on March 17, 2009. Appx64-65. As indicated in the abstract, the '884 Patent and its claims are directed to a manually operated treadmill that includes "a running belt supported by [a] plurality of bearings, wherein the running belt includes a curved running surface; and a safety device coupled to at least one of the front shaft and the rear shaft, wherein the safety device is structured to substantially prevent rotation of at least one of the front shaft and the rear shaft in a first rotational direction while permitting rotation of the at least one of the front shaft and the rear shaft in a second rotational direction opposite the first rotational direction." Appx64-65. An exemplary treadmill according to the claimed invention is shown, for example, in Figure 1:



FIG. 1

Appx71 at Fig. 1.

The '884 Patent's treadmill design was a significant advancement in the field. In the claimed treadmill, the curved, manual nature of the design means that "the speed controls for the manual treadmill 10 and the various embodiments thereof are generally the user's cadence and relative position of her weight-bearing foot on the running surface" and is "responsive to the weight of the user mounting, dismounting, or running on the treadmill 10." Appx103 at 26:63-27:2.

At the same time, the '884 Patent recognized that there were significant safety concerns that are specific to curved, manual treadmills. Appx104 at 27:2-10. Namely, "if a user were to mount the treadmill by placing her weight bearing foot at

7

a location . . . along the rear portion 74 of the running surface 70, the running belt 16 may move forward and cause them to loose [sic] their footing, resulting in an injury or simply an unpleasant user experience." Appx104 at 27:5-10. To address this previously unrecognized and unresolved safety issue, the specification goes on to teach the use of a safety device, specifically in the form of a "one-way bearing assembly," which is "a motion restricting element that is configured to permit rotation of at least one of the front and rear shaft assemblies 44, 46 (and hence the running belt 16) in only one direction . . . ." Appx104 at 27:11-19, 28:5-12. Notably, the evidence of record does not describe a single curved treadmill that incorporated such a feature, regardless of structure.

### 2. The Prior Art

#### a) Chickering

Chickering is a United States Patent, which issued on January 25, 1972, and names Kenton Chickering III as the sole inventor. Appx3196. Chickering is specifically directed to "a new type of treadmill exercising device" in which "[t]he tread surface inclines upward toward each end to provide a forward accelerating area and a rear decelerating area." Appx3196. Chickering was considered, and overcome, during prosecution of the '884 Patent. *See, e.g.,* Appx65 (listing Chickering among the "References Cited").

As shown in the figures and described in the specification, both embodiments of the device disclosed in Chickering teach a bi-planar running surface rather than a curved running surface. Specifically, in Chickering's main embodiment, the primary running surface (first tread surface 16a) is formed by placing endless belt 16 over "[a] first series of transverse parallel rollers 13" while a second running surface (second tread surface 25a) is formed by placing a second endless belt 25 over "[a] second series of transverse parallel rollers 18." Appx3198 at 2:13-20. This results in two, adjacent, flat running surfaces as can plainly be observed in Figure 2's representation of Chickering's primary embodiment:



Appx3197 at Fig. 2 (annotated).

Likewise, the sole alternative embodiment, which utilizes "a single endless belt 28" placed over "a single series of rollers 29 . . . journaled in the sidewalls 22 of base 10," also discloses a bi-planar running surface wherein the rollers 29 "are so disposed that the forward rollers lie approximately in a plane slanting downwardly

from the front of the base, while the rear rollers lie approximately in a plane slanting upward toward the rear of the base 10." Appx3198-3199 at 2:73-3:6. Again, the bi-planar nature of the resulting running surface can be observed in Chickering's Figure 3, which shows two, adjacent, flat planes:



Appx3197 at Fig. 3 (annotated).

Chickering does not disclose any kind of one-way bearing assembly or any other safety device intended to prevent forward movement of the running belt in either embodiment. *See generally* Appx3196-3199. Moreover, Chickering criticizes the use of other, more commonplace safety features, explaining that one of its "principal objectives" is "to provide a treadmill type exercising device which removes the necessity for external support means for the user," such as by eliminating the need for a user to "rely[] on handles, railings, belts, or the like, for maintaining his balance and his position." Appx3198 at 1:40-47.

### b) Magid

Magid is a United States Patent, which issued on July 23, 1996, and names Sidney H. Magid as the sole inventor. Appx3182. Magid is directed to "[a] walker apparatus" that includes "endless left and right footbelts" which "move independently and are to be treaded respectively by the left and right feet of the user, thereby preventing the action of the user's left foot from influencing the action of his right foot and vice-versa when the walker apparatus is in use." Appx3182. The Magid device is largely intended for use by "people with uncoordinated feet movement," such as "small children, physically handicapped people, old people and by those who feel more confident holding onto something while exercising," or "to provide a safe and effective way of exercising a baby and for teaching the baby to stand and walk." Appx3190 at 1:30-34, 1:53-64. Magid was considered, and overcome, during prosecution of the '884 Patent. *See, e.g.,* Appx65 (listing Magid among the "References Cited" and marking Magid as a reference "cited by examiner"); Appx2542-2558.

Magid's unique, parallel belt design raises unique safety concerns that are only heightened for Magid's intended users and needed to be addressed. *See* Appx4952-4953, ¶¶188-190. Specifically, with two parallel walking belts incorporated into the design and controlled by a user's separate feet, each belt could move in opposite directions while the device is in use, forcing the user's legs apart

and potentially causing significant injury. Appx4953, ¶190. Recognizing this problem, Magid briefly describes an embodiment that incorporates a ratchet-and-pawl-style "unidirectional control means 6, 6' . . . installed to permit only unidirectional movement of the left and right foot belts 4, 4'." Appx3191 at 4:46-59. This structure can be observed in Magid's figures, including for example in Figure 5:



Appx3186 at Fig. 5 (annotated).

### c) Sclater

Sclater is a reference handbook published in 2001 that, by its own terms, "contains drawings and descriptions of more than 2000 different mechanisms and mechanical devices that have proven themselves in modern products, machines, and systems." Appx3275; Appx3296. Assault submitted only a small portion of Sclater to the Board during the proceedings below, including specifically select pages from "Chapter 9: Coupling, Clutching, and Braking Devices" and "Chapter 12: Fastening, Latching, Clamping, and Chucking Devices," with several intermediate pages removed. *See* Appx3276-3295 (providing only pages 302-303, 311-312, 316-323, 332-335, and 420-421 of Sclater). Although even these limited excerpts describe dozens of mechanisms and devices, including at least twenty different clutches (*see generally* Appx3273-3297; *see also* Appx3277-3278, Appx3279-3280, Appx3281-3282), Assault's arguments below focused on just one application, a specific sprag-type clutch (Appx219). Sclater's limited depiction of that clutch, as well as all express teachings Sclater includes regarding it, is provided below:

13



Overrunning motion of outer race moves sprags out of locked position

Sprags in overrunning position

Wedging angle

Sprags under torque load

**Fig. 1 Precision sprags** act as wedges and are made of hardened alloy steel. In the formsprag clutch, torque is transmitted from one race to another by the wedging action of sprags between the races in one direction; in the other direction the clutch freewheels.

Appx3283.

Woodway subsequently submitted an additional page from Sclater describing several toothless ratchet-type clutches that Assault's excerpts had omitted:

14



**NO TEETH ON THESE RATCHETS**

Ratchets with springs, rollers, and other devices keep motion going one way.

Fig. 1    Fig. 2    Fig. 3    Fig. 4

Fig. 5    Fig. 6    Fig. 7    Fig. 8

**Fig. 1**   **Swinging pawls** lock on the rim when the lever swings forward, and release on the return stroke. Oversize holes for the supporting stud make sure that both the top and bottom surfaces of the pawls make contact.

**Fig. 2**   **A helical spring** grips the shaft because its inner diameter is smaller than the outer diameter of shaft. During the forward stroke, the spring winds tighter; during the return stroke, it expands.

**Fig. 3**   **A V-belt sheave** is pushed around when pawl wedges in the groove. For a snug fit, the bottom of the pawl is tapered like a V-belt.

**Fig. 4**   **Eccentric rollers** squeeze a disk on its forward stroke. On the return stroke, rollers rotate backwards and release their grip. Springs keep the rollers in contact with the disk.

**Fig. 5**   **A rack** is wedge-shaped so that it jams between the rolling gear and the disk, pushing the shaft forward. When the driving lever makes its return stroke, it carries along the unattached rack by the cross-piece.

**Fig. 6**   **A conical plate** moves like a nut back and forth along the threaded center hub of the lever. The light friction of spring-loaded pins keeps the plate from rotating with the hub.

**Fig. 7**   **Flat springs** expand against the inside of a drum when a lever moves one way, but they drag loosely when the lever turns the drum in the opposite direction.

**Fig. 8**   **An eccentric cam** jams against the disk during the motion half of a cycle. Elongated holes in the levers allow the cam to wedge itself more tightly in place.

124

Page 6

*See* Appx5029.

### 3.     Proceedings Before the Board

On April 12, 2023, Assault filed an IPR petition challenging the patentability of claims 30-34, 37-54, 57, and 59 of the '884 Patent. Appx196-200. In the petition,

Assault raised four grounds of alleged unpatentability. All four grounds alleged that certain of the challenged claims were rendered obvious by different combinations of prior art: Grounds 1-3 relied on Schonenberger as the primary reference, while Ground 4 relied on Chickering as the primary reference. Appx199-200. All four grounds relied on Magid and Sclater as secondary references, while Ground 2 further relied on U.S. Patent No. 6,923,746 ("Skowronski") to meet additional limitations of dependent claims 44 and 51. Appx199-200.

On October 24, 2023, the Board instituted IPR proceedings based on Assault's petition, finding that Assault had satisfied its burden to demonstrate a reasonable likelihood of success with respect to all challenged claims. Appx4648-4702. Despite this, following full briefing from the parties, the Board concluded that none of the challenged claims were rendered obvious by the combinations proposed in Grounds 1-3 and that claims 40, 42-44, and 50-54 were not unpatentable as obvious under any ground.[1] Appx14-62. However, the Board did find that the rejected claims – a

---

[1] The FWD contains several typographical errors. Although some errors were addressed in a subsequent errata filed by the Board, Appx60-62, at least one appears to have been missed. Specifically, the FWD states that "Petitioner has shown by a preponderance of the evidence that claims 37, **50**, and 57 are unpatentable over Chickering, Magid, and Sclater." Appx47 (emphasis added). Ground 4 did not challenge the patentability of claim 50 or even mention claim 50. Appx200; Appx274-298. However, out of an abundance of caution, Woodway reiterates that claim 50 is, indeed, not unpatentable as obvious over any ground of Assault's petition, as indicated in the summary chart provided in the errata. Appx61-62.

subset of the challenged claims – were unpatentable as obvious over Chickering in view of Magid and Sclater, the combination described in Ground 4.

In reaching its decision regarding the rejected claims, the Board adopted the following definition of a POSA: "a POSA would have a Bachelor's of Science degree in mechanical engineering and at least one year of experience in the treadmill industry, including experience and knowledge of the design, construction, testing, and operation of manual treadmills overall." Appx12-13. Notably, the Board adopted this definition even though – as Woodway pointed out – it excludes certain named inventors of the '884 Patent and is therefore presumptively incorrect. Appx4759-4760; Appx6893-6894. Nonetheless, the Board stated that its "analysis and conclusions as to patentability would not change if we had adopted either Petitioner's or Patent Owner's definitions."[2] Appx13.

## V.  SUMMARY OF ARGUMENT

The Board erred in its finding that claims 30-34, 37-39, 41, 45-49, 57, and 59 of the '884 Patent – the rejected claims – are unpatentable as obvious over Chickering in combination with Magid and Sclater. Specifically, its holding relied on erroneous interpretations of claim terms and prior art teachings, erroneous

_____

[2] As discussed herein, Woodway maintains that the rejected claims are not obvious even under the Board's POSA definition.

findings regarding motivation to combine both Magid and Sclater with Chickering, and erroneous findings regarding secondary considerations of nonobviousness, which in turn misapplied and misunderstood legal precedent and improperly elevated mere attorney argument over unrebutted evidence of record. Each of these errors on its own would warrant reversal or at least vacatur and remand.

The Board first erred in its implicit construction of "running surface," which underlies and is necessary to its unpatentability finding yet is unsupported by substantial evidence. Indeed, the Board's interpretation expressly contradicts the only evidence of record on this issue. Both parties' experts agreed that the running surface is the portion of the running belt where a runner's feet typically make contact. Despite this, the Board concluded that the running surface need not be where a user places their feet when walking/running on a treadmill and criticized Woodway's expert testimony as allegedly unsupported, ignoring the corroborating testimony from Assault's expert. Rather than engage with the experts' shared understanding, the Board adopted a new interpretation that both lacked substantial, affirmative evidence and improperly conflated separate claim limitations.

Under the correct interpretation of "running surface" as described by both parties' experts, the Board's conclusion that Chickering discloses a curved running surface is also clearly erroneous and unsupported by substantial evidence. Chickering itself teaches that a runner's foot would not contact the only allegedly

curved portion of the running belt. Thus, Chickering cannot disclose a "curved running surface" under the correct interpretation of "running surface" because the curved portion of the belt is not a location where a user's feet are expected to make contact. The only contrary "evidence" is the *ipse dixit* of Assault's expert, which contradicts Chickering and should be disregarded. The Board's finding that Chickering discloses a curved running surface is thus clearly erroneous and should be reversed.

The Board next erred in finding that a POSA would be motivated to combine Chickering with at least secondary reference Magid and Schlater. Here, the FWD misapplies the law regarding teaching away. Under binding precedent, a reference teaches away if it discourages a person of ordinary skill from following the path taken by the claimed invention. *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1327 (Fed. Cir. 2009); *In re Fulton*, 391 F.3d 1195, 1201 (Fed. Cir. 2004). When assessing whether a reference teaches away, the Board must consider all teachings, even if not relied upon by the challenging party. *Arctic Cat Inc. v. Bombardier Rec. Prods.*, 876 F.3d 1350, 1360 (Fed. Cir. 2017). The Board failed to properly apply this standard, disregarding clear teachings that would discourage a POSA from combining Magid with Chickering simply because they were not teachings on which Assault relied. This constitutes legal error.

Under the correct legal standard, the prior art collectively teaches away from combining Magid and Chickering or at the very least discourages a POSA from combining them such that there is an inadequate motivation to combine. Magid focuses on safety features for a flat, uniplanar treadmill, while Chickering teaches a multiplanar flat design and criticizes reliance on safety devices. These fundamental differences would discourage a POSA from combining the references. Moreover, Magid's one-way bearing, designed to prevent Magid's two, parallel belts from moving in opposite directions during use, would serve no purpose in Chickering as its single belt necessarily can only move in one direction at a time. To the extent the Board credited Assault's hindsight-riddled arguments regarding a risk of falling when mounting or dismounting a treadmill, this is unsupported by the prior art. The only references to this problem are in the '884 Patent itself and Assault's arguments; the prior art says nothing of such risks. These are clear indicators that Assault's arguments were premised on hindsight bias, and as such, the Board's reliance on them is improper. With insufficient evidence of record to otherwise support the Board's findings, reversal is warranted.

The Board likewise erred in finding a motivation to combine Sclater with Chickering as required for all rejected claims. In particular, the Board's decision regarding Sclater again erroneously accepted and adopted arguments fraught with hindsight bias. Without impermissible hindsight, there is no incentive for a POSA to

20

select the specific clutch Assault plucked from Sclater over other options described as having the same benefits but lacking the elements required by the rejected claims. Sclater contains only generic statements about entire categories of devices, not specific teachings tied to the specific sprag-type clutch Assault identified in its petition. Yet Assault relies on these generic motivations to support its specific combination. Such generic motivations are insufficient to show obviousness and reflect impermissible hindsight bias, especially when used to carve out specific features from generic references to arrive at the claimed invention. *See, e.g.*, *In re NTP, Inc.*, 654 F.3d 1279, 1299 (Fed. Cir. 2011); *Purdue Pharma L.P. v. Depomed, Inc.*, 643 F. App'x 960, 966 (Fed. Cir. 2016). Assault's arguments were therefore meritless.

Perhaps recognizing this, Assault attempted to bolster its arguments by referencing a third-party catalog produced by Emerson to backfill the gaps in Sclater. But Emerson is neither a primary nor secondary reference, and even Assault's cherry-picked excerpts from Emerson generically referencing use in "exercise equipment" do not suggest that the specific sprag-type clutch from Sclater would be suitable for use with Chickering. Indeed, despite the fact that Assault withheld portions of Emerson that may have undermined its position, even the portions Assault submitted demonstrate that some of Emerson's sprag-type clutches were ***not*** considered suitable for exercise equipment. Again, Assault's arguments rely on

hindsight bias to fill in the gaps. Yet the Board overlooked these issues and sided with Assault after crediting its arguments. This is erroneous and warrants reversal.

Finally, the Board's decision should also be reversed or at least vacated because of clear errors in its findings regarding secondary considerations of nonobviousness. In its discussion of secondary considerations, the Board not only erred as a matter of law by applying the wrong legal standard regarding nexus, but it also improperly elevated attorney argument over actual evidence and disregarded unrebutted and corroborated evidence of commercial success and other secondary considerations. Under Federal Circuit precedent, a patent challenger must present evidence to rebut a presumption of nexus, not just argument. *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1329 (Fed. Cir. 2016). Here, Woodway provided expert testimony and documentary evidence demonstrating that its treadmills practice and are coextensive with the rejected claims, while Assault presented no evidence and instead relied solely on attorney argument that unclaimed features could account for some of Woodway's success. Yet despite Assault bearing and failing to meet the burden of providing actual evidence, the Board faulted Woodway for not proving the insignificance of the features referenced in Assault's unsupported arguments. The Board's reliance on attorney argument rather than evidence to rebut the presumption of nexus is improper.

These errors also permeated the Board's analysis of specific secondary considerations, such as commercial success. Under controlling law, when a patentee demonstrates commercial success and shows that the successful product is coextensive with the claimed invention, it is presumed that commercial success results from the patented invention. *Chemours Co. FC, LLC v. Daikin Indus.*, 4 F.4th 1370, 1378 (Fed. Cir. 2021). Woodway presented evidence of commercial success through fact witness testimony, sales data, and industry publications, and tied its products to the challenged claims (including the rejected claims) through detailed claim charts. In response, Assault did not offer any contrary evidence. Instead, it simply pointed to its laundry list of allegedly unclaimed features and attorney argument that those features **could have** contributed to commercial success and industry praise, without providing evidence that they actually **did**. Again, the Board credited Assault's speculation and attorney argument over Woodway's extensive evidence. This was error, and the Board's decision must be reversed.

## VI.   <u>ARGUMENT</u>

### A.   **Standard of Review**

"Obviousness is a question of law with underlying factual findings relating to the 'scope and content of the prior art, differences between the prior art and the claims at issue, the level of ordinary skill in the pertinent art, and any objective indicia of non-obviousness.'" *HTC Corp. v. Cellular Commc'ns Equip., LLC*, 877

F.3d 1361, 1369 (Fed. Cir. 2017) (quoting *Randall Mfg. v. Rea*, 733 F.3d 1355, 1362 (Fed. Cir. 2013)). This Court reviews the Board's ultimate determination of obviousness and any underlying conclusions of law *de novo*, while underlying factual determinations are reviewed for substantial evidence. *See Randall*, 733 F.3d at 1362. Substantial evidence is less than a preponderance of the evidence, but nevertheless requires "more than a mere scintilla" of evidence. *In re Mouttet*, 686 F.3d 1322, 1331 (Fed. Cir. 2012) (citing *In re Gartside*, 203 F.3d 1305, 1312 (Fed. Cir. 2000)). "The Court has emphasized that 'substantial evidence' review involves examination of the record as a whole, taking into account evidence that both justifies and detracts from an agency's decision." *Gartside*, 203 F.3d at 1312. "[T]he Board's opinion must explicate its factual conclusions, enabling [the Court] to verify readily whether those conclusions are indeed supported by 'substantial evidence' contained within the record." *Id.* at 1314.

In any IPR filed on or after November 13, 2018, the Board must apply the *Phillips* standard for claim construction, which requires that each claim be construed "in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent." 37 C.F.R. § 42.100(b); *see also Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*); *Immunex Corp. v. Sanofi-Aventis U.S. LLC*, 977 F.3d 1212, 1216 & n.2 (Fed. Cir. 2020). Like obviousness, this Court reviews the Board's

claim construction *de novo*, except for necessary underlying factual findings based on extrinsic evidence, which are reviewed for substantial evidence. *Acceleration Bay, LLC v. Activision Blizzard Inc.*, 908 F.3d 765, 769 (Fed. Cir. 2018); *In re Cuozzo Speed Techs., LLC*, 793 F.3d 1268, 1280 (Fed. Cir. 2015), *aff'd sub nom.*, *Cuozzo Speed Techs. v. Com. for Intell. Prop.*, 579 U.S. 261 (2016).

## B. The Board Erred in Concluding that Chickering Taught a "Curved Running Surface"

The Board's holding that the rejected claims are unpatentable as obvious over Chickering, Magid, and Sclater is erroneous at least because it relies on an incorrect finding that Chickering discloses a "running surface" that is at least partially "curved" as required by all rejected claims. As discussed below, this finding is predicated on an incorrect interpretation of the plain and ordinary meaning of the phrase "running surface" that is both unsupported by substantial evidence but is also contradicted by the only relevant evidence of record. Under the correct interpretation, Chickering plainly does not meet the relevant claim limitations.

### 1. The Board's Implicit Construction of "Running Surface" Is Erroneous and Unsupported by Substantial Evidence

#### a) The Board's conclusions contradict the parties' expert testimony

In the FWD, the Board concluded that the running surface need not be a portion of the running belt where a user is expected or intended to place their feet when running on the treadmill, subsequently relying on this finding to conclude that

it did not matter if the actual surface on which a user is expected or intended to run is curved. Appx37-38. This finding, however, is contradicted by all evidence of record that speaks to this issue.

The unrebutted testimony of the parties' experts on this point is illustrative. Here, Woodway's expert Dr. Kim Blair testified: "A POSA would understand a treadmill's 'running surface' to be a surface that a runner's feet would typically make contact when the user is running on the treadmill during normal use" and that, because "a runner's feet is not intended to contact" the belt at the area where the forward rollers meet the rearward rollers, that area is not part of the running surface. Appx4898-4899 at ¶¶90-92. Importantly, Assault's expert Dr. Robert Giachetti agreed, testifying at his deposition that "[t]he running surface is generally speaking the top of the treadmill where the user is expected to place their feet." Appx5068 at 33:8-10. Thus, **both** parties' experts agreed that what constitutes a "running surface" depends on whether the user is expected to contact the location with his feet when running on the treadmill normally.

Incredibly, despite the fact that Dr. Blair's testimony was corroborated by Assault's own expert, the Board criticized Dr. Blair's testimony as unsupported. Appx37-38. This criticism completely ignores that Dr. Giachetti's testimony provides express support for Dr. Blair's opinions, with Dr. Giachetti making clear that Dr. Blair's understanding was correct – a "running surface" is the surface that a

runner's feet are expect to make contact when running on the treadmill. Indeed, as Assault itself explained, Dr. Giachetti's opinions regarding why, in his view, Chickering meets the "curved running belt" claim limitation depend on his understanding that "[a] POSA [would] have understood [Chickering's disclosure of using a heavier belt in a single belt design] to teach that a user *would contact the curved area of the running surface*," *i.e.*, that a runner's feet would, in fact, contact the allegedly curved portion of the running belt, thus making it a curved running surface. Appx6293-6294 (citing Appx6344-6346 at ¶¶27-31). Dr. Blair's testimony did not lack support. Rather, Assault's own expert agreed with his testimony.

By concluding that the running surface need not be a portion of the running belt where a user is expected or intended to place their feet when running on the treadmill, the Board has effectively made and adopted a new argument on Assault's behalf regarding the plain and ordinary meaning of "running surface" that contradicts the understanding of both parties and is unsupported by the only evidence of record presented this issue, i.e., the testimony of each party's expert. That is, rather than address the parties' shared understanding based on relevant extrinsic evidence, the Board asserts that the intrinsic evidence's alleged *silence* on this issue is somehow "inconsistent with" the proffered expert testimony in order to justify its adoption of a completely different – and largely unarticulated – understanding of "running surface." *See* Appx37-38 (relying on the fact that Claim 30 and the '884

Patent specification do not expressly define the term "running surface" to justify rejection of Dr. Blair's testimony without articulating any alternative understanding of the plain and ordinary meaning). This is erroneous and clearly improper.

The Board's refusal to consider the expert testimony on the plain and ordinary meaning of "running surface" turns principles of claim construction on their head. As this Court has explained, "[w]hen the intrinsic evidence is silent as to the plain meaning of a term, it is entirely appropriate . . . to look to dictionaries or other extrinsic sources for context--to aid in arriving at the plain meaning of a claim term." *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1382 (Fed. Cir. 2008). Where such extrinsic evidence clearly supports one particular understanding, without any conflicting evidence, that understanding should control. *See id.*

Here, by the Board's own admission, the intrinsic evidence at issue – the claim language and the specification – does not speak to the meaning of "running surface." The referenced intrinsic evidence's silence as to how "running surface" should be understood is not a reason to disregard extrinsic evidence that provides the plain and ordinary meaning of the term. It is all the more reason for the only evidence that was provided – namely, the testimony from both parties' experts, who generally agreed that a "running surface" is the surface of the running belt that a runner's feet would typically make contact with when the user is running on the treadmill – to control. The Board erred in finding otherwise.

**b)**      **The Board improperly conflated different claim terms**

The Board's conclusion that Chickering teaches a "curved running surface" because one of its embodiments appears to depict a curve in the "running belt" is also erroneous because it improperly conflates two separate elements of the rejected claims – the running belt and the running surface.

The "running belt" and "running surface" are two separate elements in the rejected claims, and therefore cannot refer to the same structure. *Chi. Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*, 677 F.3d 1361, 1369 (Fed. Cir. 2012) (describing the "general presumption that different terms have different meanings"). Under the language of the rejected claims, it is the "running surface" that must be curved, not the "running belt." Appx108-109 at Claims 30, 37, 57. But the Board's analysis of the "running surface" limitation in its FWD found that Chickering disclosed a curved running surface because "endless belt 28 [i.e., the element identified as the "running belt"] is depicted as curved" in one of Chickering's figures and described elsewhere as following the contour of Chickering's rollers. Appx36; *see also* Appx278 ("Chickering discloses an '**<u>endless belt 28</u>**' ('*running belt*'). . . . As shown in Figure 3, the belt 28 is curved to match the positioning of the rollers 29.") (original emphasis). The Board offered no explanation as to why it conflated the "running belt" and "running surface" limitations. Indeed, its analysis demonstrates that it

treated the two elements as the same structural feature, which is improper and presents another clear error in its analysis.

### 2. Under the Correct Interpretation of "Running Surface," the Board's Conclusions Contradict Chickering

Under the correct ordinary meaning of "running surface" as supported by intrinsic evidence, the Board's unpatentability findings are clearly erroneous.

Chickering itself expressly teaches that a runner's foot would not contact the curved portion of the running belt when using the Chickering device. Appx3198, 2:50-58. Accordingly, under the correct understanding of a "running surface," Chickering cannot disclose a "curved running surface" as the only portion of the running belt that is even arguably curved is not a portion with which a user's feet are expected or intended to make contact.

The only "evidence" to the contrary is the *ipse dixit* of Dr. Giachetti to try and undo his previous admissions, which directly contradicts Chickering and, in any event, is properly disregarded. *TQ Delta, LLC v. Cisco Sys.*, 942 F.3d 1352, 1362-63 (Fed. Cir. 2019) (finding that *ipse dixit* testimony from an expert is inappropriate and properly disregarded). Indeed, the teachings Dr. Giachetti cites have no bearing whatsoever on whether a user's feet would contact the allegedly "curved" portion of the running belt in Chickering's one-belt design. Rather, they speak only of the potential desire for larger end rollers 29a and 29b—structures located at the far front and rear ends of the treadmill, respectively, and nowhere near the alleged curve—to

provide a larger turning radius for the belt. Appx3199 at 3:11-18. Such teachings provide no insight into how (if at all) a heavy belt would affect the shape of the running belt elsewhere nor into whether a user's feet would be expected to contact the running belt at any particular location.

Dr. Giachetti's testimony does not offer any explanation either, instead baldly stating that "[a] POSA would have understood this disclosure in Chickering teaches that a user could contact the curved area of the running surface" without any elaboration. Appx6346 at ¶31. Again, the cited portion of Chickering is completely unrelated to the shape of the running surface and says nothing about whether a user's feet would be expected to contact the belt at the point where it allegedly has a curve. The Board clearly erred in relying on this unsupported expert testimony, particularly where the only teachings in Chickering that actually speak to this issue make clear that the runner's feet do not contact the belt at the alleged curved location, meaning that under both experts' understanding that a "running surface" constitutes a surface that a user is expected to contact with his feet while using the treadmill, that location is not part of the running surface.

Chickering's teachings are clear and unambiguously state that a user's feet would not contact the allegedly curved portion of the running belt. Specifically, in Chickering's main, two-belt embodiment, the primary running surface (first tread surface 16a) is formed by placing endless belt 16 over "[a] first series of transverse

parallel rollers 13." Appx3198 at 2:13-16. A second running surface (second tread surface 25a) is formed by placing a second endless belt 25 over "[a] second series of transverse parallel rollers 18." Appx3198 at 2:17-20. Because rollers 13 and 18 are described as "series of . . . parallel rollers," a POSA would readily understand the rollers that support the two belts to form a pair of flat planar surfaces rather than a single curved surface. Appx4764-4765(citing Appx4893-4896at ¶¶80-85). Thus, Chickering's primary, dual-belt embodiment discloses a multi-planar, flat running surface, not a curved running surface as required by the claims, as can plainly be seen in Figure 2:



Appx4765 (citing Appx3197, Fig. 2, Fig. 1; Appx4895-4896, ¶¶85-86]). Notably, Chickering expressly teaches that a user's feet would not contact the point where the two tread surfaces meet because, during a user's normal running movement, "the

foot leaves surface 16a and may for a brief instant be out of contact with any surface"

before again making contact with surface 25a. Appx3198 at 2:50-58.

Chickering's alternative, one-belt design – which Assault (and the Board) primarily rely on for the improper claim construction – is configured the same way. Chickering teaches that, in this alternative embodiment, "the rollers are so disposed that the forward rollers lie approximately *in a plane slanting downwardly* from the front of the base, while the rear rollers lie approximately *in a plane slanting upward* toward the rear of the base 10." Appx3199 at 3:2-6 (emphasis added). Because the single endless belt 28 "follows" the planes of these rollers when it is "placed about the rollers" (Appx3199 at 3:6-8), Chickering's alternative, single-belt embodiment thus also discloses a multi-planar, flat running surface, not a curved running surface, as shown in Figure 3:



Appx4766 (citing Appx3197, Fig. 3; Appx4896-4898, ¶¶86-88).

Notably, apart from the use of a single belt rather than two belts, the running surface configuration is the same in both Chickering embodiments, as shown below:



Appx4768 (citing Appx3197, Fig. 2, Fig. 3; Appx4899-4900, ¶¶93-94). Therefore, just as a user's feet would not contact the point where surface 16a meets surface 25a in the first Chickering embodiment, the user's feet also would not contact the point where the upward-slanting plane meets the downward-slanting plane, *i.e.*, the point where the running belt is allegedly "curved." By extension, the purported "curved" portion of the running belt cannot constitute a curved "running surface" as required by the claims. There is no evidence whatsoever, let alone substantial evidence, to the contrary. Indeed, although the FWD references out-of-context testimony from Dr. Blair indicating that "the running belt would be bending in a very, very small curve at that point to follow those trajectories, the two planes" as supposed support for its conclusion that Chickering does disclose a curved running surface, Appx36-37 (quoting Appx6505 at 24:23-25), this is precisely the area that Chickering's own

teachings confirm cannot constitute a "running surface" at all. As Dr. Blair explained at length immediately after the cited testimony, Chickering teaches that a runner wants to and does in fact avoid contacting that area of the belt when using the treadmill, meaning that any "very, very small curve" does not and cannot constitute a curved running surface. Appx6505-6510; Appx6509 at 28:14-19 ("Q. ·Okay.·Do you consider the space, that small curve that's between these planes slanting upward and the planes slanting downwardly, to be a running surface? A.·Chickering teaches that the foot does not touch that area, so no.").

The Board's finding that Chickering discloses a "curved running surface" as required by all rejected claims therefore lacks substantial evidence. Accordingly, the Board's finding should be reversed.

**C.** **The Board Erred in Finding Motivations to Combine and/or Modify in the Challenged Ground**

**1.** **The Board Erred in Concluding that the Prior Art Did Not Teach Away from the Proposed Combination with Magid**

**a)** **The Board erred as a matter of law by applying the incorrect legal standard regarding teaching away**

"A reference may be said to teach away when a person of ordinary skill, upon reading the reference, would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken by the applicant." *DePuy*, 567 F.3d at 1327 (quoting *Ricoh Co., Ltd. v. Quanta Computer Inc.*, 550 F.3d 1325, 1332 (Fed. Cir. 2008)). A prior art reference teaches

away when it "criticize[s], discredit[s], or otherwise discourage[s] the claimed []

invention." *Fulton*, 391 F.3d at 1201. Even where a mere preference might not rise

to the level of "teaching away," it may nonetheless suffice to overcome a motivation

to combine. *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1070 (Fed. Cir.

2018).

Instead of applying the above precedent, the Board merely paid lip-service to

the standard before concluding that the clear differences between the references do

not matter because the specific teachings Woodway pointed to "do not concern the

modification proposed in the Petition." Appx41-42. That is, the Board disregarded

the express teachings in Magid that would have at a minimum discouraged a POSA

from combining it with Chickering because Assault did not rely on those teachings

for its proposed combinations. This is incorrect as a matter of law. Under this Court's

precedent, the Board may not disregard a teaching that would discourage the asserted

combination simply because the party challenging patentability does not rely on it.

*See, e.g.*, *Arctic Cat*, 876 F.3d at 1360 ("[T]he prior art could contain one reference

suggesting a combination and others critiquing or otherwise discouraging the same.

Even a single reference can include both types of statements, and . . . it is error to

fail to consider the entirety of the art."). Thus, the Board was required to consider

Magid for all it teaches, including all teachings that would discourage implementing

Magid's features in a curved, single-belt treadmill, even if some of those teachings were not identified in Assault's proposed combination in its IPR petition.

> **b)    The Board's conclusion that a POSA would have been motivated to combine Magid with Chickering was erroneous and unsupported by substantial evidence**

>> **i.    The prior art teaches away from the proposed combination**

Under the correct legal standard, the prior art plainly teaches away from using any features from Magid with anything other than a flat, uniplanar treadmill, thus precluding a POSA from being motivated to combine Magid with Chickering. As would be readily apparent to the Board's POSA, Magid and Chickering have fundamentally different purposes and designs that would have generally discouraged a POSA from combining them.

To begin, a POSA would have been discouraged from combining any features of Magid with Chickering given the different foci of the two references. Magid is focused on safety features whereas Chickering expressly criticized devices that required users to rely on such safety features like "handles, railings, belts, or the like, for maintaining his balance and his position[.]" Appx3198 at 1:40-47. A POSA would not look to Magid to identify a one-way bearing or other unidirectional control means that would be suitable for use in Chickering.

A closer look at Magid and Chickering does not lead to a different result, but rather, confirms that Magid and Chickering would not be compatible with each

other. Two differing design features are of particular importance: (1) whereas Magid teaches a design with two, parallel belts, the Chickering embodiment Assault and the Board relied on has only a single belt (*compare* Appx3190 at 1:46-52 & Appx3192 at 5:19-27 *with* Appx277-278 (citing Appx3197-3198 at 2:73-3:10, Fig. 3); *see also* Appx4939-4942 Appx4945); and (2) whereas Magid teaches a uniplanar treadmill, Chickering teaches a multiplanar treadmill (*compare, e.g.,* Appx3184-3189 (figures of Magid showing only uniplanar designs) *with, e.g.,* Appx3197 (figures of Chickering showing only multiplanar designs)). When the purposes of Magid's design features are taken into account, there is simply no reasonable motivation for a POSA to make the combination Assault proposed and the Board adopted.

Turing to the first difference, the different number of belts in the two references means that a POSA would immediately recognize that Magid's rachet-and-pawl device serves no parallel purpose in Chickering. Magid's rachet-and-pawl device is meant to prevent its two parallel belts from moving in opposite directions while the device is in use; that is, it is meant to further Magid's stated purpose of "preventing the action of the user's left foot from influencing the action of his right foot and vice-versa." Appx3192, 5:19-27. This is of critical importance in Magid because the disclosed device is meant for use by "people with uncoordinated feet movement, such as small children, physically handicapped people and old people . .

38

. .” Appx3190 at 1:30-35; Appx3192 at 5:52-55. As Dr. Blair explained, such people are at heightened risk of falling and injuring themselves if one of Magid's two walking belts moves in the opposite direction from that intended during use. Appx4952-4953, ¶¶188-189. Magid and its two-belt design therefore has a unique need for some kind of control means to prevent each belt from moving in the opposite direction while the other belt remains stationary or moves in the correct direction. Appx4953, ¶190. But the Chickering embodiment Assault relies on has only a single belt, meaning that this device would not serve its intended function if added to Chickering. Appx4940-4942, ¶¶175-176, Appx4945-4948, ¶¶180-183; *see also* Appx278-280 (citing Appx3198-3199 at 2:73-3:10 (describing Chickering embodiment with "a single endless belt")).

Chickering's disdain for safety features is also important given the alleged problem to be solved by incorporating a one-way bearing device, as identified by the Board, which is inextricably tied to the second major difference in design – Magid's uniplanar design versus Chickering's multiplanar design. Here, the Board found that "a POSA would have modified Chickering to include a safety device as taught by Magid in order to reduce the risk of a user falling." Appx40. That is, the Board found that Assault adequately showed that the problem to be solved – the risk of falling when mounting or dismounting a multiplanar or (allegedly) curved treadmill due to unexpected movement of the belt – provides the necessary motivation to combine.

39

This finding, however, is contrary to law and unsupported by substantial evidence in view of Chickering's rejection of any safety features.

As this Court has previously noted, "to the extent that [a petitioner] relies on the problem to be solved to supply the reason to combine the prior art," it must "demonstrate to the Board that the problem was known in the art or that [the petitioner's] formulation of the problem was derived directly from the prior art, rather than from the challenged claims." *See Purdue*, 643 F. App'x at 966. Failure to do so is indicative of impermissible hindsight bias. *See id.*

Here, Chickering and all of the other prior art identified by Assault say ***nothing*** about the risk of falling when mounting or dismounting a curved or multiplanar treadmill. Although Assault baldly states that "[i]t has long been recognized that users may be injured by falling off a treadmill while mounting or dismounting," (Appx281), none of the prior art Assault relies on even mentions a risk associated with mounting or dismounting a curved or multiplanar treadmill or even a treadmill generally. For example, although Assault and its expert cited to references like Socwell for the premise that falls are a risk with treadmills, Socwell specifically discusses the risk of falling off the back of a treadmill while using it, not with any risks associated with mounting or dismounting. Appx3170 at 2:45-48, 3:40-45; *see also* Appx281 (citing the foregoing). Similarly, Chickering is focused on the risk of a user losing his balance while using the treadmill, and particularly with the

40

risk that the user will be carried towards the rear of the belt and fall off without any reference to mounting or dismounting. Appx3198 at 1:30-36; *see also* Appx281 (citing the foregoing). Likewise, the supposed background references Assault cites to discuss the state of the art or otherwise to support its motivation to combine arguments are similarly silent on this issue. Even the safety standards Assault cites say nothing about preventing bidirectional movement of the belt, instead requiring the use of structures like handrails and footrails to help a user maintain their balance generally. Appx3337-3343, Appx3344-3361, Appx3112-3131; *see also* Appx281-282 (citing the foregoing). In short, the prior art cited by Assault provides no teachings from which a POSA could derive the supposed problem to be solved, *i.e.*, any risk of a user falling off a curved or multiplanar treadmill when mounting or dismounting.

Rather, the only places that identify any concerns about falling when mounting or dismounting a treadmill are in the '884 Patent itself (*see, e.g.,* Appx103-104 at 26:63-27:10) and in Assault's attorney argument, the latter of which finds support only in the *ipse dixit* testimony of Assault's expert (*e.g.,* Appx281-282 (citing only irrelevant disclosures in Socwell and Chickering and the Giachetti Declaration). This is not enough to establish that a POSA would have even recognized a problem to be solved in Chickering or any of the other prior art that would have motivated a POSA to add Magid's rachet-and-pawl device.

Woodway explained the above points to the Board during the proceedings below. *See, e.g.,* Appx4795-4800. Without any meaningful explanation, however, the Board rejected them. Appx39-40. Instead, it effectively adopted Assault's threadbare arguments, which were premised not on the prior art or other actual evidence, but instead the *ipse dixit* of Assault's retained expert, Dr. Giachetti. This is improper and warrants reversal.

### ii. Even if Magid does not rise to the level of teaching away, there is still no motivation to combine

As Woodway explained in the papers below, even if the statements in the prior art do not rise to the level of teaching away from combining Magid with Chickering, "[a]t the very least, a reader of Magid would be discouraged from combining it with elements of Chickering . . . ." Appx4799. Such statements are not only "relevant to a finding regarding whether a skilled artisan would be motivated to combine" Magid and Chickering but also directly contradict the Board's finding that such a motivation exists. *Rembrandt Wireless Techs., LP v. Samsung Elecs. Co.*, 853 F.3d 1370, 1380 (Fed. Cir. 2017) (quoting *Apple Inc. v. Samsung Elecs. Co., Ltd.*, 839 F.3d 1034, 1051 n.15 (Fed. Cir. 2016)); *see also Polaris*, 882 F.3d at 1070.

### iii. The prior art does not support a finding of motivation to combine

Collectively, all of these facts indicate that the prior art teaches away from, or at least discourages, combining Magid with Chickering. Although the Board

concluded that it was "persuaded by Petitioner and Dr. Giachetti's testimony that a POSA would have combined the manual curved treadmill disclosed in Chickering with the known technique of a one-way clutch to prevent belt motion in a forward direction as disclosed in Magid in order to prevent a user from falling off the treadmill while mounting or dismounting," (Appx43), this finding is directly contradicted by the teachings of both Chickering and Magid.

Neither Chickering nor any of the other prior art Assault relied on in the proceedings below disclose any concerns regarding the running belt moving in a forward direction when a user mounts or dismounts a treadmill, regardless of whether that treadmill is curved or not. In fact, Chickering itself criticizes the inclusion of any kind of safety features that would help a user maintain his balance at any point during use of the treadmill, including presumably mounting and dismounting. *See* Appx3198 at 1:40-47. The Board completely disregarded this teaching when nonetheless finding that a POSA would have been motivated to add a safety feature from a completely different type of device to address a supposed concern that Chickering disavowed or at least consciously ignored. Likewise, Magid's teachings and focus overall would discourage a POSA from attempting to implement any of its features in a curved or multiplanar treadmill in the first place. Accordingly, the Board erred in concluding that a POSA would be motivated to combine Magid and Chickering as required for all claims found unpatentable.

Moreover, with the Board's actual findings regarding motivation to combine clearly being erroneous, all Assault is left with is the argument that a POSA would have looked at Chickering and Magid, ignored their respective teachings that discourage their combination, and combined them anyway simply because both references are in the same general field of endeavor – *i.e.*, arguably in the broad field of "exercise equipment." *See* Appx6301-6303. This, however, is insufficient as a matter of law.

The Board itself has explained that simply being in the same field of endeavor cannot establish motivation to combine. *See Johns Manville Corp. v. Knauf Insulation, Inc.*, IPR2018-00827, Paper 9, 10 (PTAB Oct. 16, 2018) (informative) ("Demonstrating that a reference is analogous art or relevant to the field of endeavor of the challenged patent is not sufficient to establish that one of ordinary skill would have had reason to combine its teachings with other prior art in the manner set forth in the claim."). Moreover, "[m]ere compatibility of the references is likewise not sufficient." *Id.* This Court has consistently reached the same conclusion. *E.g., Securus Techs., Inc. v. Glob. Tel\*Link Corp.*, 701 F. App'x 971, 977 (Fed. Cir. 2017) ("[A] broad characterization of Susen and Gainsboro as both falling within the same alleged field of 'tele-communications monitoring and control,' without more, is not enough for Securus to meet its burden of presenting a sufficient rationale to support an obviousness conclusion."); *Microsoft Corp. v. Enfish, LLC*, 662 F. App'x 981,

990 (Fed. Cir. 2016) (affirming that petitioner "did not articulate a sufficient motivation to combine" where the petitioner "gave no reason for the motivation of a person of ordinary skill to combine [the two references] except that the references were directed to the same art or same techniques"); *Comcast Cable Commc'ns, LLC v. Promptu Sys. Corp.*, 838 F. App'x 555, 557 (Fed. Cir. 2021) (upholding Board's decision that petitioner "had not proven a motivation to combine because it merely (1) alleged the references came from the same field of study and address the same problem; and (2) recited boilerplate legal conclusions untethered to any claim language.").

Thus, there is no basis for finding motivation to combine in this case. Accordingly, outright reversal is warranted as there are no viable arguments and evidence regarding motivation to combine to be considered on remand.

### 2. The Board Erred in Finding a Motivation to Combine Sclater with the Other Prior Art Based on Assault's Hindsight Bias-Tainted Arguments

The Board's decision is also erroneous because it accepted and adopted arguments presented by Assault that were fraught with improper hindsight bias.

Hindsight bias is apparent, *inter alia*, where motivation to combine arguments "primarily consisted of conclusory references to [the] belief that one of ordinary skill in the art *could* combine these references, not that they would have been motivated to do so." *InTouch Techs., Inc. v. VGO Commc'ns, Inc.*, 751 F.3d 1327, 1352 (Fed.

Cir. 2014) (original emphasis). As a rule, a tribunal like the Board "cannot allow hindsight bias to be the thread that stitches together prior art patches into something that is the claimed invention." *Metalcraft of Mayville, Inc. v. The Toro Co.*, 848 F.3d 1358, 1367 (Fed. Cir. 2017). Yet that is precisely what the Board did here in accepting Assault's arguments regarding motivation to combine and in finding the rejected claims unpatentable as obvious.

This is particularly evident with respect to Sclater. Sclater does not provide any incentive to select the specific clutch Assault utilizes over any of the dozens of other options that Sclater describes as having the same benefits. Both this Court and the Board have long recognized that the kind of generic "motivations" Assault proposes are insufficient and reflective of impermissible hindsight bias, particularly where they are used to carve out specific features from generic references to arrive at the claimed invention. *See, e.g., NTP*, 654 F.3d at 1299 ("Given any network, we could likely carve out a possible 'interface' and combine it with Harrison to hold that the addition of a RF information transmission network would have been obvious. This type of piecemeal analysis is precisely the kind of hindsight that the Board must not engage in."); *Purdue Pharma*, 643 F. App'x at 966 ("Here, the Board found that Purdue failed to sufficiently show that a skilled artisan would have had a reason to combine the teachings of Baveja and Shell to achieve the claimed invention. . . . Its expert opined generally on the interrelated teachings of those

46

references, but did not explain in sufficient detail how or why a skilled artisan would have been motivated to combine the 'swelling' and 'substantially intact' features of the Shell formulation with the Baveja formulation to attain the claimed dosage form."); *Amazon.com, Inc. v. JumpSport, Inc.*, IPR2018-00715, Paper 8 at 38-39 (PTAB Sept. 6, 2018) (rejecting motivation to combine argument given, *inter alia*, "the lack of any discussion of the advantages – if any – of the particular portion of the Katzman design used by Petitioner," which indicated improper hindsight); *see also Duo Security Inc. v. StrikeForce Techs., Inc.*, IPR2017-01064, Paper 7 at 24-25 (PTAB Oct. 16, 2017) ("Petitioner's vague assertions do not substantiate a reason that would have prompted [a POSA] to combine the specific relevant *element* or *teaching* of [the secondary reference] . . . with [the primary references] to achieve the invention recited in the challenged claims.") (original emphasis).

Sclater contains, at most, generic statements about the general applicability of various devices, not any teachings that can be tied directly to the specific sprag-type clutch Assault selected. Generic statements like those Assault relies on cannot support a motivation to combine when they are not specifically tied to the clutch Assault argues should be incorporated into the primary reference devices. *See Purdue Pharma*, 643 F. App'x at 964-66 (agreeing that "generic and conclusory statements of interrelated teachings of the prior art" cannot support a finding of motivation to combine).

The Board's conclusions regarding Sclater overlook the fact that Assault did not argue generally that a sprag-type clutch should be added to Chickering. Rather, Assault argued that a POSA would have been motivated to add "the" *specific* sprag-type clutch shown in a particular figure of Sclater to Chickering. Appx285-286 (referring to "the sprag-type one-way bearing assembly" of Sclater and its specific structure). Indeed, Assault specifically needed that particular disclosure because it relied on certain of the features shown in the figure to meet the "rotatable element" limitations found in claims 30, 37, 50, and 57, *i.e.*, all of the challenged independent claims. Appx285-286; *see also* Appx248-249 (providing claim language and same analysis for Ground 1).

But Assault's arguments regarding why a POSA would have allegedly looked to the Sclater clutch in the first place are completely divorced from that particular device. Instead, Assault attempted to justify this reliance by arguing that Emerson – a third party catalog that Assault did not rely on as a primary or secondary reference in any ground of the petition – provides a motivation to select the specific sprag-type clutch from Sclater, at least in part because Emerson teaches that certain of the sprag-type clutches disclosed in the catalog may be suitable for use generically in "exercise equipment." *See* Appx252-253; Appx6305-6306. Despite being effectively adopted by the Board (*see, e.g.,* Appx44 (citing Emerson)), those arguments are not credible.

Assault did not rely on Emerson for the "rotatable element" limitations in any of the rejected claims, nor could it as Emerson does not disclose the structural features that Assault needed to recreate the claim limitations for purposes of its petition. Thus, Assault's attempts to attribute the teachings of Sclater to Emerson and vice-versa is perhaps the clearest demonstration of the hindsight bias that permeates Assault's arguments regarding Sclater. Assault had the language of the claims it intended to challenge available to it and used that language to identify a structure – the specific sprag-type clutch of Sclater – that it knew met certain structural limitations, but it needed to come up with a reason why a POSA would select that specific device.

A generous reading of Sclater may provide some generic teachings that could be construed to apply to the specific clutch Assault wanted to use. However, it did not provide the necessary specifics. So, instead, Assault turned to Emerson. But while Emerson's disclosures might conceivably have offered some motivation to use the sprag-type clutches disclosed *in Emerson* in generic "exercise equipment," it does not follow that a POSA would have understood that the sprag-type clutch of Sclater – a separate reference that is not referenced in Emerson – would be suitable for such a use. Indeed, Emerson discloses multiple *series* of sprag-type clutches, at least one of which is *not* described as being suitable for use in exercise equipment. *See* Appx3312 (describing "Conveyor Backstop Clutches" as suitable for use as in

belt conveyors, bucket elevators, conveyors, low rpm head-shafts, and inclined conveyors, but not in exercise equipment). It is likely that various other clutches described in the original Emerson catalog similarly were not suitable for use in exercise equipment, as well. However, it is impossible to know for sure because Assault chose to submit only 39 of Emerson's at least 128 total pages, as indicated by its table of contents, to the Board. *See generally* Appx3298-3336; *see also* Appx3299.

Notably, Emerson's descriptions of uses for the clutches in its M Series (pages 14-27), MZEU Series (pages 28-32), B Series (page 56-59), PB Series (pages 60-61), HT Series (pages 62-63), and BR Series (pages 64-71) were completely omitted from the exhibit submitted by Assault. *See generally* Appx3298-3336. All of these appear to be sprag-type clutches based on the more limited disclosure available on pages 4-7 of Emerson. Appx3299-3306. Presumably, had these clutches been described as suitable for use in exercise equipment, Assault would have included them in its exhibit. It did not. Yet, even the cherry-picked portions of Emerson that Assault did include acknowledged at least one series of sprag-type clutches that was not specifically suitable for use in exercise equipment – the "Conveyor Backstop Clutches." At a minimum, this would have alerted a POSA to the fact that that not all sprag-type clutches are interchangeable and significantly tempered any

motivation to select a completely different sprag-type clutch, such as the one disclosed in Sclater and relied on by Assault, for any particular use.

Importantly, Sclater itself confirms that not all sprag-type clutches are suitable for all uses. Sclater provides a list of factors that one would be "require[d]" to review before selecting a sprag-type clutch for a specific use:

> Overrunning sprag clutches transmit torque in one direction and reduce speed, rest, hold, or free-wheel in the reverse direction. Applications include overrunning, back stopping and indexing. ***Their selection – similar to other mechanical devices – requires a review of the torque to be transmitted, overrunning speed, type of lubrication, mounting characteristics, environmental conditions, and shock conditions that might be encountered***.

Appx3285 (emphasis added).

Yet, as Woodway pointed out in the proceedings below none of Assault's arguments nor any of the expert opinions it relies on for purposes of motivation to combine analyze these factors in connection with the sprag-type clutch they propose to combine with Chickering. *See* Appx4807-4809. Instead, Assault and Dr. Giachetti relied entirely on generic statements directed to an entire class of clutches and did not implicate any of the "require[d]" factors described elsewhere in Sclater. *See* Appx288-292; Appx3079-3084. These cannot support a motivation to combine when they are not specifically tied to the clutch Assault relied on. *See Purdue*, 643 F. App'x at 964-66 (agreeing that "generic and conclusory statements of interrelated teachings of the prior art" cannot support a finding of motivation to combine).

Despite the substantial problems with Assault's motivation to combine arguments, the Board did little more than pay lip service to the concept of hindsight bias before (incorrectly) rejecting Woodway's substantial evidence and related argument as "unpersuasive because they are rigidly focused on the alleged lack of a sufficiently particular disclosure of motivation in Sclater, without taking full account of an ordinarily skilled artisan's 'knowledge, creativity, and common sense.'" Appx43-46 (quoting *Randall Mfg. v. Rea*, 733 F.3d 1355, 1362 (Fed. Cir. 2013)). This is incorrect and, respectfully, completely misses the point. The Board improperly disregarded the fact that Assault's motivation to combine positions with respect to Sclater are impermissible under the precedent of this Court and more generally improper because of their lack of specificity and clear reliance on hindsight bias to work backwards from the claim language to then cobble together nonspecific teachings from the prior art. Because the Board's finding that the rejected claims are obvious over Chickering, Magid, and Sclater necessarily depends on this erroneous conclusion, the holding that the rejected claims are not patentable should be reversed.

### 3. The Board's Analysis Regarding Magid and Sclater Is Inconsistent with its Correct and Well-Reasoned Findings Regarding Lack of Motivation to Combine Schonenberger and Socwell

In contrast to its erroneous findings as to Magid and Sclater, the Board did correctly apply the law on motivation to combine when it recognized that other

modifications proposed by Assault in Grounds 1-3 were not supported by an adequate motivation. For example, with respect to Grounds 1-3, which collectively challenged the patentability of independent claims 30, 37, 50, and 57, as well as certain claims depending therefrom, based on a combination of Schonenberger, Socwell, Magid, Sclater and (as to Ground 2 only) Skowronski, the Board rejected Assault's arguments for failure to show an adequate motivation to combine. Appx14, Appx23-29. In doing so, it correctly found that Assault had "not met its burden of showing that a POSA would have modified Schönenberger's brackets 19 and rollers 12, 12' so that movable surface 1 follows a curved running surface as taught by Socwell," because Assault and its expert both failed to explain how a POSA would account for and modify Schonenberger's closely-spaced, rigid slats to form a curved running surface instead of the flat surface taught in Schonenberger, as was required for every claim of all three grounds. Appx25-29.

**D. The Evidence of Secondary Considerations, Including the Presumption of Nexus and Unrebutted Evidence of Commercial Success, Outweighs any Evidence of Obviousness**

The Board erred in concluding that Woodway was not entitled to a presumption of nexus because "[Woodway's] evidence does not sufficiently establish that the different models of its curved manual treadmills are coextensive with the claims of the '884 patent." Appx51. As discussed in further detail below, this finding was based on significant erroneous understandings of law and resultant

erroneous findings of fact. Under controlling law, Woodway was plainly entitled to a presumption of nexus based on the evidence presented, and Assault's arguments to the contrary, based entirely on speculation and unsupported attorney argument, were insufficient to rebut that presumption.

### 1. The Board Erred as a Matter of Law by Applying the Incorrect Legal Standard Regarding the Presumption of Nexus

The Board's finding that there can be no presumption of nexus in this case because of the presence of alleged unclaimed features relies on an erroneous understanding of law. In particular, the Board's understanding of *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366 (Fed. Cir. 2019), which the Board relied on to conclude that a presumption of nexus did not apply, is erroneous and inconsistent with Federal Circuit precedent regarding application of that case.

The Board appears to interpret *Fox Factory* as standing for the proposition that there can be no presumption of nexus where there are ***any*** unclaimed features that ***could*** materially affect the functionality of the allegedly coextensive device. *See* Appx49-50 (discussing *Fox Factory*). However, this Court's decisions after *Fox Factory* have explained, there is no "bright-line rule that the presumption of nexus does not apply if any unclaimed feature materially affects the functioning of a product that is alleged to be coextensive," and the Board's previous efforts to announce such a rule were erroneous. *Teva Pharms. Int'l GmbH v. Eli Lilly & Co.*,

8 F.4th 1349, 1361 (Fed. Cir. 2021). The reasons for this are simple and pragmatic; "under such a rule the presumption of nexus would rarely, if ever, attach because virtually every innovative product inevitably has some unclaimed feature that materially affects its functionality. Such a rule would be unsound." *Id.* Rather, "[t]he presumption analysis requires the fact finder to consider the unclaimed features of the stated products *to determine their level of significance and their impact on the correspondence between the claim and the products*." *Id.* (emphasis added). This is also consistent with *Fox Factory*'s acknowledgement that the Federal Circuit has "never held that the existence of one or more unclaimed features, standing alone, means nexus may not be presumed." *Fox Factory*, 944 F.3d at 1374.

Notably, the requisite level of significance for the presumption of nexus not to apply is quite high. In *Fox Factory*, the Federal Circuit's findings were predicated on "the patentee's own assertions about the significance of the unclaimed features," including the patentee's assertion in other proceedings that unclaimed features were "critical" to the functionality of the product, in view of which "no reasonable fact finder could conclude that these features are insignificant." *Id.* at 1375. That is, the Federal Circuit concluded that a "patent claim is not coextensive with a product that includes a '*critical*' unclaimed feature that is claimed by a different patent and that materially impacts the product's functionality . . . .'" *Id.* (internal citations omitted, emphasis added). By extension, where the significance of the unclaimed feature is

not "critical" to the functionality of the device at issue, the presence of that feature is not enough to overcome the render a presumption of nexus inappropriate.

Accordingly, the Board here was required to conduct and provide a ***factual*** analysis of the unclaimed features and conclude that at least one unclaimed feature actually affects the functionality of the device with critical significance. However, it provided no such analysis. The Board simply repeats Assault's laundry list of purported unclaimed features without ever explaining how or why those features supposedly have the requisite critical level of significance on functionality needed to find that no presumption of nexus applies.[3] Appx50-51. This is erroneous under controlling law, and the Board's finding relying on this erroneous understanding of law must be reversed.

### 2. The Board Made Erroneous Factual Findings That Improperly Elevated Attorney Argument Over Unrebutted Evidence

To the extent the Board's findings regarding the presumption of nexus are found to be directed to the critical significance of unclaimed features on the functionality of the CURVE® treadmills – as discussed, they are not – the

---

[3] Although the Board identified some purported functionality associated with the "less steep curve" in the Curve Trainer and "an onboard generators system" in the EcoMill and EcoMill Legacy, it never explained the alleged significance of these features on the overall functionality of the device, let alone provided sufficient facts to show that those features had critical significance. Appx50-51.

underlying factual findings are also erroneous, particularly because they are not based on any evidence of record.

Previous Federal Circuit holdings regarding rebutting the presumption of nexus are instructive. It is well established that "a patent challenger cannot successfully rebut the presumption [of nexus] with argument alone—it must present evidence." *WBIP*, 829 F.3d at 1329; *see also Polaris*, 882 F.3d at 1072. Importantly, this principle extends not only to rebuttal of the presumption of nexus but the establishment of the presumption in the first instance. In *Polaris*, for example, the Federal Circuit cited the foregoing holding in *WBIP* before concluding that "the Board erred in failing to credit Polaris's undisputed evidence that its [commercial products] embody and are coextensive with [the challenged claims]." 882 F.3d at 1072. There, patent owner Polaris submitted a declaration from a technical expert who testified that he reviewed and compared the claims of the challenged patent and relevant commercial products and determined that several of the commercial products embodied each and every element of certain challenged claims, while petitioner Arctic Cat "presented no contrary evidence." *Id.* at 1073. Although the Board rejected the technical expert's testimony as mere "conclusory statements," the Federal Circuit found this decision to be error. *Id.* Importantly, the Federal Circuit went on to explain that its precedent "does not require a patentee and its expert to go further than Polaris did here . . . to demonstrate that its commercial products are the

inventions disclosed in the challenged claims, where the proffered evidence is not rebutted and the technology is relatively simple." *Id.*

The Board's FWD here is erroneous for the same reasons. There is no dispute that Woodway presented expert testimony, including detailed claim charts, from Dr. Blair along with other evidence to demonstrate that its CURVE® treadmills practice and are coextensive with the challenged claims. *See* Appx4813-4825; Appx4971-4975, ¶¶226-228; Appx5178-5251. There is also no dispute that Assault never presented any evidence to rebut this evidence or otherwise challenge that the CURVE® treadmills actually do practice and are coextensive with the challenged claims. *See* Appx6309 (for purposes of nexus, arguing only that the "safety device" limitations were allegedly found in the prior art). Instead, Assault simply provided attorney argument – entirely within the context of commercial success – that other unclaimed features "***could*** account for" some of [Woodway's] sales, all while failing to identify any evidence to support those arguments or propel it beyond the realm of speculation. Appx6316 (emphasis added). Yet, despite the fact that argument alone cannot undermine a finding of nexus – only evidence can (*Polaris*, 882 F.3d at 1072) – the Board incredibly faulted ***Woodway*** for failing to prove "why these features are ***insignificant***." Appx51. This was not Woodway's burden to meet; rather, the onus was on Assault to present evidence – not mere attorney argument – to rebut Woodway's presumption of nexus. The Board's holding to the contrary and its

reliance on unsupported attorney argument and speculation over Woodway's actual evidence is clearly erroneous.

Again, the FWD's misapplication of *Fox Factory* does not compel a different result. The Federal Circuit in *Fox Factory* never found that the mere identification of unclaimed features coupled with a bald assertion by the party challenging patentability was sufficient to render the presumption of nexus inapplicable. Rather, consistent with *Polaris*, *Fox Factory*'s finding that the presumption of nexus did not apply was based on evidence, namely the patentee's own admissions as an opposing party in the IPR regarding the key features of the commercial products at issue. *Fox Factory*, 944 F.3d at 1375; *see also* Fed. R. Evid. 801(d)(2)(B) (permitting evidence in the form of opposing party statements that the party "manifested that it adopted or believed to be true"). As noted above, there is no comparable evidence here. Woodway has never made any statements to suggest that any unclaimed features of its CURVE® treadmills are of critical significance to their functionality, nor has Assault presented any other evidence to support that idea. *Fox Factory* does not justify the Board's factual findings.

Woodway's showing of nexus was unrebutted by any evidence, and Assault challenged it solely through attorney argument. The fact that the Board credited that argument over actual evidence of record in reaching its factual findings constitutes error and warrants reversal.

### 3. The Board Erred by Improperly Disregarding Unrebutted and Corroborated Evidence of Nonobviousness

Largely because of the foregoing errors of fact and law, the Board misapprehended or overlooked Woodway's evidence of individual secondary considerations of nonobviousness.

The Board's treatment of Woodway's unrebutted evidence of commercial success is instructive. Under controlling law, "[w]hen a patentee can demonstrate commercial success, usually shown by significant sales in a relevant market, and that the successful product is the invention disclosed and claimed in the patent, ***it is presumed that the commercial success is due to the patented invention***." *Chemours*, 4 F.4th at 1378 (citing *J.T. Eaton & Co. v. Atl. Paste & Glue Co.*, 106 F.3d 1563, 1571 (Fed. Cir. 1997) & *WBIP*, 829 F.3d at 1329) (emphasis added)).

Here, Woodway presented evidence of commercial success in the form of witness testimony, CURVE® treadmill sales data, and information about the size of the market for curved manual treadmills, which Assault never rebutted with contrary evidence of its own. Appx4825-4827 (citing Appx5005-5013 at ¶¶17-41; Appx5491; Appx5492-5494); Appx6911-6914. However, because it erroneously concluded that the presumption of nexus did not apply, the Board never applied the corollary presumption that commercial success is tied to the patented invention and thus never actually reached whether this evidence demonstrated commercial success. *See* Appx52-53 (finding no direct nexus between Woodway's evidence of

commercial success and the claimed invention without discussing whether evidence otherwise demonstrated commercial success). The Board's threadbare analysis of several other secondary considerations of nonobviousness were similarly deficient and focused improperly on whether there was a direct nexus between individual claim limitations rather than the CURVE® treadmills as a whole, without ever meaningfully engaging with whether the evidence itself showed the presence of the relevant indicia of nonobviousness. Appx53-56 (repeatedly referring to the "safety device" limitation in isolation).

The Board therefore misapprehended or overlooked important evidence of secondary considerations of nonobviousness. The Board found certain challenged claims (i.e., the rejected claims) unpatentable as obvious (Appx7-58; Appx61-62), thus rendering secondary considerations of nonobviousness necessarily relevant and important. *WBIP*, 829 F.3d at 1328 ("A determination of whether a patent claim is invalid as obvious under § 103 requires consideration of all four *Graham* factors, and it is error to reach a conclusion of obviousness until all those factors are considered. . . . Indeed, we have repeatedly stressed that objective considerations of non-obviousness must be considered in *every* case."). As noted above, however, the Board credited Assault's mere identification of alleged unclaimed features and bald attorney argument and speculation that those features led to the commercial success of and industry praise directed to the CURVE® line of treadmills over Woodway's

evidence of record – evidence that included extensive expert and fact testimony, detailed claim charts, sales data, and industry publications – to conclude that there were no relevant secondary considerations. This is error.

Because the Board incorrectly found no presumption of nexus, it incorrectly concluded that there was no nexus between the unrebutted secondary considerations evidence offered by Woodway. By extension, the Board's FWD must be reversed in view of the Board's error in misapprehending and overlooking material evidence.

## VII. <u>CONCLUSION</u>

Woodway respectfully asks this Court to reverse the Board's decision finding claims 30-34, 37-39, 41, 45-49, 57, and 59 of U.S. Patent No. 10,561,884 unpatentable as obvious.

Dated: April 7, 2025

Respectfully submitted,

*/s/Kadie M. Jelenchick*

Kadie M. Jelenchick
Sarah E. Rieger
FOLEY & LARDNER LLP
777 East Wisconsin Avenue
Milwaukee, Wisconsin 53202-5306
(414) 271-2400
kjelenchick@foley.com
srieger@foley.com

Jack T. Carroll
FOLEY & LARDNER LLP
150 E Gilman St, Suite 5000
Madison, WI 53703-1482
(608) 257-5035
jcarroll@foley.com

*Attorneys for Appellant*
*Woodway USA, Inc.*

# ADDENDUM

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

LIFECORE FITNESS, LLC d/b/a ASSAULT FITNESS,
Petitioner,

v.

WOODWAY USA, INC.,
Patent Owner.

IPR2023-00843
Patent 10,561,884 B2

Before MEREDITH C. PETRAVICK, NEIL T. POWELL, and
AMEE A. SHAH, *Administrative Patent Judges.*

PETRAVICK, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining Some Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

## I.    INTRODUCTION

*A.  Background and Summary*

LifeCore Fitness, LLC d/b/a Assault Fitness ("Petitioner") filed a
Petition requesting *inter partes* review of claims 30–34, 37–54, 57, and 59 of
U.S. Patent No. 10,561,884 B2 (Ex. 1001, "the '884 patent").  Paper 2

("Pet."). Woodway USA, Inc. ("Patent Owner") filed a Preliminary Response. Paper 5. On October 24, 2023, we instituted this *inter partes* review as to all challenged claims and all grounds presented in the Petition. Paper 6 ("Institution Decision" or "Inst. Dec.").

After institution, Patent Owner filed a Response to the Petition. Paper 17[1] ("PO Resp."). Petitioner filed a Reply. Paper 25 ("Pet. Reply"). Patent Owner filed a Sur-reply. Paper 29 ("PO Sur-reply"). An oral hearing was held on July 24, 2024 and the transcript is entered into the record. Paper 43 ("Tr").

We have jurisdiction under 35 U.S.C. § 6. This is a Final Written Decision under 35 U.S.C. § 318(a) as to the patentability of the challenged claims of the '884 patent. For the reasons discussed below, we determine that Petitioner has established by a preponderance of the evidence that claims 30–34, 37–39, 41, 45–49, 57, and 59 are unpatentable and has failed to establish by a preponderance of the evidence that claims 40, 42–45, and 50–54 are unpatentable.

## B. Real Parties in Interest

Petitioner identifies LifeCore Fitness, LLC d/b/a Assault Fitness as the real party in interest. Paper 22, 1.

Patent Owner identifies Woodway USA, Inc. as the real party in interest. Paper 4, 1.

---

[1] The record contains sealed and redacted versions for several papers. We refer to the redacted papers in this decision.

C. *Related Matters*

The parties identify the following related court proceedings:

*Woodway USA, Inc., v. LifeCore Fitness, Inc. d/b/a Assault Fitness,* Case No. 3:22-cv-00492 (S.D. Cal.) ("the District Court Litigation"),

*Woodway USA, Inc. v. Samsara Fitness, LLC et al.*, Case No. 2:15-cv-00956 (DWI), and

*Chapco, Inc. et al v. Woodway USA, Inc.*, Case No. 3:15-cv-01665 (DCT).

Pet. vi; Paper 4, 1.

This proceeding is related to the following *inter partes* reviews: IPR2023-00836 (U.S. Patent No. 9,039,580 B1), IPR2023-00849 (U.S. Patent No. 10,799,745 B2), and IPR2024-00083 (U.S. Patent No. 11,465,005).

D. *The '884 Patent*

The '884 patent is titled "Manual Treadmill and Methods of Operating the Same" and issued on February, 18, 2020. Ex. 1001, code (45), (54).

The '884 patent depicts manual treadmill 10 in Figure 1, which is reproduced below.



FIG. 1

Figure 1 shows manual treadmill 10, having a handrail 14 mounted on a base 12, which supports running belt 16. *Id.* at 4:50–54. Running belt 16 has a non-planar, curved running surface 70. *Id.* at 6:64–66. As the user runs, running belt 16 generally moves rearward or clockwise. *Id.* at 6:66–7:1, 29:5–6.

Figure 2 of the '884 patent is reproduced below.



FIG. 2

Figure 2 depicts an embodiment of base 12, having a frame 40, front shaft assembly 44 and rear shaft assembly 46. *Id.* at 3:40–42, 5:12–17. Rear shaft assembly 46 has running belt pulleys 66 fixed to rear shaft 68. *Id.* at 5:37–39. Attached to frame 40 are bearing rails 200.

Figure 9 of the '884 patent is reproduced below.



FIG. 9

Figure 9 depicts bearing rail 200. *Id.* at 3:26–27. Bearing rail 200 includes a plurality of bearings 208 and has top profile 210, which is shaped as a complex curve in this embodiment. *Id.* at 11:20–23. However, the shape of

the top profile can have variations and may not have an entirely smooth contour. *Id.* at 12:12–18, Figs. *7a–7j.*

Forward rotation of running belt 16 is undesirable because it could cause a user to lose their footing, resulting in injury. *Id.* at 27:4–10. Manual treadmill 10, thus, may include safety devices to prevent forward rotation. *Id.* at 27:11–13. One safety device is depicted in Figure 36 of the '884 patent, reproduced below.



FIG. 36

Figure 36 depicts one embodiment of a one-way bearing assembly. *Id.* at 4:37–39. One-way bearing assembly 1300 restricts motion by permitting rotation of front and rear shaft assemblies 44, 46 in only one direction. *Id.* at 27:15–21. One-way bearing assembly 1300 has inner ring 1304 and an outer ring 1306. *Id.* at 27:22–26. Disposed between inner ring 1304 and outer ring 1306 are sprags (not shown) that are asymmetric and, thus, allow for motion in one direction and prevent rotation in the opposite direction. *Id.* at 27:26–29. Outer ring 1306 is fixed to housing 1302, which is mounted to frame 40 so as to prevent movement of housing 1302 in response to rotation

of rear shaft 68. *Id.* at 27:22–29. Key 1312 is fixed to inner ring 1304 and cooperates with keyway 1314 in rear shaft 68, and, thus, inner ring 1341 rotates with rear shaft 68. *Id.* at 27:43–46, 27:49–53.

> If a force is applied by the user to the running belt 16 that urges the rear shaft 68 to rotate counterclockwise, the one way bearing assembly 1300 provides a counter force, preventing the counterclockwise rotation of the rear shaft 68 and the forward rotation of the running belt 16. Specifically, as the rear shaft 68 begins to move counterclockwise, the interaction of the key 1312 and the keyway 1314 begins to drive the inner ring 1304 of the one-way bearing assembly 1300 rearward. The sprags become wedged between the inner ring 1304 and the outer ring 1306, preventing the counterclockwise rotation of the inner ring and key 1312 disposed therein. The key 1312, by virtue of its inability to rotate, provides a counterforce to the keyway 1314 as the key way continues to attempt to rotate counterclockwise. By preventing the key way 1314 from moving counterclockwise, the one-way bearing assembly 1300 thus prevents the rear shaft 68, the rear running belt pulleys 66, and running belt 16 from rotating counterclockwise as seen in FIGS. 1 and 5.

*Id.* at 27:53–28:4.

The '884 patent discloses another embodiment of a safety device having a one-way bearing assembly. *Id.* at 28:5–7, Fig. 38. Additionally, the '884 patent discloses other safety systems to prevent undesirable forward rotation of running belt 16, such as a cam locking system, taper locks, a user operated pin system, or a band brake system with a lever. *Id.* at 29:30–35.

### E. Illustrative Claim

Petitioner challenges claims 30–34, 37–54, 57, and 59 of the '884 patent. Claims 30, 37, 50 and 57 are independent. Claims 31–34 depend directly or indirectly from claim 30, and claims 38–49 depend directly or

indirectly from claim 37, claims 52–54 depend from claim 50, and claim 59

depends from claim 57.  Claim 30 is illustrative and reproduced below.

> 30. A manually powered treadmill, comprising:
> a frame having a front end and a rear end positioned opposite the front end;
> a front shaft coupled to the frame proximate the front end;
> a rear shaft coupled to the frame proximate the rear end;
> a plurality of bearings coupled to the frame;
> a running belt at least partially supported by the plurality of bearings, wherein the running belt comprises a curved running surface; and
> a safety device coupled to the frame and the running belt, the safety device having a first rotatable element and a second rotatable element, wherein at least one of the first and second rotatable elements are adapted for rotation relative to the frame;
> wherein the running belt and one of the first and second rotatable elements of the safety device freely rotate in a first direction of rotation relative to the other of the first and second rotatable elements of the safety device, but interference between the safety device and at least one of the first and second rotatable elements substantially prevents rotation in a second direction of rotation, opposite the first direction of rotation, of the running belt and the one of the first and second rotatable elements relative to the other of the one of the first and second rotatable elements.

Ex. 1001, 35:51–36:8.

*F. Evidence and Asserted Grounds*

Petitioner asserts that claims 30–34, 37–54, 57, and 59 would have been unpatentable on the following grounds:

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 30–34, 37–43, 45–50, 52–54, 57, 59 | 103 | Schönenberger[2], Socwell[3], Magid[4], Sclater[5] |
| 44, 51 | 103 | Schönenberger, Socwell, Magid, Sclater, Skowronski[6] |
| 30–34, 37–54, 57, 59 | 103 | Schönenberger, Socwell, Magid, Sclater |
| 30–34, 37–39, 41, 45–49, 57, 59 | 103 | Chickering[7], Magid, Sclater |

Pet. 4–5.

Petitioner also relies upon the Declarations of Robert Giachetti, Ph.D. (Exs. 1003, 1036).

To support its patentability arguments, Patent Owner relies upon the Declaration of Kim B. Blair, Ph.D. Ex. 2018. To support its secondary consideration arguments, Patent Owner relies upon Eric A. Weber. Ex. 2020.

---

[2] U.S. Patent No. 4,614,337, issued Sept. 30, 1986 (Ex. 1010).
[3] U.S. Patent No. 5,897,461, issued Apr. 27, 1999 (Ex. 1011).
[4] U.S. Patent No. 5,538,489, issued July 23, 1996 (Ex. 1012).
[5] Neil Sclater and Nicholas P. Chironis, Mechanisms & Mechanical Devices Sourcebook, Third Ed., (McGraw-Hill 2001) (Ex. 1017).
[6] U.S. Patent No. 6,923,746, issued Aug. 2, 2005 (Ex. 1030).
[7] U.S. Patent No. 3,637,206, issued Jan. 25, 1972 (Ex. 1013).

## II. ANALYSIS

### A. *Legal Standards*

"In an IPR, the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (requiring *inter partes* review petitions to identify "with particularity . . . the evidence that supports the grounds for the challenge to each claim")); *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (discussing the burden of proof in *inter partes* review).

A claim is unpatentable under § 103(a) if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). "[W]hen a patent claims a structure already known in the prior art that is altered by the mere substitution of one element for another known in the field, the combination must do more than yield a predictable result." *KSR*, 550 U.S. at 416 (citing *U.S. v. Adams*, 383 U.S. 39, 50–51 (1966)). The question of obviousness is resolved on the basis of underlying factual determinations, including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) when in evidence, objective indicia of non-obviousness (i.e., secondary considerations). *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

IPR2023-00843
Patent 10,561,884 B2

## B. Level of Ordinary Skill in the Art

In determining the level of ordinary skill in the art, various non-exhaustive factors may be considered, including: "(1) the educational level of the inventor; (2) type of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology; and (6) educational level of active workers in the field." *Daiichi Sankyo Co. v. Apotex, Inc.*, 501 F.3d 1254, 1256 (Fed. Cir. 2007) (quoting *Envtl. Designs, Ltd. v. Union Oil Co.*, 713 F.2d 693, 696 (Fed. Cir. 1983)).

Petitioner contends that a person of ordinary skill in the art ("POSA") "would have had a bachelor's degree in mechanical engineering and at least one year of machine design experience related to power transmission equipment and a demonstrated understanding of exercise biomechanics, including anthropometry (i.e., the study of human proportion)." Pet. 5 (citing Ex. 1003 ¶¶ 48, 44–49 (supporting testimony of Dr. Giachetti)) Pet. Reply 3. Petitioner additionally states that "[t]his description is approximate and additional development experience could make up for less education and vice versa." Pet. 5. Petitioner argues that experience with exercise biomechanics is important for the design of curved treadmills. Pet. Reply 3 (citing Ex. 1036 ¶¶ 22–23).

Patent Owner argues that a POSA "would be a person with a bachelor of science degree in mechanical engineering *or* at least two years of experience in the treadmill industry, including experience and knowledge of the design, construction, testing, and operation of manual treadmills." PO Resp. 3–4 (emphasis added) (citing Ex. 2018 ¶¶ 70–75 (supporting testimony of Dr. Blair)). Patent Owner argues that its proposed level does not exclude the inventors of the '884 patent, who do not have a mechanical

11

engineering degree, and is more consistent with the claim language. *Id.*; PO Sur-reply 2–3. Patent Owner, however, states that the patentability analysis would not change whether we adopt Petitioner's or Patent Owner's definition. PO Resp. 4.

We do not adopt Patent Owner's definition of the level of ordinary skill in the art because it is overly broad. During oral argument, Patent Owner clarified that its proposed level of ordinary skill includes a person with a mechanical engineering degree and no experience in the treadmill industry. *See, e.g.*, Tr. 73:1–6. A POSA should have some knowledge related to treadmills as the '884 patent and the prior art all relate to the field of treadmills. *See generally* Exs. 1001, 1009–1013; *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001).

Both Petitioner and Patent Owner's definitions encompass a person who has at least a degree in mechanical engineering degree. Pet. 5; PO Resp. 3–4. Petitioner's definition additionally requires knowledge of exercise biomechanics, including anthropometry, and Patent Owner's additionally requires knowledge of design, construction, testing, and operation of manual treadmills. Patent Owner argues that "any definition that requires a POSA to be a degreed engineer with 'a demonstrated understanding of exercise biomechanics, including anthropometry'. . . — would necessarily exclude certain named inventions." PO Sur-reply 2–3. We agree with Patent Owner that that experience and knowledge of treadmills is require, but the knowledge of exercise biomechanics is not. Ex. 2018 ¶ 70.

Accordingly, we determine that a POSA would have a Bachelor's of Science degree in mechanical engineering and at least one year of

experience in the treadmill industry, including experience and knowledge of the design, construction, testing, and operation of manual treadmills overall.

However, we note that our analysis and conclusions as to patentability would not change if we had adopted either Petitioner's or Patent Owner's definitions. We note that the parties do not indicate that the outcome of our patentability analysis would differ based on the definition of a POSA. *See* Pet. 5; PO Resp. 4; Pet. Reply 2–3.

## C. Claim Construction

We construe each claim "in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent." 37 C.F.R. § 42.100(b). Under this standard, claim terms are generally given their plain and ordinary meaning as would have been understood by a person of ordinary skill in the art at the time of the invention and in the context of the entire patent disclosure. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc). Only those terms in controversy need to be construed, and only to the extent necessary to resolve the controversy. *Realtime Data LLC v. Iancu*, 912 F.3d 1368, 1375 (Fed. Cir. 2019).

In the Petition, Petitioner states that claim terms should be construed according to their ordinary and customer meaning. Pet. 18. After the Petition was filed the District Court in the related District Court Litigation issued a Markman Order (Ex. 1033) construing the terms "substantially prevent" and "safety device."

### 1. *"substantially prevent"*

The District Court construed "substantially prevent" as "restricts rotation to allow for only one rotational direction of movement."

Ex. 1033, 16.  In this proceeding, we need not construe this claim term as there is no related dispute.

2.  *"safety device"*

For the '884 patent, the District Court construed "safety device" as "a device that includes the elements recited [in the claims] and restricts rotation to allow for only one rotational direction of movement."  Ex. 1033, 23.

Both parties indicate that we should adopt the District Court's construction.  PO Resp. 5; Pet. Reply 2.  We, thus, construe "safety device" as "a device that includes the elements recited [in the claims] and restricts rotation to allow for only one rotational direction of movement

We need not construe explicitly any other claim terms to reach our decision.  *See Realtime Data*, 912 F.3d at 1375 ("The Board is required to construe 'only those terms . . . that are in controversy, and only to the extent necessary to resolve the controversy.'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

D.  *Ground 1: Schönenberger, Socwell, Magid, Sclater*

1.  *Summary of Schönenberger*

Schönenberger is a U.S. patent titled "Movable Surface Apparatus, Particularly for Physical Exercise and Training" and issued on September 30, 1986.  Ex. 1010, codes (45), (54).  Schönenberger discloses a movable surface apparatus that may be driven by gravity.  *Id.* at 4:34–37, 13:33–34.  One objective of Schönenberger's invention is to provide an apparatus that "is safe in operation and requires little operating power, has low noise level in operation."  *Id.* at 1:65–66.  Another objective is to provide an apparatus having

a pleasant, springy feel when being stepped or jumped on without, however, being excessively stressed by bending or bowing, so that the surface which is engaged by the foot of the user will have, essentially, the characteristics of a yielding, yet firm support similar, for example, to walking on moss-covered ground or a needle-covered path.

*Id.* at 1:67–2:5.

Figure 2, reproduced below, "is a fragmentary schematic side view of the movable surface and its drive arrangement, with the housing removed." *Id.* at 3:1–3.



Schönenberger's Figure 2 "is a fragmentary schematic side view of the movable surface and its drive arrangement, with the housing removed." *Id.* at 3:1–3. Housing 2 includes frame members 36 and 37 which provide for physical and structural support. Schönenberger discloses that "within the housing 2 are located rotatable drums, rollers, sheaves, sprockets, or the like, about which the surface 1, which is an endless loop, is placed." *Id.* at 4:15–17. Schönenberger discloses that the rotatable elements are "preferably in the form of two operating drums or rollers 10" and that "rollers or sheaves 10 have a toothed or ribbed circumference." *Id.* at 4:18–20; 4:23–24.

Schönenberger discloses movable surface 1 is formed of slats 4. *Id.* at 2:6–9, 5:38–41. Slats 4 are preferably made of lightweight metal, like aluminum, and have a generally T-shaped cross section with center web 8. *Id.* at 4:43–47. "The distance between adjacent step slats 4 is so selected that only little space or clearance is left between the slats—just enough to prevent interference of adjacent slats upon movement." *Id.* at 4:54–57.

Figure 19 of Schönenberger is reproduced below.



# FIG. 19

Figure 19 depicts a schematic top view of the support and drive arrangement for the running surface. *Id.* at 3:51–54. Slats 4 is supported by rubber support belt 13 *Id.* at 5:1–3, 5:9–12. Support belt 13 is positioned over support rollers 12 so that there is a small distance between support belt 13 and slats 4 when unloaded. *Id.* at 5:51–52. Upon loading, the flat underside of slats 4 will engage support belts 13, 13' and the support belts move and engage support rollers 12. *Id.* at 5:57–65.

In one embodiment, Schönenberger replaces support belts 13, 13'
with a belt 5' that bears against support rollers 12 when loaded. *Id.* at
8:34–62, Fig. 10.

2. *Summary of Socwell*

Socwell is a U.S. patent titled "Exercise Treadmill" and issued on
April 27, 1999. Ex. 1011, codes (45), (54). Socwell discloses "a novel
curved deck treadmill which provides a structurally supported arcuate
shaped, movable surface on which a user may exercise." *Id.* at 3:26–29. In
one embodiment, the curved deck treadmill does not have a motor. *Id.* at
11:54–60. Socwell's Figure 1 is reproduced below.



Figure 1 "is a perspective view of one presently preferred embodiment
of a curved deck treadmill." *Id.* at 4:35–36. Curved deck treadmill 10

comprises a support frame 12 having first side 20 and second side 22, with deck 56 between. *Id.* at 5:23–26.

Socwell's Figure 2 is reproduced below.



Figure 2 "is a side elevational view of the embodiment of [Figure 1] exposing one presently preferred arrangement of the internal components of the present invention." *Id.* at 4:38–40. In one embodiment, deck 56 has first end 58, second end 60, and intermediate portion 62 between. *Id.* at 5:26–28. Roller assembly 14 is provided between first roller 78 and second roller 86. *Id.* at 5:33–38. Belt 16 is rotatably mounted on roller assembly 14 in relation to deck 56 and provides "a structurally supported arcuate shaped, movable surface on which a user may exercise." *Id.* at 5:42–45.

Socwell's Figure 5 is reproduced below.



*Fig. 5*

Figure 5 depicts belt securing assembly 94. Belt securing assembly 94 retains endless belt 15 in a curvilinear configuration, substantially flush with deck 56. *Id.* at 10:5–9. Belt securing assembly 94 includes mounting bracket 96 which holds roller 98 so that roller 98 engages belt 16. *Id.* at 10:17–21.

3. *Summary of Magid*

Magid is a U.S. patent titled "Walker Apparatus with Left and Right Foot Belts" and issued on July 23, 1996. Ex. 1012, codes (45), (54).

Magid's Figure 2 is reproduced below.



FIG. 2

Figure 2 depicts Magid's preferred embodiment of a walker apparatus — an exercise walker. *Id.* at 3:41–44. The exercise walker comprises base 11, having two-foot belts 4, 4', a pair of front rollers 41, and a pair of real rollers 42. Figure 2 shows unidirectional control means 6, 6', which permits only unidirectional movement of foot belts 4, 4'. *Id.* at 4:47–49. Magid states:

> A unidirectional control means 6, 6' is installed to permit only unidirectional movement of the left and right foot belts 4, 4'. In this embodiment, the control means 6, 6' includes a pair of ratchet gears 61 attached to outer ends of the front rollers 41 and mounted rotatably on the first shaft 411, and a pair of pawls 62 secured to the base 11 and engaging one of the ratchet gears 61

> to permit only unidirectional rotation of the front rollers 41, thereby preventing bidirectional movement of the foot belts 4, 4'. A releasable means (not shown) may be provided to release selectively the pawls 62 from the ratchet gears 61 in a known manner to permit reciprocating movement of the foot belts 4,4' when desired. Of course, the ratchet gears may be attached to the rear rollers 42 to achieve the same result.

*Id.* at 4:46–60.

### 4. Summary of Sclater

Sclater is titled "Mechanisms and Mechanical Devices Sourcebook, Third Edition." Ex. 1017, cover. Chapter 9 of Sclater is titled "Coupling, Clutching, and Braking Devices" and describes basic mechanical clutches, including a cam and roller clutch. *Id.* at 302–303. A cam and roller clutch is "[an] over-running clutch [that] is better suited for higher-speed free-wheeling than a pawl-and-ratchet clutch." *Id.* at 303. For a cam and roller clutch,

> [t]he inner driving member has cam surfaces on its outer rim that hold light springs that force the rollers to wedge between the cam surfaces and the inner cylindrical face of the driven member. While driving, friction rather than springs force the rollers to wedge tightly between the members to provide positive clockwise drive. The springs ensure fast clutching action. If the driven member should begin to run ahead of the driver, friction will force the rollers out of their tightly wedged positions and the clutch will slip."

*Id.*

Sclater also discusses spring-loaded pins and sprags in a one-way clutch and describes them as having "[s]prags combined with cylindrical rollers in a bearing assembly [that] can provide a simple, low-cost method for meeting the torque and bearing requirements of most machine

applications" and can serve as a roller bearing, and with the clutch's torque rating dependent on the number of sprags. *Id.* at 312.

Sclater further provides "details of overriding clutches" and explains a friction clutch is quieter than a ratchet and pawl. *Id.* at 316. In discussing ways to apply overrunning clutches, Sclater explains that "[t]hese clutches allow freewheeling, indexing and backstopping," and "they will solve many design problems." *Id.* at 318.

Figure 1 from Sclater's page 318 is reproduced below.



Fig. 1 Precision sprags act as wedges and are made of hardened alloy steel. In the formsprag clutch, torque is transmitted from one race to another by the wedging action of sprags between the races in one direction; in the other direction the clutch freewheels.

Figure 1 illustrates precision sprags which are an example of an overrunning clutch. *Id.* at 318. This clutch transmits torque from one race to another by the wedging actions of sprags between the races in one direction and, in the other direction, the races freewheels. *Id.*

Sclater states that application for sprag-type clutches "include overrunning, backstopping, and indexing" and the selection of an overrunning sprag clutch "requires a review of the torque to be transmitted, overrunning speed, type of lubrication, mounting characteristics, environment conditions, and shock conditions that might be encountered." *Id.* at 320.

Figure 2 from Sclater's page 320 is reproduced below.



Figure 2 depicts an example application of backstopping. *Id.* at 320. A vertical conveyor carrying buckets and having a motor and a backstopping clutch with an outer race fastened to the stationary frame of the conveyor.

### 5. *Independent Claim 30*

Petitioner contends that claim 30 is unpatentable over Schönenberger, Socwell, Magid, and Sclater. Pet. 27–61. In particular, Petitioner argues that a combination of Schönenberger and Socwell teaches a running belt comprising a curved running surface, as recited by claim 30.

Petitioner relies upon Schönenberger as disclosing a movable surface 1 (i.e., a running belt) that is supported by rollers 12, 12,' on brackets 19, and pulleys 10. *Id.* at 34–37 (citing Ex. 1010, 2:6–9, 8:34–51; Ex. 1003 ¶¶ 159–163, 222, 248, 280 285, 293).

Petitioner relies upon Socwell as disclosing "a 'novel curved deck treadmill which provides a structurally supported arcuate shaped, moveable surface on which a user may exercise.'" *Id.* at 37 (citing Ex. 1011, 3:26–29; Ex. 1003 ¶ 165) (emphasis omitted).

Petitioner argues:

> It would have been obvious to POSA to modify Schönenberger's brackets 19 and rollers 12, 12' ("*plurality of bearings*") to provide a curved support surface such that the movable surface 1 ("*running surface*") "*follows a curved running surface*" as taught by Socwell. (Ex. 1003 ¶¶166-167.)

*Id.* at38. Petitioner reasons that a POSA would make such a modification to: (1) increase safety (*id.* at 38–40 (citing Ex. 1011, 2:11–29, 2:45–67, 3:1–9, 3:40–45; Ex. 1003 ¶¶ 168, 172; Ex. 1010, 4:1–6)); (2) reduce impact loading of the user's joints (*id.* at 40–41 (citing Ex. 1011, 3:53–57)); (3) provide a more comfortable versatile treadmill that can be used for exercise and rehabilitation (*id.* at 41 (citing Ex. 1011, 3:53–57, 13:43–47; Ex. 1003 ¶ 173)).

Petitioner further asserts that a POSA would have known that lowering Schönenberger's rollers 12 relative to the front and rear shaft assemblies would result in a curved running surface and that the movable surface 1 would follow the profile defined by the rollers 12. *Id.* at 42 (citing Ex. 1003 ¶ 175); Pet. Reply 6 ("it would have been obvious to arrange the rollers 12 curvilinearly like the curved deck 56 of Socwell."). Petitioner

annotated     Schönenberger's Figure 12, reproduced below, to illustrate its proposed modification.



Ex.1010, Fig.12

Schönenberger's Annotated Figure 12 depicts rollers 12 being lower than pulleys 10 and movable surface 1 having a curved running surface. *Id.* at 42.

According to Petitioner, "[t]he modification would be the use of a known technique – using a curvilinear arrangement of bearings, as taught by Socwell – to improve similar devices (treadmills), in the same way, i.e., to produce a curved running surface." *Id.* at 45. Petitioner asserts that because movable surface 1's slats 4 are heavy, they would conform to the profile of the rollers 12. *Id.* at 42–43 (citing Ex. 1003 ¶ 176).

Patent Owner disagrees that in Petitioner's proposed modification moveable surface 1 would follow the curve of rollers 12, 12' because movable surface 1 is formed of rigid metal slats 4. *See generally* PO Resp. 13–21. Patent Owner argues that, because of this difference, it would not have been obvious to a POSA how Socwell's teaching of a curved running surface could be incorporated into Schönenberger's movable surface 1. *Id.*

We determine that Petitioner has not met its burden of showing that a POSA would have modified Schönenberger's brackets 19 and rollers 12, 12'

so that movable surface 1 follows a curved running surface as taught by Socwell. Schönenberger's moveable surface 1 is formed of rigid lightweight metal slats 4. Ex. 1010, 4:43–47. In one embodiment, depicted in Schönenberger's Figure 10, slats 4 are connected to a belt 5', which

> at the same time, forms the resilient cushion between the slats 4 and the support rollers 12, 12' respectively, as well as the longitudinal stiffening element which holds the slat 4 in adjacent alignment in the right position (right angle position with respect to the running direction, at the ends respectively in the area of driving elements 10).

*Id.* at 8:38–44.

> Patent Owner's declarant Dr. Blair testifies that:

> As can be seen, Schonenberger's rollers 12 as shown in Figure 9 again are flat, and the slats 4 follow along that flat plane on the support belt 13. However, if a POSA were to try and create a curved running surface, the POSA would not simply be able to lower the rollers 12 into a curved shape because the width of the slats would necessarily restrict the angles and distances between the rollers. Indeed, Schonenberger teaches that the width of one slat covers two or three of its rollers. EX1010 at 6:19-27 ("…three rollers 12 in engagement with each end of the slat 4 is preferred."). Any added curvature would not be a simple substitution of the curvature taught in Socwell because the slats and support belt mechanisms in Schonenberger need to be accounted for.

Ex. 2018 ¶ 160 (alteration in original). Dr. Blair's testimony indicates that further modification would be needed to Schönenberger's system. *Id.* ¶ 158.

Petitioner responds that in the relied upon embodiment depicted in Figure 10 "the individual slats 4 cannot overlap because the belts 5' maintain positioning of the slats 4 relative to each other." Pet. Reply 9 (citing Ex.1010, 4:37–41, 8:34–44; Ex.1036 ¶ 47 (testimony of Dr. Giachetti).

But, Schönenberger discloses that the distance between adjacent slats "is so selected that only little space or clearance is left between the slats." Ex. 1010, 4:54–56. Neither Petitioner's response nor Dr. Giachetti's cited testimony sufficiently explains how a POSA would modify Schönenberger's movable surface 1, having slats 4, to accommodate a concave curvature. *See* Ex. 1036 ¶ 47; Ex. 2018 ¶¶ 161–164.

We determine that Petitioner has not met its burden of showing that it would have been obvious to a POSA to modify Schönenberger's brackets 19 and rollers 12, 12' so that movable surface 1 follows a curved running surface as taught by Socwell.

### a) Conclusion as to claim 30

After considering Petitioner's evidence and analysis, and taking into account Patent Owner's arguments, based on the record before us this stage of the proceeding, we determine that Petitioner has failed to show that claim 30 is unpatentable over Schönenberger, Socwell, Magid, and Sclater.

### 6. Independent claims 37, 50, and 57

Petitioner relies upon a similar analysis to show that independent claims 37, 50, and 57 are unpatentable as the analysis it relies upon to show claim 30 is unpatentable. *See* Pet. 27–61.

Patent Owner relies upon the same arguments it made in connection with claim 30. *See generally* PO Resp. (arguing claims 30, 37, 50, and 57 together).

For similar reasons as discussed above with respect to claim 30, after considering Petitioner's evidence and analysis, we determine that Petitioner has failed to show by a preponderance of the evidence that claims 37, 50, and 57 are unpatentable over Schönenberger, Socwell, Magid, and Sclater.

7. *Dependent Claims 31–34, 38, 39, 41, 45–49, and 59*

Petitioner contends that the additional limitations of dependent claims 31–34, 38, 39, 41, 45–49, and 59 are unpatentable over Schönenberger, Socwell, Magid, and Sclater. Pet. 61–70. Claims 31–34, 38, 39, 41, 45–49, and 59 depend from claims 30, 37, 50, and 57.

We determine that Petitioner has failed to show by a preponderance of the evidence that claims 31–34, 38, 39, 41, 45–49, and 59 are unpatentable over Schönenberger, Socwell, Magid, and Sclater. *In re Fritch*, 972 F.2d 1260, 1266 (Fed. Cir. 1992) ("[D]ependent claims are nonobvious if the independent claims from which they depend are nonobvious.").

E. *Ground 2: Unpatentability over Schönenberger, Socwell, Magid, Sclater, and Skowronski*

Petitioner contends that claims 44 and 51 are unpatentable over Schönenberger, Socwell, Magid, Sclater, and Skowronski. Pet. 70–75. Claim 44 depends from claim 37, and claim 51 depends from claim 50. We determine that Petitioner has failed show by a preponderance of the evidence that claims 41 and 55 are unpatentable over Schönenberger, Socwell, Magid, Sclater, and Showronski. *In re Fritch*, 972 F.2d at 1266.

F. *Ground 3: Unpatentability over Schönenberger, Socwell, Magid, Sclater*

Petitioner contends that claims 30–34, 37–54, 57, and 59 are unpatentable over Schönenberger, Socwell, Magid and Sclater. Pet. 75–79. This is the same combination of references presented for ground 1. For ground 3 only, Petitioner proposes alternate claim constructions from the District Court Litigation for the terms "shaft," "safety device" and

"substantially prevent" and applies those constructions. *Id.* at 19, 75; Pet. Reply 2.

For similar reasons as discussed above with respect to ground 1, we determine that Petitioner has failed to show by a preponderance of the evidence that claims 37, 50, and 57 are unpatentable over Schönenberger, Socwell, Magid, and Sclater.

G. *Ground 4: Unpatentability over Chickering, Magid, and Sclater*

Petitioner contends that claims 30–34, 37–39, 41, 45–49, 57, and 59 are unpatentable over Chickering, Magid, and Sclater. Pet. 79–103.

1. *Summary of Chickering*

Chickering is a U.S. Patent titled "Endless Belt Exerciser with Accelerating and Decelerating Tread Surfaces" and issued on January 25, 1972. Ex. 1013, codes (45), (54).

Chickering's Figure 1 is reproduced below.



Figure 1 shows one embodiment of an exercise device having base 10 formed of two sidewalls 22 and two end walls 23. *Id.* at 1:65–68. "A first series of transverse parallel rollers 13 have their ends journaled in arms 14,"

and "[a] second series of transverse parallel rollers 18 have their ends journaled in arms 19." *Id.* at 2:14–15, 2:18–19. Endless belt 16 is disposed about rollers 13 and endless belt 25 is disposed about rollers 18. *Id.* at 2:15–17, 2:19–21. Arms 14 and 19 are pivotally connected to sidewalls 22, so that the inclination of first and second series of rollers 13 and 18 can be adjusted. *Id.* at 2:2–13, 2:27–31.

Chickering's Figure 3 is reproduced below.



Figure 3 depicts an alternate embodiment having single endless belt 28. *Id.* at 2:73–75. In this embodiment, rollers 29 are journaled in sidewalls 22 of base 10. *Id.* at 3:1–2.

> [T]he rollers are so disposed that the forward rollers lie approximately in a plane slanting downwardly from the front of the base, while the rear rollers lie approximately in a plane slanting upward toward the rear of the base 10. Thus, when the endless belt 28 is placed about the rollers, it follows their contour.

*Id.* at 3:2–8. "When a single belt is used, it may be necessary to use heavier belting material so that the belt will lie flat upon the rollers without being under tension." *Id.* at 3:11–13.

   *1.   Independent Claim 30*

Petitioner contends that claim 30 is unpatentable over Chickering, Magid, and Sclater.  Pet. 79–97.

   *a)  A manually powered treadmill, comprising: [8]*

Petitioner contends, and Patent Owner does not dispute, that Chickering discloses a manually powered treadmill.  Pet. 79 (citing Ex. 1013, 1:1–7, 2:44–49; Ex. 1003 ¶¶ 354–357, 402, 424); *see generally* PO Resp.

After considering Petitioner's evidence and analysis, we determine that Petitioner has shown by a preponderance of the evidence that Chickering discloses a manually powered treadmill.

   *b)  a frame having a front end and a rear end positioned opposite the front end; a front shaft coupled to the frame proximate the front end; a rear shaft coupled to the frame proximate the rear end;*

Petitioner contends, and Patent Owner does not dispute, that Chickering's single-belt embodiment discloses a frame having a front end and rear end, a front shaft coupled to the frame at the front end, a rear shaft coupled to the frame at the rear end.  Pet. 80–81 (citing Ex. 1013, 1:65–68, 2:75–3:2, 3:11–16; Ex. 1003 ¶¶ 358–360, 361, 363, 365, 403, 405, 425). Petitioner annotated Chickering's Figure 3 to illustrate this mapping and, the annotated figure is reproduced below.

---

[8] On this record, we do not need to determine whether the preamble is limiting as it is undisputed that Chickering discloses a manually powered treadmill.



**Ex.1013, Fig.3**

Chickering Annotated Figure 3 shows base 10 labeled as "Frame" and front and rear end rollers 29B, 29A labeled as "Front Shaft" and "Rear Shaft" respectively. *Id.* at 81.

After considering Petitioner's evidence and analysis, we determine that Petitioner has shown by a preponderance of the evidence that Chickering discloses a frame, a front shaft, and a rear shaft as arranged as recited in claim 30.

   *c)*  *a plurality of bearings coupled to the frame;*

Petitioner contends, and Patent Owner does not dispute, that Chickering discloses journaled rollers 29 (i.e., bearings) coupled to base 10. Pet. 81 (citing Ex. 1013, 2:75–3:23:11–16; Ex. 1003 ¶¶ 360–361, 363, 365, 405).

After considering Petitioner's evidence and analysis, we determine that Petitioner has shown by a preponderance of the evidence that Chickering discloses a plurality of bearings coupled to the frame.

> d) *a running belt at least partially supported by the plurality of bearings, wherein the running belt comprises a curved running surface*

Petitioner maps the claimed running belt to Chickering's endless belt 28 and points to Chickering's depiction of its single-belt embodiment in Figure 3 to show a running belt following a curved running surface. Pet. 83. Dr. Giachetti testifies that Chickering discloses a curved running surface and points to the following paragraph of Chickering for support. Ex. 1003 ¶¶ 368–370, 406–408, 427. Chickering states:

> An alternate form of the exercising device of the present invention is shown in FIG. 3, wherein a single endless belt 28 forms both the accelerating and decelerating areas. In the device shown in FIG. 3, a single series of rollers 29 are provided journaled in the sidewalls 22 of base 10. However, the rollers are so disposed that the forward rollers lie approximately in a plane slanting downwardly from the front of the base, while the rear rollers lie approximately in a plane slanting upward toward the rear of the base 10. Thus, when the endless belt 28 is placed about the rollers, it follows their contour and provides a forward accelerating area and a rear decelerating area which are inclined from the horizontal with each being lowest at their point of nearest proximity.

Ex. 1013, 2:73–3:10.

Petitioner annotates Chickering's Figure 3 to illustrate this contour. Petitioner's Annotated Figure 3 is reproduced below.



**Ex.1013, Fig.3**

Petitioner's Annotated Figure 3 show the single-belt embodiment with arrow pointing to the curved top profile.  Pet. 83.

Dr. Giachetti testifies that Chickering discloses a curved running surface and points to the following paragraph of Chickering for support. Ex. 1003 ¶ 161.

> An alternate form of the exercising device of the present invention is shown in FIG. 3, wherein a single endless belt 28 forms both the accelerating and decelerating areas.  In the device shown in FIG. 3, a single series of rollers 29 are provided journaled in the sidewalls 22 of base 10.  However, the rollers are so disposed that the forward rollers lie approximately in a plane slanting downwardly from the front of the base, while the rear rollers lie approximately in a plane slanting upward toward the rear of the base 10.  Thus, when the endless belt 28 is placed about the rollers, it follows their contour and provides a forward accelerating area and a rear decelerating area which are inclined from the horizontal with each being lowest at their point of nearest proximity.

Ex. 1013, 2:73–3:10.

Patent Owner disputes that Chickering's single-belt embodiment discloses a running belt following a curved running surface. PO Resp. 7–13. Like Petitioner, Patent Owner points to Chickering's disclosure that the rollers are so disposed that the forward rollers lie approximately in a plane slanting downwardly from the front of the base, while the rear rollers lie approximately in a plane slanting upward toward the rear of the base 10 (Ex. 1013, 3:2–6) and argues that "[b]ecause the single endless belt 28 'follows' the planes of these rollers when it is 'placed about the rollers' ([Ex. 1013,]3:6-8), a POSA would further understand that Chickering's alternative, single-belt embodiment also discloses a multi-planar running surface rather than a curved running surface." PO Resp. 9–10. Patent Owner annotates Chickering's Figure 3 to illustrate this point and Patent Owner's annotated Figure 3 is reproduced below. *Id.*



Patent Owner annotated Chickering's Figure 3 to include a line along the top of rear rollers 29 to show a plane slanting upward and a line along the top of

forward rollers 29 to show a plane slanting downwardly along forward rollers 29. *Id.*

Relying upon the testimony of Dr. Blair, Patent Owner argues that the claimed running surface is a surface with which a runner's feet are intended to make contact when using a treadmill and, in Chickering, a runner's feet is not intended to contact the belt at the area where the forward rollers meet the rearward rollers. PO Resp. 10–13 (citing Ex. 2018 ¶¶ 93–94); *see also* PO Sur-reply 6–7. Citing a description of Chickering's two-belt embodiment, Patent Owner argues that there would be a brief instance where a runner's feet would not be contact with endless belt 28 of the one-blet embodiment. PO Resp. 11–12 (citing Ex. 1013, 2:50–58). Patent Owner, thus, argues that Chickering does not disclose a curved running surface. *Id.* at 13.

Petitioner responds that the claims do not require that the claimed running surface is a surface with which a runner's feet are intended to make contact when using a treadmill. Pet. Reply 3–5. Petitioner argues that "Chickering discloses [that] the single belt is heavier thus requiring a more gradual curvature" and "[a] POSA would have understood this disclosure in Chickering to teach that a user would contact the curved area of the running surface." *Id.* at 4–5 (citing Ex. 1036 ¶¶ 27–31).

We agree with Petitioner that Chickering's single-belt embodiment discloses a curved running surface, as recited by claim 30. Chickering describes endless belt 28 as following the contour of the rollers with areas that are inclined from the horizontal and meet at their lowest point. Ex. 1013, 2:73–3:10. As can be seen from Petitioner's annotated Figure 3 of Chickering above, the rollers meet at their lowest portion (i.e., the central portion) and endless belt 28 is depicted as curved at that point. *See id.* at Fig. 3. This is consistent with Chickering's disclosure that the single-belt

embodiment needs heavier belting and consistent with Dr. Giachetti's testimony that a POSA would know that heavier belting requires a larger turn radius. Ex. 1036 ¶¶ 27–31. On cross-examination, Dr. Blair testifies that "the running belt would be bending in a very, very small curve at that point to follow those trajectories, the two planes." Ex. 1038, 24:23–25.

We find Patent Owner's arguments and the testimony of Dr. Blair to be unpersuasive, because we do not agree that the claimed running surface is required to be a surface with which a runner's feet are intended to make contact when using a treadmill.

Dr. Blair testifies that "[a] POSA would understand a treadmill's 'running surface' to be a surface that a runner's feet would typically make contact when the user is running on the treadmill during normal use" and that, because a runner's feet is not intended to contact the belt at the area where the forward rollers meet the rearward rollers, that area is not part of the running surface. Ex. 2018 ¶¶ 90–92. Dr. Blair's testimony, however, contains no sufficient explanation to support his conclusion of what a POSA would understand by the term "running surface." *See id.* ¶ 90.

Further, Dr. Blair's testimony is inconsistent with the language of claim 30. Claim 30 recites: "the running belt comprises a curved running surface." Ex. 1001, 35:58–59. The language of claim 30 does not require the running belt's running surface to only be portions that the runner typically or is intended to run upon.

Dr. Blair's testimony is also inconsistent with the '884 patent which does not describe the running surface as being limited to the surface that a runner's feet would typically make contact when the user is running on the treadmill during normal use. *See generally id.* The '884 patent describes numerous examples of continuous running surfaces with a wide variety of

contours. *See id.* at Figs. 7a–7j (depicting side schematic views of the profiles of running surfaces *(id.* at 3:16–22)). The '884 patent describes running surface as having portions adjacent to the front and rear shafts assemblies 44 and 46 and a central portion there between. *Id.* at 6:34–40. The '884 patent describes the running surface as generally divided into three general regions—"the front portion 72, which is adjacent to the front shaft assembly 44, the rear portion 74, which is adjacent to the rear shaft assembly 46, and the central portion76, which is intermediate the front portion 72 and the rear portion 74"— which can have different geometric configurations. *Id.*; *see also id.* at 10:15–16 (describing alternative embodiment have more or less than three regions). The '884 patent discloses a number of geometric configures of the running surface's portions, including a concave curve integrated with linear portions. *Id.* at 10:11–13; *see also id.* at 9:4–6 (describing the possible geometric configurations as concave, convex, linear and various combination thereof); 10:39–62 (describing that the relative length of the front, central, and rear portions may vary).

Given the language of claim 30 and the disclosure of the '884 patent, we are not persuaded by the insufficiently supported testimony of Dr. Blair, the claim term "running surface" requires a surface with which a runner's feet are intended to make contact when using a treadmill.

Petitioner has sufficiently shown that Chickering discloses a running belt supported by the first bearing rail and the second bearing rail and disposed about the front shaft and the rear shaft, wherein the running belt follows a curved running surface.

> e) *a safety device coupled to the frame and the running belt, the safety device having a first rotatable element and a second rotatable element, wherein at least one of the first and second rotatable elements are adapted for rotation relative to the frame; wherein the running belt and one of the first and second rotatable elements of the safety device freely rotate in a first direction of rotation relative to the other of the first and second rotatable elements of the safety device, but interference between the safety device and at least one of the first and second rotatable elements substantially prevents rotation in a second direction of rotation, opposite the first direction of rotation, of the running belt and the one of the first and second rotatable elements relative to the other of the one of the first and second rotatable elements*

Petitioner relies upon Magid's unidirectional control means 6, 6' to teach the claim safety device. Pet. 84–85 (citing Ex. 1012, 4:46–59). In one embodiment, unidirectional control means 6, 6' is a ratchet and pawl mechanism attached to either the front or rear rollers. Ex. 1012, 4:46–59, Figs. 2, 5.

Petitioner contends that "[i]t would have been obvious to a POSA to combine the manual curved treadmill disclosed in Chickering with the known technique of a one-way clutch to prevent belt motion in a forward direction as disclosed in Magid." *Id.* at 85 (citing Ex. 1003 ¶¶ 432–442). Petitioner argues that a POSA would have made such a combination to prevent a user from falling off the treadmill while mounting or dismounting. *Id.* at 86–88. According to Petitioner,

> A POSA would have been motivated to modify Chickering to include Magid's control means 6, 6' mounted to the front roller or the rear roller . . . , to permit only unidirectional belt movement to reduce the risk of a user stepping onto the belt and losing their balance when the belt moves forward.

*Id.* at 88 (citing Ex. 1003 ¶¶ 439–440 (supporting testimony of Dr. Giachetti)).

We determine that Petitioner's analysis and evidence sufficiently shows that a POSA would have modified Chickering to include a safety device as taught by Magid in order to reduce the risk of a user falling.

A ratchet and pawl clutch, however, does not have a third element to create interference with the ratchet or pawl, as required by claim 30. *See* Pet. 90. Petitioner asserts that a one-way clutch that works by creating interference is taught by Sclater's sprag-type one-way bearing assembly that includes sprags with rolling elements, such as cylindrical rollers or balls, an inner race, and an outer race surrounding the inner race. *Id.* at 90–93 (citing Ex. 1017, 312, 318; Ex. 1003 ¶¶ 378–383). Petitioner further asserts that wedging between the sprags and the inner and outer races prevents rotation of the inner race in an opposite direction and would prevent the movable surface 1 from moving forward. *Id.* at 92 (citing Ex. 1017, 318; Ex. 1003 ¶ 384).

Petitioner argues that Magid's "[r]atchet and pawl clutch" makes noise during operation and Sclater's "friction-type clutch" is quieter. *Id.* at 93; Ex. 1003 ¶ 444. Petitioner contends a "POSA would have considered a sprag-type one-way clutch bearing for an exercise equipment application, such as a treadmill" and "would have known how to replace Magid's control means with Sclater's one-way bearing assembly." Pet. 94–95 (citing Ex. 1018, 52–53; Ex. 1003 ¶ 447).

Petitioner's evidence sufficiently shows that it would have been obvious to a POSA to substitute Sclater's one-way sprag-type bearing for Magid's ratchet and pawl one-way mechanism to obtain predictable results, *e.g.,* reduced noise and improved durability.

Patent Owner first argues that a POSA would not combine Chickering and Magid because Magid teaches away from the combination.  PO Resp. 38–44.  According to Patent Owner, if Chickering were combined with Magid to modify Magid to have a single belt, Magid's feature of "'preventing the action of the user's left foot from influencing the action of his right foot and vice-versa' would be lost."  *Id.* at 39 (quoting Ex. 1012, 5:19–27).  Patent Owner also argues that a POSA would not combine Chickering and Magid because Chickering's primary objective is for a user to exercise without relying upon handles, railing, belts to maintain balance.  *Id.* at 43 (citing Ex. 1013, 1:40–47).

"A reference may be said to teach away when a person of ordinary skill, upon reading the reference, would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken by the applicant."  *In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994).

We are not persuaded by Patent Owner that either of Chickering or Magid teaches away from the combination proposed in the Petition — modifying Chickering's single-belt embodiment to include Magid's unidirectional control mean 6, 6' (PO Resp. 41).  Patent Owner points to differences between Chickering and Magid, but we are not persuaded that those differences – number of belts, use as a therapeutic device as opposed to a recreational exercise device, use of handles – would discourage a POSA from making the proposed combination.  Ex. 1036 ¶¶ 57–59.

Much of Patent Owner's arguments are misplaced because the arguments concern modifying Magid to have a single non-planer belt (*see, e.g.*, PO Resp. 39 (arguing that if Magid was modified to use a single-belt,

Magid's key feature would be lost)) and do not concern the modification proposed in the Petition. Those arguments, thus, are unpersuasive.

Patent Owner next argues that because Magid is focused on a two-belt therapeutic walker device, a POSA would not have looked to Magid and combined its teachings with a single-belt treadmill for a user of ordinary abilities. *Id.* at 39–40. Patent Owner argues that "a POSA would immediately recognize that the Socwell and Chickering devices would have no need for the purported safety device disclosed in Magid" or that a POSA would only look to teaching of other treadmills having curved or multi-planar running surfaces and not to treadmills having flat or uniplanar surfaces. *Id.* at 39. Patent Owner asserts:

> Rather, when looking to improve or modify a curved or multi-planar treadmill like that described in . . . Chickering, . . ., a POSA would examine the teachings of other treadmills having curved or multi-planar running surfaces, not a narrow-use walker device with a flat or uniplanar surface, such as in Magid. This is because the design and engineering requirements of a treadmill having a curved running surface differ from those of a treadmill with a flat or uniplanar running surface. Design and engineering requirements urge a POSA to avoid combining the teachings of Socwell, Chickering, or other non-planar or multi-planar treadmills with Magid, particularly given the above, where Magid expressly teaches away from a single-belt treadmill.

*Id.* at 43–44 (citing Ex. 2018 ¶¶ 197–205)

We do not agree with Patent Owner's characterization of Magid as being narrowly related to two-belt walkers used just for therapy. As Petitioner points out, Magid discloses that its walker can be broadly used by people exercising. Pet. Reply 13 n 2 (citing Ex. 1036 ¶ 57); Ex. 1012, 1:53–59, 7:61–67.

Further, we are persuaded by Petitioner and Dr. Giachetti's testimony that a POSA would have combined the manual curved treadmill disclosed in Chickering with the known technique of a one-way clutch to prevent belt motion in a forward direction as disclosed in Magid in order to prevent a user from falling off the treadmill while mounting or dismounting. Pet. 85–90 (citing Ex. 1003 ¶¶ 187–198); *see also* Pet. Reply 13–15 (citing Ex. 1036 ¶¶ 62–65).

Patent Owner argues that Petitioner's motivations to combine are fraught with hindsight bias because "Petitioner does not adequately explain why a POSA would have been specifically motivated to select the mechanism Petitioner relies on, rather than one of the dozens of other options Sclater presents." PO Resp. 44–54. In particular, Patent Owner argues that Sclater does not specifically disclose that the sprag type clutch relied upon by Petitioner reduces noise and improves durability. *Id.*

The test for obviousness is not whether the claimed invention is expressly disclosed in the references, but whether the claimed subject matter would have been obvious to those of ordinary skill in the art in light of the *combined teachings* of those references. *In re Keller*, 642 F.2d 413, 425 (CCPA 1981). In an obviousness analysis, it is not necessary to find precise disclosure directed to the specific subject matter claimed because inferences and creative steps that a person of ordinary skill in the art would employ can be taken into account. *See KSR*, 550 U.S. at 418. In this regard, "[a] person of ordinary skill is also a person of ordinary creativity, not an automaton." *Id.* at 421. "[I]n many cases a person of ordinary skill will be able to fit the teachings of multiple patents together like pieces of a puzzle." *Id.* As the U.S. Supreme Court has stated, obviousness requires an "expansive and flexible" approach that asks whether the claimed

improvement is more than a "predictable variation" of "prior art elements according to their established functions." *Id.* at 415, 417. "A factfinder should be aware, of course, of the distortion caused by hindsight bias and must be cautious of arguments reliant upon *ex post* reasoning." *Id.* at 421 (citing *Graham*, 383 U.S. at 36). "Rigid preventative rules that deny factfinders recourse to common sense, however, are neither necessary under our case law nor consistent with it." *KSR*, 550 U.S. at 421.

Petitioner's evidence sufficiently shows that it would have been obvious to a POSA "to substitute Sclater's one-way sprag-type bearing for Magid's ratchet-and-pawl one-way mechanism to obtain predictable results, e.g., reduced noise and improved durability." Pet. 61; Ex. 1003 ¶ 215. Magid broadly describes its safety device as "[a] unidirectional control means 6, 6'" and describes the unidirectional control means 6, 6' as being a ratchet and pawl mechanism in one embodiment. Ex. 1012, 4:47–55. This suggests that that the unidirectional control means 6, 6' could be a unidirectional control mechanism other than the ratchet and pawl described in one embodiment of Magid. *See also id.* at 7:61–67 (stating that Magid's invention is not limited to the preferred embodiments).

Sclater teaches using a sprag-type clutch for back stopping a conveyor belt. Ex. 1017, 320. A POSA would know that sprag-type clutches were also known for use in exercise equipment. *See* Ex. 1003 ¶¶ 89, 211, 447; Ex. 1018, 52–53; Ex. 1036 ¶ 76.

Dr. Giachetti testifies that "[s]ome common mechanical clutches include ratchet clutches and cam type one-way clutches, such as sprag clutches." Ex. 1003 ¶ 81. Dr. Giachetti testifies that "[r]atchet and pawl clutch mechanisms make noise during operation" because an audible "click" sound is made when the pawl collides with a gear tooth on the ratchet.

Ex. 1003 ¶ 208; *see also id.* ¶ 83 ("A ratchet clutch having a pawl that contacts the gear during overrunning is loud, as compared to other mechanical clutches."). Similarly, Sclater teaches that a friction-type clutch is quieter than a ratchet and pawl mechanism. Ex. 1017, 316. Sclater states:

> Sprags combined with cylindrical rollers in a bearing assembly can provide a simple, low-cost method for meeting the torque and bearing requirements of most machine applications. Designed and built by Est. Nicot of Paris, this unit gives one-direction-only torque transmission in an overrunning clutch. In addition, it also serves as a roller bearing.

*Id.* at 312.

Dr. Giachetti also testifies that roller clutches are better suited for high-speed freewheeling than ratchet clutches because "the pawl may skip past a few teeth before backstopping the ratchet gear, whereas the sprags are always in contact with the rings and do not need to find a discrete gear tooth to stop" and "because there are multiple sprags, they distribute the load over a larger surface area." Ex. 1003 ¶ 445 (citing Ex. 1017, 303, 320).

Finally, Dr. Giachetti testifies that "[a] POSA would have considered a sprag-type one-way clutch bearing [suitable] for an exercise equipment application, such as a treadmill." Ex. 1003 ¶¶ 91, 211 (citing Ex. 1018, 52–53 (a catalogue describing a sprag type one-way clutch as an option for "exercise equipment").

Given the testimony of Dr. Giachetti as to the knowledge of a POSA and the supporting evidence from Sclater, Petitioner has sufficiently shown that it would have been obvious to a POSA to substitute a one-way sprag type bearing clutch for Magid's ratchet and pawl one-way mechanism in order to reduce noise and improve durability.

Patent Owner's arguments are unpersuasive because they are rigidly focused on the alleged lack of a sufficiently particular disclosure of motivation in Sclater, without taking full account of an ordinarily skilled artisan's "knowledge, creativity, and common sense." *Randall Mfg. v. Rea*, 733 F.3d 1355, 1362 (Fed. Cir. 2013).

We determine that Petitioner's analysis and evidence sufficiently shows that the combination of Chickering, Magid, and Sclater teaches a safety device as recited by claim 30.

### 2. Secondary Considerations

We have considered Patent Owner's arguments and evidence concerning secondary considerations of evidence, discussed below, as part of our obviousness analysis for this ground. Patent Owner's evidence of secondary considerations, however, do not outweigh Petitioner's showing that claim 30 would have been obvious over Chickering, Magid, and Sclater.

### 3. Conclusion as to claim 30

After considering Petitioner's evidence and analysis, and taking into account Patent Owner's arguments and evidence, we determine that Petitioner has shown by a preponderance of the evidence that claim 30 is unpatentable over Chickering, Magid, and Sclater.

### 4. Independent Claims 37, 50, and 57

Petitioner relies upon a similar analysis to show that independent claims 37, 50, and 57 are unpatentable as the analysis it relies upon to show claim 30 is unpatentable. *See* Pet. 79–97. We note that Petitioner provides additional explanation for limitations of claims 37, 50, and 57 that slightly differ from claim 30. *See id.*

Patent Owner relies upon the same arguments it made in connection with claim 30. *See generally* PO Resp.

For similar reasons as discussed above with respect to claim 30, we determine that Petitioner has shown by a preponderance of the evidence that claims 37, 50, and 57 are unpatentable over Chickering, Magid, and Sclater.

5.    *Dependent Claims 31–34, 38, 39, 41, 45–49, and 59*

Petitioner contends that the additional limitations of dependent claims 31–34, 38, 39, 41, 45–49, and 59 are unpatentable over Chickering, Magid, and Sclater.  Pet. 97–103.  Patent Owner does not dispute that the combination of Chickering, Magid, and Sclater disclose the additional limitations.

After considering Petitioner's evidence and analysis, we determine that Petitioner has shown by a preponderance of the evidence that claims 31–34, 38, 39, 41, 45–49, and 59 are unpatentable over Chickering, Magid, and Sclater.

H.  *Secondary Considerations of Nonobviousness*

1.  *Legal Standards*

Objective evidence of non-obviousness "may often be the most probative and cogent evidence in the record" and "may often establish that an invention appearing to have been obvious in light of the prior art was not." *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1349 (Fed. Cir. 2012).  Thus, notwithstanding what the teachings of the prior art would have suggested to one skilled in the art, secondary considerations (objective evidence of nonobviousness) may lead to a conclusion that the challenged claims would not have been obvious. *In re Piasecki*, 745 F.2d 1468, 1471–72 (Fed. Cir. 1984).  Thus, our obviousness analysis includes consideration and weighing of Patent Owner's indicia of nonobviousness.

In order to accord substantial weight to secondary considerations in an obviousness analysis, "the evidence of secondary considerations must have a 'nexus' to the claims, *i.e.*, there must be 'a legally and factually sufficient connection' between the evidence and the patented invention." *Henny Penny Corp. v. Frymaster LLC*, 938 F.3d 1324, 1332 (Fed. Cir. 2019) (quoting *Demaco Corp. v. F. Von Langs-dorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988)); *Quanergy Sys., Inc. v. Velodyne Lidar USA, Inc.*, 24 F.4th 1406, 1417 (Fed. Cir. 2022).

Although the patent owner bears the initial burden of proving a nexus (*WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1359 (Fed. Cir. 1999)), a presumption of nexus may be appropriate if the patent owner shows "the asserted objective evidence is tied to a specific product and that product 'embodies the claimed features, and is coextensive with them.'" *Polaris Indus, Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1072 (Fed. Cir. 2018) (quoting *Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*, 229 F.3d 1120, 1130 (Fed. Cir. 2000) (emphasis added)); *Quanergy*, 24 F.4th at 1417. On the other hand, "[w]hen the [product] is not coextensive with the patented invention—for example, if the patented invention is only a component of a commercially successful machine or process," the patent owner is not entitled to a presumption of nexus. *Demaco*, 851 F.2d at 1392.

A patent owner may establish nexus, either through (1) the use of a rebuttable presumption that arises when certain conditions are met or (2) a direct showing of nexus.

*2. Rebuttable Presumption of Nexus*

In the first, a patent owner may rely on a rebuttable presumption of nexus as follows:

> As first recognized in *Demaco* . . . , a patentee is entitled to a rebuttable presumption of nexus between the asserted evidence of secondary considerations and a patent claim if the patentee shows that the asserted evidence is tied to a specific product and that the product "is the invention disclosed and claimed." 851 F.2d at 1392 (emphasis added). That is, presuming nexus is appropriate "when the patentee shows that the asserted objective evidence is tied to a specific product and that product 'embodies the claimed features, and is coextensive with them.'" *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1072 (Fed. Cir. 2018) (quoting *Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*, 229 F.3d 1120, 1130 (Fed. Cir. 2000)) . . .
>
> . . . Whether a product is coextensive with the patented invention, and therefore whether a presumption of nexus is appropriate in a given case, is a question of fact.

*Fox Factory*, *Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019).

The court in *Fox Factory* further explained, with respect to a presumption of nexus, that "the degree of correspondence between a product and a patent claim falls along a spectrum," and that "[a]lthough we do not require the patentee to prove perfect correspondence to meet the co-extensiveness requirement, what we do require is that the patentee demonstrate that the product is essentially the claimed invention." *Id.* at 1374. The court in *Fox Factory* rejected the patent owner's argument that the co-extensiveness requirement is simply an inquiry into "whether the patent claims broadly cover the product that is the subject of the evidence of secondary considerations." *Id.* at 1377. Thus, simply showing that a patent claim broadly covers the commercial product being asserted as objective evidence of nonobviousness is not enough to show they are coextensive. *Id.*

That is because "[a] patent claim is not coextensive with a product that includes a 'critical' unclaimed feature that is claimed by a different patent and that materially impacts the product's functionality." *Id.* at 1375. In contrast, "if the unclaimed features amount to nothing more than additional insignificant features, presuming nexus may nevertheless be appropriate." *Id.* at 1374. Based on the facts of the case in *Fox Factory*, the court found that "nexus may not be presumed" because "there are one or more features not claimed by the [challenged patent] that materially impact the functionality" of the products on which patent owner's presumption argument is based and the court rejected arguments that the patent claims broadly cover the product. *Id.* at 1376–1377.

Patent Owner argues that different models of its curved manual treadmills practice and are coextensive with the claims of the '884 patent. PO Resp. 57–58. They are 1) the CURVE treadmill (a.k.a SpeedBoard treadmill and CURVE Legacy treadmill); 2) Curve XL treadmill, 3) Curve LTG treadmill, 4) Curve FTG treadmill; 5) Curve 3.0 treadmill, 6) Curve Trainer, and 7) EcoMill and EcoMill Legacy treadmills. *Id.*

To support its argument, Patent Owner relies upon a claim chart purporting to show how the CURVE treadmill meets the claimed invention and the testimony of Dr. Blair. *Id.* at 56–69; Ex. 2018 ¶¶ 226–228 (citing Ex. 2027).

However, Patent Owner and Dr. Blair indicate that a number of its curved manual treadmills had different distinguishing features—features that are unclaimed. Patent Owner indicates that the Curve XL offered a larger running surface, that the Curve LTG treadmill is a lighter duty version, that Curve FTG treadmill has different handrails and additional features for providing different levels of resistance, that the Curve 3.0 has upgraded

software and sophisticated electronics, and the Curve Trainer has a less steep curve that provides a quieter and quicker acceleration, and the EcoMill and EcoMill Legacy has an onboard generators system that produces power for the display and USB charging station. Further, as Petitioner points out, we note that Patent Owner evidence points to unclaimed features such as a durable WOODWAY membrane technology, displays, heart-rate monitors, speed outputs, adjustable resistance, sophisticated load cells, data acquisition boards and software, and runner feedback system. Pet. Reply 26–27 (citing Ex. 1037, 27:13–25, 28:20–29:13; Ex. 2028, 77–79); Ex. 2057, 3.

Patent Owner and Dr. Blair broadly assert that these unclaimed features are not significant for the purposes of establishing nexus. PO Resp. 57–58; Ex. 2018 ¶¶ 226–228. But neither Patent Owner or Dr. Blair sufficiently explains why these features are insignificant and, at best, Dr. Blair's testimony shows that the '884 patent's claims broadly cover the CURVE treadmill only. PO Resp. 57–58; Ex. 2018 ¶¶ 226–228.

After reviewing Patent Owner's evidence of coextensions, determine that Patent Owner's evidence does not sufficiently establish that the different models of its curved manual treadmills are coextensive with the claims of the '884 patent. Patent Owner, thus, is not entitled to a presumption of nexus.

### 3. *Direct Showing of Nexus*

"A finding that a presumption of nexus is inappropriate does not end the inquiry into secondary considerations," however. *Id.* at 1373. "To the contrary, the patent owner is still afforded an opportunity to prove nexus by showing that the evidence of secondary considerations is the 'direct result of the unique characteristics of the claimed invention.'" *Id.* at 1373−74 (quoting *In re Huang*, 100 F.3d 135, 140 (Fed. Cir. 1996)). "Where the

offered secondary consideration actually results from something other than what is both claimed and novel in the claim, there is no nexus to the merits of the claimed invention," meaning that "there must be a nexus to some aspect of the claim not already in the prior art." *In re Kao*, 639 F.3d 1057, 1068−69 (Fed. Cir. 2011).

Ultimately, we must weigh Patent Owner's objective evidence in the context of whether the claimed invention as a whole would have been obvious to a skilled artisan. *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1331−32 (Fed. Cir. 2016). Only if the patent owner presents a *prima facie* case of nexus does the burden of production shift to the patent challenger to adduce evidence showing that any commercial success or industry praise was due to extraneous factors other than the patented invention. *Demaco*, 851 F.2d at 1393.

### a) Commercial Success

"Evidence of commercial success, or other secondary considerations, is only significant if there is a nexus between the claimed invention and the commercial success." *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1311–12 (Fed. Cir. 2006). "When a patentee can demonstrate commercial success, usually shown by significant sales in a relevant market, and that the successful product is the invention disclosed and claimed in the patent, it is presumed that the commercial success is due to the patented invention." *J.T. Eaton & Co. v. Atlantic Paste & Glue Co.*, 106 F.3d 1563, 1571 (Fed. Cir. 1997).

Patent Owner argues that it enjoyed 100% market share of the curved, manual treadmill market and made significant sales. PO Resp. 69–71. Citing to the testimony of Mr. Weber, Patent Owner asserts that "[t]he

commercial success of Patent Owner's products was based on the key features of the claimed invention." *Id.* at 71 (citing Ex. 2020 ¶¶ 34–41).

Mr. Weber is Patent Owner's Director of Sales and Marketing. Ex. 2020 ¶ 2. Mr. Weber testifies that safety is a critical factor for commercial success and in particular the use of a safety mechanism to control unintended rotation of the running bet. *Id.* ¶ 34 ("Woodway's line of curved, manual treadmills would not be commercially successful without such a safety feature"). *Id.* ¶¶ 37–41.

Petitioner argues that Patent Owner's evidence does not establish that Patent Owner is commercially successful in the field of manual treadmills and not just curved manual treadmills and that Patent Owner's evidence does not establish a nexus between its sales and the claimed safety mechanism. *See* Pet. Reply 20–30.

We agree with Petitioner that Patent Owner has not sufficiently established a nexus between its sales and the alleged commercial success. We do not credit Mr. Weber's testimony that the alleged commercial success of Woodway's curved, manual treadmills was due to the safety mechanism. As Petitioner points out, Mr. Weber's testimony indicates that Woodway's alleged commercial success could be due to other factors, such as Woodway's reputation. Pet. Reply 27 (citing Ex. 2020 ¶¶ 2, 13).

### 4. *Industry Praise*

"Evidence that the industry praised a claimed invention or a product that embodies the patent claims weighs against an assertion that the same claim would have been obvious." *Lectrosonics, Inc. v. Zaxcon, Inc.*, IPR2018-01129, Paper 33 at 68 (PTAB Jan. 24, 2020) (citing *WBIP*, 829 F.3d at 1334).

Patent Owner argues that its "CURVE line of treadmills garnered significant attention and praise in the industry." PO Resp. 70–72; PO Sur-reply 24. For support, Patent Owner asserts that its Curve Legacy was nominated for an Innovation Award by FIBO (Ex. 2020 ¶ 56, Ex. 2057), cites the testimony of Mr. Weber, Patent Owner's Director of Sales and Marketing (Ex. 2020 ¶¶ 43–56), and certain publications (Ex. 2045, 5; Ex. 2046, 3, 5; and Ex. 2052, 1). PO Resp. 72–73. Additionally, Mr. Weber's testimony refers to certain publications that are at Exhibits 2047–2057.

We have reviewed all of Patent Owner's cited evidence and determine that it is insufficient to show industry praise. *See* Pet. Reply 30–31. Although Patent Owner's evidence praises the CURVE lines to some extent, the praise is because of features not claimed and not for the claimed invention, which includes the claimed safety device. *See* Exs. 2047–2057; Ex. 1037, 67:8–16. For example, Exhibit 2057 indicates that the Curve Legacy was nominated for the Innovation Award by FIBO because it is "environmentally friendly", "has . . . no wear and tear components," "not necessary to replace the deck or running belt," includes "[a] durable WOODWAY membrane technology," and provides "direct feedback." Ex. 2057, 3. Additionally, Exhibit 2047 is insufficient because it is Patent Owner's own press release and, thus, is praise from itself. None of the cited evidence mentions the claimed safety device feature. *See* Exs. 2047–2057.

### 5. Copying

> [C]opying requires evidence of efforts to replicate a specific product, which may be demonstrated through internal company documents, direct evidence such as disassembling a patented prototype, photographing its features, and using the photograph as a blueprint to build a replica, or access to the patented product combined with substantial similarity to the patented product.

*Wyers v. Master Lock Co.,* 616 F.3d 1231, 1246 (Fed. Cir. 2010).

Patent Owner argues that "a number of companies" have launched products that are close copies of products in its CURVE line. PO Resp. 73–77; *see also* PO Sur-reply 23–25. As evidence of copying, Patent Owner relies upon the testimony of its employee Mr. Weber that a number of companies have products that are allegedly copies of Patent Owner's CURVE line of products. PO Resp. 73 (citing Ex. 2020 ¶¶ 57–68). Mr. Weber's testimony relies upon certain photographs to show the alleged copying (Exs. 2058–2065). Petitioner also alleges copying by a licensee and Patent Owner. PO Resp. 74.

Petitioner responds that Patent Owner's evidence does not show evidence of an effort to replicate a specific product. Pet. Reply 31–35.

We have reviewed all of Patent Owner's cited evidence and determine that it is insufficient to show copying of the claimed invention. Exhibits 2058–2065 make no mention of a feature resembling the claimed safety device. We also do not credit the conclusory testimony of Mr. Weber, Patent Owner's Director of Sales and Marketing, concerning his observations of alleged copying by others. Ex. 2020 ¶¶ 57–67. Finally, Patent Owner's evidence does not sufficiently show copying of a specific product.

### 6. *Long-Felt but Unsolved Need & Passage of Time*

Long-felt need can be shown by evidence that indicates that the prior art had a recognized need for a solution to the problem, and that others had tried and failed to find a solution to that problem. *Millennium Pharms., Inc. v. Sandoz Inc.,* 862 F.3d 1356, 1369 (Fed. Cir. 2017).

Patent Owner asserts that "[b]efore the priority date of the '884 patent, no one had successfully commercialized a curved, manual treadmill." PO

Resp. 77; PO Sur-reply 25–26. Patent Owner additionally argues that the passage of time between the prior art and the invention shows nonobviousness. PO Resp. 78—79.

Petitioner argues that Patent Owner's evidence fails to show that other POSA tried and failed to find a solution. Pet. Reply 35–36.

We have reviewed all of Patent Owner's cited evidence and determine that it is insufficient to show copying of the claimed invention. *See id.* Patent Owner's evidences does not sufficiently show that a POSA recognized a need that was long-felt or that others had tried and failed to solve the problems. None of the cited evidence describes failed efforts of others to solve the specific problems addressed by the claimed invention, such as a safety device that prevents bidirectional movement.

### 7. *Conclusion as to Secondary Considerations*

We have considered all of Patent Owner's arguments and evidence concerning secondary considerations. We determine that Patent Owner has not sufficiently establish a nexus between the unique features of the claimed invention and the evidence of secondary considerations. We, thus, give Patent Owner's evidence little weight.

## III. CONCLUSION[9]

After considering the evidence and arguments presented in the Petition and Preliminary Response, determine Petitioner has established by a

---

[9] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application

preponderance of the evidence that claims 30–34, 37–39, 41, 45–49, 57, and 59 are unpatentable and has failed to establish by a preponderance of the evidence that claims 40, 42–45, and 50–54 are unpatentable.

In summary:

| Claim(s) | 35 U.S.C. § | Reference(s)/Basis | Claim(s) Shown Unpatentable | Claim(s) Not Shown Unpatentable |
|---|---|---|---|---|
| 30–34, 37–43, 45–50, 52–54, 57, 59 | 103 | Schönenberger, Socwell, Magid, Sclater | | 30–34, 37–43, 45–50, 52–54, 57, 59 |
| 44, 51 | 103 | Schönenberger, Socwell, Magid, Sclater, Skowronski | | 44, 51 |
| 30–34, 37–54, 57, 59 | 103 | Schönenberger, Socwell, Magid, Sclater | | 30–34, 37–54, 57, 59 |
| 30–34, 37–39, 41, 45–49, 57, 59 | 103 | Chickering, Magid, Sclater | 30–34, 37–39, 41, 45–49, 57, 59 | |
| **Overall Outcome** | | | 30–34, 37–39, 41, 45–49, 57, 59 | 40, 42–45, 50–54 |

or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

## IV. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that claims 30–34, 37–39, 41, 45–49, 57, and 59 are unpatentable, and

FURTHER ORDERED that, because this is a final written decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2023-00843
Patent 10,561,884 B2

FOR PETITIONER:

Andrew B. Turner
John M. Halan
Rebecca J. Cantor
Kyle G. Konz
BROOKS KUSHMAN P.C.
atruner@brookskushman.com
jhalan@brookskushman.com
rcantor@brookskushman.com
kkonz@brookskushman.com


FOR PATENT OWNER:

Richard J. McKenna
Kadie M. Jelenchick
FOLEY & LARDNER LLP
rmckenna@foley.com
kjelenchick@foley.com

59

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

LIFECORE FITNESS, INC.
d/b/a ASSAULT FITNESS,
Petitioner,

v.

WOODWAY USA, INC.,
Patent Owner.

———————

IPR2023-00843
Patent 10,561,884 B2

———————

Before MEREDITH C. PETRAVICK, NEIL T. POWELL, and
AMEE A. SHAH, *Administrative Patent Judges.*

PETRAVICK, *Administrative Patent Judge*.

ERRATA TO FINAL WRITTEN DECISON

On October 22, 2024, we issued a Final Written Decision. Paper 44.
Pages 2 and 57 of the Final Written Decision inadvertantly list claim 45 as
both patentable and unpatenable. The Final Written Decision is modified to

indicate that claim 45 is unpatenable under the ground based upon Shickering, Magid, and Sclater.  The following sentence on page 2 is modified as follows, with modification shown by underling:

For the reasons discussed below, we determine that Petitioner has established by a preponderance of the evidence that claims 30–34, 37–39, 41, 45–49, 57, and 59 are unpatentable and has failed to establish by a preponderance of the evidence that claims 40, 42–4<u>4</u>, and 50–54 are unpatentable.

The following sentence spanning pages 56 and 57 and the table on page 57 is modified as follows:

After considering the evidence and arguments presented in the Petition and Preliminary Response, determine Petitioner has established by a preponderance of the evidence that claims 30–34, 37–39, 41, 45–49, 57, and 59 are unpatentable and has failed to establish by a preponderance of the evidence that claims 40, 42–4<u>4</u>, and 50–54 are unpatentable.

In summary:

| Claim(s) | 35 U.S.C. § | Reference(s)/Basis | Claim(s) Shown Unpatentable | Claim(s) Not Shown Unpatentable |
|---|---|---|---|---|
| 30–34, 37–43, 45–50, 52–54, 57, 59 | 103 | Schönenberger, Socwell, Magid, Sclater | | 30–34, 37–43, 45–50, 52–54, 57, 59 |
| 44, 51 | 103 | Schönenberger, Socwell, Magid, Sclater, Skowronski | | 44, 51 |
| 30–34, 37–54, | 103 | Schönenberger, Socwell, Magid, | | 30–34, 37–54, 57, 59 |

| | | | | |
|---|---|---|---|---|
| 57, 59 | | Sclater | | |
| 30–34, 37–39, 41, 45–49, 57, 59 | 103 | Chickering, Magid, Sclater | 30–34, 37–39, 41, 45–49, 57, 59 | |
| **Overall Outcome** | | | 30–34, 37–39, 41, 45–49, 57, 59 | 40, 42–44, 50–54 |

FOR PETITIONER:

John M. Halan
Andrew B. Turner
Rebecca J. Cantor
Kyle G. Konz
BROOKS KUSHMAN P.C.
jhalan@brookskushman.com
atruner@brookskushman.com
rcantor@brookskushman.com
kkonz@brookskushman.com

FOR PATENT OWNER:

Richard J. McKenna
Kadie M. Jelenchick
FOLEY & LARDNER  LLP
rmckenna@foley.com
kjelenchick@foley.com

4

US010561884B2



(12) **United States Patent**     (10) **Patent No.:**   **US 10,561,884 B2**

Bayerlein et al.     (45) **Date of Patent:**   *****Feb. 18, 2020**

(54) **MANUAL TREADMILL AND METHODS OF OPERATING THE SAME**

(71) Applicant: **Woodway USA, Inc.**, Waukesha, WI (US)

(72) Inventors: **Douglas G. Bayerlein**, Oconomowoc, WI (US); **Vance E. Emons**, Hartland, WI (US); **Nicholas A. Oblamski**, Waukesha, WI (US); **Scott D. Hoerig**, Brookfield, WI (US); **Matthew J. Zank**, Milwaukee, WI (US); **Robert L. Zimpel**, Menomonee Falls, WI (US); **Joel W. Richards**, Wauwatosa, WI (US)

(73) Assignee: **Woodway USA, Inc.**, Waukesha, WI (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/958,339**

(22) Filed: **Apr. 20, 2018**

(65) **Prior Publication Data**

US 2018/0236292 A1     Aug. 23, 2018

**Related U.S. Application Data**

(63) Continuation of application No. 14/832,708, filed on Aug. 21, 2015, which is a continuation of application

(Continued)

(51) **Int. Cl.**

| | | |
|---|---|---|
| *A63B 21/005* | (2006.01) | |
| *A63B 22/00* | (2006.01) | |

(Continued)

(52) **U.S. Cl.**

CPC ...... *A63B 21/0053* (2013.01); *A63B 21/0054* (2015.10); *A63B 21/0055* (2015.10);

(Continued)

(58) **Field of Classification Search**

CPC ............................................. A63B 22/02–0228

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 8,308 A | 8/1851 | Seymour |
| 219,439 A | 9/1879 | Blend |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 3201120 | 9/2001 |
| CN | 2860541 | 1/2007 |

(Continued)

OTHER PUBLICATIONS

U.S. Appl. No. 61/280,265, filed Nov. 2, 2009, Astilean, Aurel A.

(Continued)

*Primary Examiner* — Jennifer Robertson

(74) *Attorney, Agent, or Firm* — Foley & Lardner LLP

(57) **ABSTRACT**

A manually operated treadmill is provided that includes a frame having a front end and a rear end positioned opposite the front end; a front shaft rotatably coupled to the frame proximate the front end; a rear shaft rotatably coupled to the frame proximate the rear end; a plurality of bearings coupled to the frame; a running belt supported by the plurality of bearings, wherein the running belt includes a curved running surface; and a safety device coupled to at least one of the front shaft and the rear shaft, wherein the safety device is structured to substantially prevent rotation of at least one of the front shaft and the rear shaft in a first rotational direction

(Continued)



LIFECORE Ex. 1001, p. 1

while permitting rotation of the at least one of the front shaft and the rear shaft in a second rotational direction opposite the first rotational direction.

**59 Claims, 20 Drawing Sheets**

**Related U.S. Application Data**

No. 14/076,912, filed on Nov. 11, 2013, now Pat. No. 9,114,276, which is a continuation of application No. 13/235,065, filed on Sep. 16, 2011, which is a continuation-in-part of application No. PCT/US2010/027543, filed on Mar. 16, 2010.

(60) Provisional application No. 61/161,027, filed on Mar. 17, 2009.

(51) **Int. Cl.**
| | | |
|---|---|---|
| *A63B 21/00* | (2006.01) | |
| *A63B 22/02* | (2006.01) | |
| *A63B 23/04* | (2006.01) | |

(52) **U.S. Cl.**
CPC ........ *A63B 21/157* (2013.01); *A63B 22/0017* (2015.10); *A63B 22/0023* (2013.01); *A63B 22/02* (2013.01); *A63B 22/0235* (2013.01); *A63B 22/0285* (2013.01); *A63B 23/04* (2013.01); *A63B 2230/06* (2013.01); *A63B 2230/75* (2013.01)

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 411,986 | A | | 10/1889 | Frazeur et al. |
| 641,424 | A | | 1/1900 | Taitel et al. |
| 759,296 | A | | 5/1904 | Morairty |
| 767,221 | A | | 8/1904 | Hagen |
| 783,769 | A | | 2/1905 | Wright |
| 931,394 | A | | 8/1909 | Day |
| 1,211,765 | A | | 1/1917 | Schmidt |
| 2,117,957 | A | | 5/1938 | Heller |
| 2,399,915 | A | | 5/1946 | Drake |
| 2,842,365 | A | | 7/1958 | Kelley |
| 3,637,206 | A | | 1/1972 | Chickering, III |
| 3,642,279 | A | * | 2/1972 | Cutter .................... A63B 22/02 |
| | | | | 482/54 |
| 3,968,543 | A | | 7/1976 | Shino et al. |
| 4,334,676 | A | * | 6/1982 | Schonenberger ...... A63B 22/02 |
| | | | | 482/54 |
| 4,389,047 | A | | 6/1983 | Hall |
| 4,406,451 | A | * | 9/1983 | Gaetano ................. A61H 15/00 |
| | | | | 403/113 |
| 4,544,152 | A | | 10/1985 | Taitel |
| 4,548,405 | A | | 10/1985 | Lee et al. |
| 4,576,352 | A | | 3/1986 | Ogden |
| 4,614,337 | A | | 9/1986 | Schonenberger |
| 4,635,928 | A | | 1/1987 | Ogden et al. |
| 4,659,074 | A | | 4/1987 | Taitel et al. |
| 4,726,581 | A | | 2/1988 | Chang |
| 4,886,266 | A | | 12/1989 | Trulaske |
| 4,938,469 | A | | 7/1990 | Crandell |
| 5,031,901 | A | | 7/1991 | Saarinfn |
| 5,094,447 | A | | 3/1992 | Wang |
| 5,145,480 | A | | 9/1992 | Wang |
| 5,162,988 | A | | 11/1992 | Semerau et al. |
| 5,242,339 | A | | 9/1993 | Thornton |
| 5,290,205 | A | | 3/1994 | Densmore et al. |
| 5,310,392 | A | | 5/1994 | Lo |
| 5,318,487 | A | | 6/1994 | Golen et al. |
| 5,368,532 | A | | 11/1994 | Farnet |
| 5,378,213 | A | | 1/1995 | Quint |

| | | | | |
|---|---|---|---|---|
| 5,411,279 | A | | 5/1995 | Magid |
| 5,411,455 | A | | 5/1995 | Haber et al. |
| 5,431,612 | A | | 7/1995 | Holden |
| 5,470,293 | A | | 11/1995 | Schonenberger |
| 5,492,517 | A | * | 2/1996 | Bostic .................. A63B 21/015 |
| | | | | 482/110 |
| 5,538,489 | A | * | 7/1996 | Magid .................... A47D 13/04 |
| | | | | 482/54 |
| 5,575,740 | A | | 11/1996 | Piaget et al. |
| 5,577,598 | A | | 11/1996 | Schoenenberger |
| 5,643,144 | A | | 7/1997 | Trulaske |
| 5,669,856 | A | | 9/1997 | Liu |
| 5,683,332 | A | | 11/1997 | Watterson et al. |
| 5,688,209 | A | | 11/1997 | Trulaske et al. |
| 5,709,632 | A | † | 1/1998 | Socwell |
| 5,856,736 | A | | 1/1999 | Rotunda et al. |
| 5,887,579 | A | | 3/1999 | Eriksson et al. |
| 5,897,461 | A | | 4/1999 | Socwell |
| 6,042,514 | A | | 3/2000 | Abelbeck |
| 6,053,848 | A | | 4/2000 | Eschenbach |
| 6,095,952 | A | | 8/2000 | Ali et al. |
| 6,146,315 | A | | 11/2000 | Schonenberger |
| 6,152,854 | A | | 11/2000 | Carmein |
| 6,180,210 | B1 | | 1/2001 | Debus |
| 6,328,676 | B1 | | 12/2001 | Alessandri |
| 6,334,839 | B1 | | 1/2002 | Lim et al. |
| 6,348,025 | B1 | | 2/2002 | Schonenberger |
| 6,454,679 | B1 | | 9/2002 | Radow |
| 6,500,097 | B1 | | 12/2002 | Hall |
| 6,652,424 | B2 | | 11/2003 | Dalebout |
| 6,740,009 | B1 | | 5/2004 | Hall |
| 6,824,502 | B1 | | 11/2004 | Huang |
| 6,837,830 | B2 | | 1/2005 | Eldridge |
| 6,893,382 | B1 | | 5/2005 | Moon et al. |
| 6,923,746 | B1 | * | 8/2005 | Skowronski ....... A63B 22/0023 |
| | | | | 482/51 |
| 7,090,620 | B1 | | 8/2006 | Barlow |
| 7,179,205 | B2 | | 2/2007 | Schmidt |
| 7,410,449 | B2 | | 8/2008 | Yeh |
| 7,560,822 | B1 | | 7/2009 | Hoffmann |
| 7,618,345 | B2 | | 11/2009 | Corbalis et al. |
| 7,717,828 | B2 | | 5/2010 | Simonson et al. |
| 7,780,573 | B1 | | 8/2010 | Carmein |
| 7,789,800 | B1 | | 9/2010 | Watterson et al. |
| 7,806,805 | B2 | | 10/2010 | Barufka et al. |
| 7,862,483 | B2 | | 1/2011 | Hendrickson et al. |
| 8,075,450 | B2 | | 12/2011 | Fabbri et al. |
| 8,206,269 | B2 | | 6/2012 | Fabbri et al. |
| 8,241,187 | B2 | | 8/2012 | Moon et al. |
| 8,308,619 | B1 | | 11/2012 | Astilean |
| 8,343,016 | B1 | | 1/2013 | Astilean |
| D682,372 | S | | 5/2013 | Alessandri et al. |
| 8,585,561 | B2 | | 11/2013 | Watt et al. |
| 8,676,170 | B2 | | 3/2014 | Porrati et al. |
| 8,690,738 | B1 | | 4/2014 | Astillian |
| 8,734,300 | B2 | | 5/2014 | Piaget et al. |
| 8,864,627 | B2 | | 10/2014 | Bayerlein et al. |
| 8,876,668 | B2 | | 11/2014 | Hendrickson et al. |
| 8,920,347 | B2 | | 12/2014 | Bayerlein et al. |
| 9,005,085 | B2 | | 4/2015 | Astilean |
| 9,044,635 | B2 | | 6/2015 | Lull |
| D736,866 | S | | 8/2015 | Oblamski et al. |
| 9,192,810 | B2 | | 11/2015 | Beard et al. |
| 9,233,272 | B2 | | 1/2016 | Villani et al. |
| 9,254,409 | B2 | | 2/2016 | Dalebout et al. |
| D751,156 | S | | 3/2016 | Tasca et al. |
| 9,305,141 | B2 | | 4/2016 | Fabrizio |
| 9,314,667 | B2 | | 4/2016 | Puerschel |
| 9,352,188 | B2 | | 5/2016 | Astilean |
| 9,429,511 | B1 | | 8/2016 | Kannel |
| D788,792 | S | | 6/2017 | Alessandri et al. |
| 9,824,110 | B2 | | 11/2017 | Giudici et al. |
| 9,974,997 | B2 | | 5/2018 | Cei |
| 10,010,748 | B1 | | 7/2018 | Weinstein et al. |
| D827,058 | S | | 8/2018 | Lisi et al. |
| 2002/0147079 | A1 | | 10/2002 | Kalnbach |
| 2003/0186787 | A1 | | 10/2003 | Wu et al. |
| 2004/0018917 | A1 | | 1/2004 | Corbalis et al. |
| 2004/0077465 | A1 | | 4/2004 | Schmidt |

LIFECORE Ex. 1001, p. 2

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2004/0097341 A1 | 5/2004 | Alessandri et al. | |
| 2005/0009668 A1* | 1/2005 | Savettiere .......... | A63B 22/0023 |
| | | | 482/66 |
| 2005/0202936 A1 | 9/2005 | Ota | |
| 2005/0209059 A1 | 9/2005 | Crawford et al. | |
| 2006/0003871 A1 | 1/2006 | Houghton et al. | |
| 2006/0003872 A1 | 1/2006 | Chiles et al. | |
| 2006/0122035 A1 | 6/2006 | Felix | |
| 2006/0287165 A1 | 12/2006 | Pasqualin | |
| 2007/0021278 A1 | 1/2007 | Pan et al. | |
| 2007/0123396 A1 | 5/2007 | Ellis | |
| 2007/0298935 A1 | 12/2007 | Badarneh et al. | |
| 2008/0020907 A1 | 1/2008 | Lin | |
| 2008/0119332 A1 | 5/2008 | Roman | |
| 2008/0287266 A1 | 11/2008 | Smith | |
| 2009/0156363 A1 | 6/2009 | Guidi et al. | |
| 2009/0170666 A1 | 7/2009 | Chiang | |
| 2009/0215589 A1 | 8/2009 | Schoenenberger | |
| 2009/0280960 A1 | 11/2009 | Tian | |
| 2010/0216607 A1 | 8/2010 | Mueller | |
| 2010/0222182 A1 | 9/2010 | Park | |
| 2011/0266091 A1 | 11/2011 | Taylor | |
| 2012/0010048 A1 | 1/2012 | Bayerlein et al. | |
| 2012/0019973 A1 | 1/2012 | Ehrmantraut et al. | |
| 2012/0157267 A1 | 6/2012 | Lo | |
| 2012/0231934 A1 | 9/2012 | Lo | |
| 2012/0264569 A1 | 10/2012 | Escobedo et al. | |
| 2012/0270705 A1 | 10/2012 | Lo | |
| 2014/0011642 A1 | 1/2014 | Astilean | |
| 2014/0080679 A1 | 3/2014 | Bayerlein et al. | |
| 2014/0087922 A1 | 3/2014 | Bayerlein et al. | |
| 2014/0171272 A1 | 6/2014 | Hawkins et al. | |
| 2015/0119202 A1 | 4/2015 | Hendrickson et al. | |
| 2015/0157895 A1 | 6/2015 | Bettini | |
| 2015/0306456 A1 | 10/2015 | Pasini et al. | |
| 2015/0367175 A1 | 12/2015 | Alessandri et al. | |
| 2016/0023039 A1 | 1/2016 | Cei | |
| 2016/0096064 A1 | 4/2016 | Gatti | |
| 2016/0166877 A1 | 6/2016 | Cei et al. | |
| 2016/0263429 A1 | 9/2016 | Wagner | |
| 2016/0296789 A1 | 10/2016 | Astilean et al. | |
| 2016/0367851 A1 | 12/2016 | Astilean et al. | |
| 2017/0007886 A1 | 1/2017 | Alessandri | |
| 2017/0113093 A1 | 4/2017 | Bellavista et al. | |
| 2017/0182356 A1 | 6/2017 | Cei et al. | |
| 2017/0274248 A1 | 9/2017 | Brown et al. | |
| 2017/0312582 A1 | 11/2017 | Root, Jr. | |
| 2018/0001134 A1 | 1/2018 | Bayerlein et al. | |
| 2018/0111023 A1 | 4/2018 | Cei et al. | |
| 2018/0229065 A1 | 8/2018 | Leonardi et al. | |
| 2019/0054344 A1 | 2/2019 | Athey et al. | |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 201006229 | 1/2008 |
| CN | 201030178 | 3/2008 |
| CN | 201333278 | 10/2009 |
| CN | 102309835 | 1/2012 |
| DE | 10 2005 009 414 | 9/2006 |
| DE | 20-2006-005995 | 9/2006 |
| EP | 1 466 651 A1 | 10/2004 |
| GB | 2 223 685 A | 4/1990 |
| JP | 03-148743 | 6/1991 |
| JP | 3148743 | 2/2009 |
| KR | 2009007043 | 1/2009 |
| KR | 10-2016-0150084 A | 12/2016 |
| WO | WO-2009/014330 A1 | 1/2009 |
| WO | WO-2010/057238 A2 | 5/2010 |
| WO | WO-2010/107632 | 9/2010 |
| WO | WO-2014/160057 | 10/2014 |
| WO | WO-2016/163680 A1 | 10/2016 |

OTHER PUBLICATIONS

Andrews et al., The Effect of an 80-Minute Intermittent Running Protocol on Hamstrings Strength Abstract, NSCA Presentation, Jul. 15, 2006, 1 page.

Answer to Counterclaims filed Nov. 14, 2014 between *Speedfit LLC and Aurel Astilean* versus *Woodway USA, Inc.*, 8 pages.

Astilean, Alex, YouTube Video entitled "SpeedFit—Speedboard—First Curve Prototype" retrieved from the internet at: https://www.youtube.com/watch?v=dO9h-F-JVCU on Apr. 6, 2015, 49 pages of screenshots.

Brughelli et al., Effects of Running Velocity on Running Kinetics and Kinematics, Journal of Strength and Conditioning Research, Apr. 2011, 7 pages.

Claim Construction Order, *Speedfit LLC and Aurel A. Astilean* v. *Woodway USA, Inc.*, Docket No. 2:13-cv-01276-KAM-AKT, Nov. 20, 2017, 23 pages.

Complaint for Declaratory Judgment of Patent Invalidity and Correction of Inventorship, *Woodway USA, Inc.* v. *Aurel A. Astilean*, Civ. Dkt. No. 2:13-cv-00681-WEC (E.D. WI), Jun. 13, 2013, 6 pages.

Curvature, http://en.wikipedia.org/wiki/Curvature, Mar. 3, 2010, 1 page.

Decision and Order Denying Defendants Motion to Dimiss or to Transfer and Staying Case Pending Decision from Eastern District New York District Court, *Woodway USA, Inc.* v. *Aurel A. Astilean*, Civ. Dkt. No. 2:13-cv-00681-WEC (E.D. WI), Dec. 18, 2013, 7 pages.

Declaration of Aurel A. Astilean filed Jun. 15, 2015 between *Speedfit LLC and Aurel Astilean* versus *Woodway USA, Inc.* and Exhibit A.

Declaration of Aurel A. Astilean, *Speedfit LLC and Aurel A. Astilean* v. *Woodway USA, Inc.*, Docket No. 2:17-cv-00768-KAM-AKT, Exhibit 1, Mar. 26, 2018, 5 pages.

Declaration of Dan Bostan filed Jun. 15, 2015 between *Speedfit LLC and Aurel Astilean* versus *Woodway USA, Inc.* and Exhibit A.

Declaration of John F. Vodopia filed Jun. 6, 2017.

Declaration of John F. Vodopia in Further Support of Plaintiffs' Motion for Leave to Amend filed Jul. 7, 2015 and Exhibits A-C.

Declaration of John F. Vodopia in Support of Plaintiffs' motion for Leave to Amend filed Jul. 7, 2017 and Exhibits A-F.

Declaration of John F. Vodopia in Support of Plaintiffs' Motion Under 35 USC 256 to Correct Inventorship of U.S. Pat. No. 8,308,619 and U.S. Pat. No. 8,342,016 filed Jun. 15, 2015 between *Speedfit LLC and Aurel Astilean* versus *Woodway USA, Inc.* and Exhibits A-H.

Declaration of Kadie M. Jelenchick filed Jul. 7, 2015 and Exhibits A-G.

Declaration of Kadie M. Jelenchick filed Jun. 15, 2015 and Exhibits A, B and E.

Declaration of Kadie M. Jelenchick filed Jun. 6, 2017.

Declaration of Nicholas Oblamski filed Jun. 15, 2015, and Exhibit A, 11 pages.

Declaration of Nicholas Oblamski, *Speedfit LLC and Aurel A. Astilean* v. *Woodway USA, Inc.*, Docket No. 2:17-cv-00768-KAM-AKT, Exhibit 1, Mar. 26, 2018, 12 pages.

Declaration of Thomas B. Decea filed Nov. 19, 2015 between *Speedfit LLC and Aurel Astilean* versus *Woodway USA, Inc.*

Discovery Channel, "Wreckreation Nation", Season 1, Episode 8, first aired Feb. 24, 2009, 9 pages of screenshot excerpts.

Docket Report, *Speedfit LLC and Aurel A. Astilean* v. *Douglas G. Bayerlain*, Civ. Dkt. No. 2:13-cv-01276-KAM-AKT (E.D.N.Y.), Dec. 19, 2013, 8 pages.

Docket Report, *Woodway USA, Inc.* v. *Aurel A. Astilean*, Civ. Dkt. No. 2:13-cv-00681-WEC (E.D. WI), Dec. 19, 2013, 3 pages.

EMS-Grivory Grivory GV-5H Black 9915 Nylon Copolymer, 50% Glass Fiber Filled, as Conditioned, believed to be publically available before Sep. 16, 2011, 2 pages.

Excerpt from U.S. Appl. No. 14/076,912, Exhibit F, *Speedfit LLC and Aurel A. Astilean* v. *Woodway USA, Inc.*, Docket No. 2:17-cv-00768-KAM-AKT, Mar. 26, 2018, 4 pages.

**LIFECORE Ex. 1001, p. 3**

(56)　　　　　　References Cited

OTHER PUBLICATIONS

First Amended Complaint (Jury Trial Demanded), *Speedfit LLC and Aurel A. Astilean* v. *Douglas G. Bayerlein*, Civ. Dkt. No. 2:13-cv-01276-KAM-AKT (E.D.N.Y.), Jun. 17, 2013, 16 pages.
First Amended Complaint filed Jun. 17, 2013 between *Speedfit LLC and Aurel Astilean* versus *Woodway USA, Inc.*, 16 pages.
Hall, The Rotary Treadwheel, available at least as early as Nov. 2011, 1 page.
Hersher, Perfect Landing, http://news.harvard.edu/gazette/story/2010/01/different-strokes/, Jan. 27, 2010, 5 pages.
Hopker et al., Familiarisation and Reliability of Sprint Test Indices During Laboratory and Field Assessment, Journal of Sports Science and Medicine, Dec. 1, 2009, 5 pages.
http://www.gettyimages.com/detail/463782507, Animal treadmill c. 1872, Museum of Science and Industry, Chicago, 3 pps.
http://www.gettyimages.com/license/542395667, 1930 era treadmill, 1 page.
http://www.mpiwg-berlin.mpg.de/resrep00_01/Jahresbericht_2_2_section.html, 27 pps.
Integrated Performance Systems, LLC, Conditioning in a Professional Athlete Case Study, 2005, 1 page.
Integrated Performance Systems, LLC, Lower Extremity Rehabilitation & Assessment Case Study, 2005, 2 pages.
Integrated Performance Systems, LLC, Youth Athlete-Speed Training Case Study, 2005, 2 pages.
International Preliminary Report for Application No. PCT/US2010/026731, dated Sep. 29, 2011, 7 pages.
International Preliminary Report for Application No. PCT/US2010/027543, dated Sep. 29, 2011, 9 pages.
International Search Report and Written Opinion for Application No. PCT/US2010/026731, dated May 4, 2010, 8 pages.
International Search Report and Written Opinion for Application No. PCT/US2010/027543, dated May 12, 2010, 10 pages.
International Search Report and Written Opinion for International Application No. PCT/US2016/055572, dated Feb. 17, 2017, 9 pages.
International Search Report, PCT/US2017/040449, dated Oct. 11, 2017, 6 pages.
International Standard ISO 20957-6:2005(E), for Stationary training equipment—Part 6: Treadmills, additional specific safety requirements and test methods, First edition May 1, 2005, 18pps.
Introducing the New Force 3 Treadmill Advanced Analysis Package, www.fittech.com.au, believed to be publically available before Sep. 16, 2011, 3 pages.
Joint Disputed Claim filed Apr. 19, 2017 between *Speedfit LLC and Aurel Astilean* versus *Woodway USA, Inc.*, 10 pages.
Lieberman et al., Running Barefoot, Forefoot Striking & Training Tips, http://www.barefootrunning.fas.harvard.edu/5BarefootRunning&TrainingTips.html, Feb. 26, 2010, 5 pages.
Lieberman et al., Running Barefoot: Biomechanics of Foot Strike, http://www.barefootrunning.fas.harvard.edu/4Biomechanicsof-FootStrike.html, Feb. 26, 2010, 6 pages.
Lieberman et al., Running Barefoot: Biomechanics of Foot Strikes & Applications to Running Barefoot or in Minimal Footwear, http://www.barefootrunning.fas.harvard.edu/index.html, Feb. 26, 2010, 2 pages.
Lieberman et al., Running Barefoot: FAQ, http://www.barefootrunning.fas.harvard.edu/6FAQ.html, Feb. 26, 2010, 3 pages.
Lieberman et al., Running Barefoot: Heel Striking & Running Shoes, http://www.barefootrunning.fas.harvard.edu/2FootStrikes&RunningShoes.html, Feb. 26, 2010, 2 pages.
Lieberman et al., Running Barefoot: Running Before the Modern Shoe, http://www.barefootrunning.fas.harvard.edu/3RunningBeforeTheModernShoe.html, Feb. 26, 2010, 4 pages.
Lieberman et al., Running Barefoot: Why Consider Foot Strike, http://www.barefootrunning.fas.harvard.edu/1WhyConsiderFootStrike.html, Feb. 26, 2010, 1 page.
Memorandum and Order filed Dec. 28, 2015 between *Speedfit LLC and Aurel Astilean* versus *Woodway USA, Inc.*, 22 pages.
Memorandum and Order filed Oct. 10, 2014 between *Speedfit LLC and Aurel Astilean* versus *Woodway USA, Inc.*, 39 pages.
Memorandum and Order filed Oct. 19, 2015 between *Speedfit LLC and Aurel Astilean* versus *Woodway USA, Inc.*, 11 pages.
Memorandum of Law in Support of Plaintiffs' Motion for Leave to Amend the Second Amended Complaint filed Jul. 7, 2015, 13 pages.
Memorandum of Law in Support of Plaintiffs' Motion Under 35 USC 256 to Correct Inventorship of SPN 8,308,619 and U.S. Pat. 8,342,016 between *Speedfit LLC and Aurel Astilean* versus *Woodway USA, Inc.*, 14 pages.
Minute Entry for Proceedings on Nov. 10, 2015 and Exhibit G.
Moody, The Effects Resisted Sprint Training on Speed, Agility and Power Production in Young Athletes, believed to be publically available before Dec. 31, 2006, 5 pages.
Motion to Dismiss filed Oct. 30, 2015 and Exhibits A-H.
Nexus Resin Group, 10124 Antistat, believed to be publically available before Sep. 16, 2011, 2 pages.
Notice of Motion filed Jul. 7, 2015 between *Speedfit LLC and Aurel Astilean* versus *Woodway USA, Inc.*, 2 pages.
Notice of Motion Under 35 USC 256 to Correct Inventorship of U.S. Pat. No. 8,308,619 and U.S. Pat. No. 8,342,016 filed Jun. 15, 2015 between *Speedfit LLC and Aurel Astilean* versus *Woodway USA, Inc.*, 3 pages.
Notice of Woodway USA, Inc.'s Motion for Summary Judgment of Invalidity of U.S. Pat. No. 8,308,619 and 8,343,016 filed Jun. 5, 2017, 9 pages.
OSHA 1926.307, 9 pps.
Owners Manual for NordicTrack WalkFit Classic Treadmill, received on Mar. 2, 2017, 30 pps.
Owners Manual, Force 1, Nov. 29, 2007, 44 pages.
Owners Manual, Force 3, Jan. 28, 2009, 45 pages.
Owners Manual, The Force, Dec. 18, 2008, 68 pages.
Photographs of public display of Speedfit Speedboard by Woodway presented at IHRSA Tradeshow on Mar. 17, 2009, 8 pages.
Photographs produced to Woodway at least by Nov. 10, 2014 in litigation, *Speedfit LLC and Aurel A. Astilean* v. *Woodway USA, Inc.*, No. 2:13-cv-01276-KAM-AKT, 11 pages.
Plaintiff's Reply to Defendant Woodway's Answer, Affirmative Defenses and Counterclaims to Plaintiff's Second Amended Complaint filed Mar. 27, 2015, 6 pages.
Plaintiff's Reply to Defendant Woodway's Answer, Affirmative Defenses and Counter-Claims to Plaintiffs' Supplemental Complaint filed Mar. 17, 2017, 8 pages.
Plaintiffs Memorandum of Law in Opposition to Woodway's Motion for Summary Judgement of Invalidity and Opening Claim Construction Brief, Cross-Motion for Summary Judgment Upholding Validity, Cross-Motion for Summary Judgment for Infringement and Motion to Extend the Page Limitation for this Memorandum filed Jun. 6, 2017, 46 pages.
Plaintiffs' Initial Claims Construction Memorandum filed Jul. 31, 2017.
Plaintiffs' Memorandum of Law in further Opposition to Defendant's Motion to Dismiss Certain of Plaintiffs' Claims filed Nov. 19, 2015, 19 pages.
Plantar Fascia, http://en.wikipedia.org/wiki/Plantar_fascia, Mar. 3, 2010, 3 pages.
Reply in Opposition to D126 filed Nov. 6, 2015 and Exhibits A and B.
Reply Memorandum of Law in Further Support of Plaintiffs' Motion for Leave to Amend the Second Amended Complaint filed Jul. 7, 2015 between *Speedfit LLC and Aurel Astilean* versus *Woodway USA, Inc.*, 13 pages.
Response in Opposition re [117] First Motion to Amend Second Amended Complaint filed Jul. 7, 2015, 2 pages.
Response in Opposition to [110] Motion to Amend-Corret-Supplement filed Jun. 15, 2015, 2 pages.
Revised Answer to Counterclaims filed Dec. 12, 2014 between *Speedfit LLC and Aurel Astilean* versus *Woodway USA, Inc.*, 5 pages.
Ross et al., The Effects of Treadmill Sprint Training and Resistance Training on Maximal Running Velocity and Power, National Strength and Conditioning Association, Mar. 2009, 10 pages.

LIFECORE Ex. 1001, p. 4

(56)　　　　　**References Cited**

OTHER PUBLICATIONS

Rule 56.1 Counter-Statement by Plaintiffs Speedfit LLC, and Aurel A. Astilean filed Jun. 6, 2017, 13 pages.
Second Amended Complaint filed Feb. 17, 2015 between *Speedfit LLC and Aurel Astilean* versus *Woodway USA, Inc.*, 18 pages.
Sirotic et al., Physiological and Performance Test Correlates of Prolonged, High-Intensity, Intermittent Running Performance in Moderately Trained Women Team Sport Athletes, Journal of Strength and Conditioning Research, 2007, 7 pages.
Sirotic et al., The Reliability of Physiological and Performance Measures During Simulated Team-Sport Running on a Non-Motorised Treadmill, Journal of Science and Medicine in Sport, Apr. 11, 2007, 10 pages.
Soccer International, The Red Devil's in the Details, dated Jun. 2010, 4 pages.
Speedfit LLC's Opening Claim Construction Brief, *Speedfit LLC and Aurel A. Astilean* v. *Woodway USA, Inc.*, Docket No. 2:17-cv-00768-KAM-AKt, Mar. 26, 2018, 9 pages.
Speedfit, video produced to Woodway at least by Nov. 10, 2014 in litigation, *Speedfit LLC and Aurel A. Astilean* v. *Woodway USA, Inc.*, No. 2:13-cv-01276-KAM-AKT, 21 pages of screenshot excerpts.
Speedfit, video produced to Woodway at least by Nov. 10, 2014 in litigation, *Speedfit LLC and Aurel A. Astilean* v. *Woodway USA, Inc.*, No. 2:13-cv-01276-KAM-AKT, 23 pages of screenshot excerpts.
Supplemental Complaint filed Feb. 10, 2017 between *Speedfit LLC and Aurel Astilean* versus *Woodway USA, Inc.*
Supplemental Declaration of Kadie M. Jelenchick filed Jun. 6.
The Australian Competition & Consumer Commission's Mandatory Safety Standard for Treadmills (Supplier Guide), 2009, 20 pps.
The Woodway Force Brochure, The Best Way to Train for Speed & Athletic Power, dated May 5, 2005, 2 pages.
Third Amended Complaint filed Oct. 23, 2015 between *Speedfit LLC and Aurel Astilean* versus *Woodway USA, Inc.* and Exhibits A-H.
Woodway USA, Inc.'s Answer, Affirmative Defenses, and Counterclaims to Plaintiffs' First Amended Complaint filed Oct. 24, 2014 and Exhibits 1 and 2.
Woodway USA, Inc.'s Answer, Affirmative Defenses, and Counterclaims to Plaintiffs' Second Amended Complaint filed Mar. 6, 2015, 17 pages.
Woodway USA, Inc.'s Answer, Affirmative Defenses, and Counterclaims to Plaintiffs' Supplemental Complaint filed Feb. 24, 2017, 18 pages.
Woodway USA, Inc.'s List of Claim Terms to be Considered and Proposed Constructions, *Speedfit LLC and Aurel A. Astilean* v. *Woodway USA, Inc.*, Docket No. 2:17-cv-00768-KAM-AKT, Exhibit D, Mar. 26, 2018, 4 pages.
Woodway USA, Inc.'s Memorandum in response to Plaintiffs' Motion for Leave to Amend the Second Amended Complaint filed Jul. 7, 2015, 16 pages.
Woodway USA, Inc.'s Memorandum in Response to Plaintiffs' Motion Under 35 USC 256 to Correct Inventorship of U.S. Pat. No. 8,308,619 and U.S. Pat. No. 8,342,016 filed Jun. 15, 2015, 20 pages.
Woodway USA, Inc.'s Memorandum of Law in Support of Its Motions for Summary Judgment of Invalidity of U.S. Pat. No. 8,308,619 and 8,343,016 and Opening Claim Construction Brief filed Jun. 6, 2017, 38 pages.
Woodway USA, Inc.'s Opening Claim Construction Brief, *Speedfit LLC and Aurel A. Astilean* v. *Woodway USA, Inc.*, Docket No. 2:17-cv-00768-KAM-AKT, Mar. 26, 2018, 15 pages.
Woodway USA, Inc.'s Patents, *Speedfit LLC and Aurel A. Astilean* v. *Woodway USA, Inc.*, Docket No. 2:17-cv-00768-KAM-AKT, Exhibit B, Mar. 26, 2018, 3 pages.
Woodway USA, Inc.'s Reply Claim Construction Brief, *Speedfit LLC and Aurel A. Astilean* v. *Woodway USA, Inc.*, Docket No. 2:17-cv-00768-KAM-AKT, Mar. 26, 2018, 9 pages.
Woodway USA, Inc.'s Reply Memorandum in Support of Its Motion to Dismiss filed Nov. 25, 2017, 24 pages.
Woodway USA, Inc.'s Responsive Claim Construction Brief filed Jul. 28, 2017, 19 pages.

Woodway, Curve 3.0 Specification, May 25, 2011, 1 page.
Woodway, Curve Specification, May 24, 2011, 1 page.
Woodway, Curve Specification, May 25, 2011, 1 page.
Woodway, Curve XL Specification, May 18, 2011, 1 page.
Woodway, Force Specification, Apr. 8, 2008, 1 page.
Woodway, Force Specification, May 2, 2011, 1 page.
Woodway, Force Specification, May 2, 2012, 1 page.
Woodway's USA, Inc.'s Reply in Support of its Motion for Summary Judgment of Invalidity of U.S. Pat. Nos. 8,308,619 and 8,343,016 and Reply Claim Construction Brief filed Jun. 6, 2017, 16 page.
Woodway's Opposition to Defendant's Notice of Motion and Motion to Dismiss Case and Transfer Litigation to EDNY, *Woodway USA, Inc.* v. *Aurel A. Astilean*, Civ. Dkt. No. 2:13-cv-00681-WERC (E.D. WI), Oct. 18, 2013, 22 pages.
Woodways USA, Inc.'s Supplemental Rule 56.1 Statement of Undisputed Material Facts and Responses to Rule 56.1 Counterstatement by Plaintiffs Speedfit LLC and Aurel A. Astilean filed Jun. 6, 2017, 20 pages.
Speedfit, video produced to Woodway at least by Apr. 28, 2015 in litigation, a copy of which is submitted herewith on DVD, *Speedfit LLC et al.* v. *Woodway USA, Inc.*, Docket No. 2:13-cv-01276-KAM-AKT.
Minute Order Regarding Claim Construction, *Speedfit LLC* v. *Woodway*, Docket No. 2:17-cv-00768-KAM-AKT, Jun. 13, 2018, 2 pages.
Minute Entry and Order for Markman Hearing, dated Jun. 13, 2018, 2 pps.
Order Denying Motion for Reconsideration (Doc. No. 248), dated Jun. 20, 2018, 12 pps.
Supplemental Expert Report of Kim B. Blair, PhD., Case 3:15-CV-01665-JCH, Document 184-8, filed Mar. 16, 2018, 19 pps., marked on its face as Exhibit AA.
Second Supplemental Expert Report of Kim B. Blair, PhD., Case 3:15-CV-01665-JCH, Document 254-3, 41 pps., marked on its face as Exhibit 3.
Expert Report of Kim B. Blair, Ph.D., Case 3:15-CV-01665-JCH, Document 254-7, filed Jun. 8, 2018, 135 pps., marked on its face as Exhibit 7.
Rebuttal Expert Report of Kim B. Blair, Ph.D., Case 3:15-CV-01665-JCH, Document 254-15, 184 pps., marked on its face as Exhibit 15.
Woodway USA, Inc.'s opposition to plaintiffs' motion for partial reconsideration, Case 3:15-CV-01665-JCH, Document 250, filed May 14, 2018, 19 pps.
Defendant Woodway USA, Inc.'s responses and objections to plaintiffs' first set of interrogatories, Case 3:15-CV-01665-JCH, Document 254-22, 17 pps., marked on its face as Exhibit 22.
Woodway USA, Inc.'s motion for summary judgment of infringement of U.S. Pat. No. 9,039,580, Case 3:15-CV-01665-JCH, Document 255, filed Jun. 8, 2018, 3 pps.
Woodway USA, Inc.'s Memorandum of Law in support of its motion for summary judgment of infringement of U.S. Pat. No. 9,039,580, Case 3:15-CV-01665-JCH, Document 256, 38 pps.
Woodway USA, Inc.'s local rule 56(a)1 statement of undisputed material facts in support of its motion summary judgment of infringement of U.S. Pat. No. 9,039,580, Case 3:15-CV-01665-JCH, Document 257, 8 pps.
Woodway USA, Inc.'s memorandum of law in opposition to plaintiffs' motion for summary judgment of non-infringement and invalidity of Claim 25 of U.S. Pat. No. 9,039,580, Case 3:15-CV-01665-JCH, Document 266, filed Jun. 29, 2018, 42 pps.
Woodway USA, Inc.'s local rule 56(a)2 statement of facts in opposition to plaintiffs' motion for summary judgment, Case 3:15-CV-01665-JCH, Document 267, filed Jun. 29, 2018, 34 pps.
Woodway USA, Inc.'s Amended Supplemental Counterclaims, Case 3:15-CV-01665-JCH, Document 309, filed Sep. 14, 2018, 28 pps.
Plaintiffs' motion for partial reconsideration, Case 3:15-CV-01665-JCH, Document 248, filed May 7, 2018, 3 pps.
Plaintiffs' memorandum of law in support of their motion for partial reconsideration, Case 3:15-CV-01665-JCH, Document 249, filed May 8, 2018, 9 pps.

**LIFECORE Ex. 1001, p. 5**

(56) **References Cited**

OTHER PUBLICATIONS

Plaintiffs' Reply in Support of motion for partial reconsideration, Case 3:15-CV-01665-JCH, Document 251, filed May 29, 2018, 4 pps.
Plaintiffs' motion for summary judgment of non-infringement and invalidity on Claim 25 of U.S. Pat. No. 9,039,580, Case 3:15-CV-01665-JCH, Document 252, 2 pps.
Plaintiff's memorandum in support of motion for summary judgment of non-infringement and invalidity on Claim 25 of U.S. Pat. No. 9,039,580, Case 3:15-CV-01665-JCH, Document 253, filed Jun. 8, 2018, 45 pps.
Plaintiffs' Local Rule 56(a)1 statement of undisputed material facts, Case 3:15-CV-01665-JCH, Document 254, filed Jun. 8, 2018, 14 pps.
Plaintiffs' Opposition to Woodway USA, Inc.'s motion for summary judgment of infringement on Claim 25 of U.S. Pat. No. 9,039,580, Case 3:15-CV-01665-JCH, Document 264, filed Jun. 29, 2018, 35 pps.
Plaintiffs' Local Rule 56(a)2 statement of facts in opposition to summary judgment, Case 3:15-CV-01665-JCH, Document 265, filed Jun. 29, 2018, 17 pps.
Chapco, Inc. and Samsara Fitness LLC's notice pursuant to 34 U.S.C. §282, Case 3:15-CV-01665-JCH, Document 310, filed Sep. 14, 2018, 4 pps.
Plaintiffs' preliminary non-infringement contentions, Case 3:15-cv-01165-JCH, Document 96-3, filed May 2, 2017, 56 pps.
Plaintiffs' supplemental non-infringement contentions, Case 3:15-CV-01665-JCH, Document 98-8, filed May 2, 2017, 60 pps.
Plaintiffs' preliminary invalidity contentions, Case 3:15-CV-01665-JCH, Document 254-16, filed Jun. 8, 2018, 205 pps., marked on its face as Exhibit 16.
Declaration of Robert Giachetti, Case 3:15-CV-01665-JCH, Document 88-2, filed May 1, 2017, 20 pps., marked on its face as Exhibit 1.
Opening expert report of Dr. Robert Giachetti re: invalidity of U.S. Pat. No. 8,986,169 and U.S. Pat. No. 9,039,580, Case 3:15-CV-01665-JCH, Document 216-1, filed Apr. 5, 2018, 67 pps., marked on its face as Exhibit 1.
Expert report of Dr. Robert Giachetti, Case 3:15-CV-01665-JCH, Document 216-2, filed Apr. 5, 2018, 31 pps., marked on its face as Exhibit 2.
Supplemental rebuttal expert report of Dr. Robert Giachetti responsive to supplemental expert report of Dr. Kim Blair dated Mar. 15, 2018, dated May 14, 2018, 12 pps.
Supplemental rebuttal expert report of Dr. Robert Giachetti responsive to second supplemental expert report of Dr. Kim Blair dated Apr. 13, 2018, Case 3:15-CV-01665-JCH, Document 254-4, filed Jun. 8, 2018, 18 pps., marked on its face as Exhibit 4.
Woodway USA, Inc.'s first supplemental responses and objections to plaintiff's first set of interrogatories (Nos. 1-7), Case 2:17-cv-00768-KAM-AKT, Document 38-1, filed Mar. 14, 2018, 18 pps., marked on its face as Exhibit A.
Transcript of videotaped deposition of Alex Astilean taken Jul. 10, 2018 for Case 2:17-cv-00768-KAM-AKT, 75 pps.
Transcript of videotaped deposition of Speedfit LLC by Alex Astilean taken Jul. 10, 2018 for Case 2:17-cv-00768-KAM-AKT 38 pps.
Notice of Woodway USA, Inc.'s motion to preclude the testimony of plaintiffs' technical expert James Whelan, Case 2:13-cv-01276-KAM-AKT, Document 211, filed Aug. 8, 2018, 3 pps.
Woodway USA, Inc.'s memorandum in support of its motion to preclude the testimony of plaintiffs' technical expert James Whelan, Case 2:13-cv-01276-KAM-AKT, Document 212, filed Aug. 8, 2018, 37 pps.
Declaration of Matthew W. Peters, Case 2:13-cv-01276-KAM-AKT, Document 213, filed Aug. 8, 2018, 2 pps.
Video deposition transcript of James D. Whelan taken on Sep. 28, 2015, Case 2:13-cv-01276-KAM-AKT, Document 213-1, filed Aug. 8, 2018, 23 pps., marked on its face as Exhibit A.

Rebuttal expert report of Kim B. Blair, Ph.D., Case 2:13-cv-01276-KAM-AKT, Document 213-3, filed Aug. 8, 2018, 24 pps., marked on its face as Exhibit C.
Transcript of civil cause for evidentiary hearing before the Honorable Kiyo A. Matsumoto, United States District Judge, Case 2:13-cv-01276-KAM-AKT, Document 213-4, filed Aug. 8, 2018, 10 pps., marked on its face as Exhibit D.
Woodway USA, Inc.'s reply memorandum in further support of its motion to preclude the testimony of Plaintiffs' technical expert James Whelan, Case 2:13-cv-01276-KAM-AKT, Document 226, filed Aug. 8, 2018, 16 pps.
Supplemental declaration of Matthew W. Peters, Case 2:13-cv-01276-KAM-AKT, Document 227, filed Aug. 8, 2018, 1 pg.
Transcript of videotaped deposition of Dan Bostan, Case 2:13-cv-01276-KAM-AKT, Document 227-2, filed Aug. 8, 2018, 4 pps., marked on its face as Exhibit F.
Transcript of civil cause for evidentiary hearing before the Honorable Kiyo A. Matsumoto, United States District Judge, Case 2:13-cv-01276-KAM-AKT, Document 227-3, filed Aug. 8, 2018, 5 pps., marked on its face as Exhibit G.
Plaintiff's supplemental responses and objections to defendant's first set of interrogatories, Case 2:17-cv-00768-KAM-AKT, Document 38-3, filed Mar. 14, 2018, 22 pps., marked on its face as Exhibit C.
Expert report of James D. Whelan, P.E., report dated Jun. 12, 2018, 30 pps.
Expert report of James D. Whelan, P.E., report dated Jul. 27, 2015, Case 2:13,cv-01276-KAM-AKT, Document 212-1, filed Aug. 8, 2018, 62 pps., marked on its face as Exhibit 1.
Expert report of James D. Whelan, P.E., report dated Aug. 26, 2015, Case 2:13-cv-01276-KAM-AKT, Document 212-2, filed Aug. 8, 2018, 19 pps., marked on its face as Exhibit 2.
Expert report of James D. Whelan, P.E., report dated Sep. 28, 2018, 10 pps.
Biodex Medical Systems, Inc., "The Biodex RTM Rehabilitation Treadmill Operation Manual", believed to have published 2002, 48 pages.
Buchheit et al., "Assessing Stride Variables and Vertical Stiffness with GPS-Embedded Accelerometers: Preliminary Insights for Monitoring of Neuromuscular Fatigue on the Field", Dec. 2015.
Coolthings, "Woodway EcoMill: A Non-Motorized Treadmill with Electronic Displays", Jun. 4, 2009, https://www.coolthings.com/woodway-ecomill-a-non-motorized-treadmill-with-electronic-displays/, 1 page.
HDT Expeditionary Systems, Inc., "KineAssist-MX Owner's Manual vG", 2015, 73 pages.
Liszewski, Andrew, "EcoMill Treadmill Generates Its Own Power", Jun. 1, 2009, http://www.ohgizmo.com/2009/06/04/ecomill-treadmill-generates-its-own-power/, 1 page.
NASA, "Combined Operational Load Bearing External Resistance Treadmill (Colbert)", Aug. 2009, 3 pages.
NASA, "International Space Station: Combined Operational Load Bearing External Resistance Treadmill (Colbert)", Jul. 19, 2017, https://www.nasa.gov/mission_pages/station/research/experiments/765.html, 4 pages.
NASA, "International Space Station: Do Tread on Me", Aug. 19, 2009, https://www.nasa.gov/mission_pages/station/behindscenes/colbert_feature.html, 2 pages.
NASA, "International Space Station: Treadmill with Vibration Isolation and Stabilization System (TVIS)", May 17, 2018, https://www.nasa.gov/mission_pages/station/research/experiments/976.html, 5 pages.
NASA, "Space Shuttle Mission STS-128: Racking Up New Science", Press Kit, Aug. 2009, 116 pages.
Ruling Re: Plaintiffs' Motion for Summary Judgment of Non-Infringement and Invalidity (Doc. No. 252) and Woodway's Motion for Summary Judgment of Infringement (Doc. No. 255), *Chapco, Inc. and Samsara Fitness, LLLC* v. *Woodway USA, Inc.*, Docket No. 3:15-cv-01665-JCH, Jul. 24, 2018, 26 pages.
Southern Research et al., "AIMTech Project Brief", Oct. 20, 2015, 2 pages.
Southern Research et al., "Resist Force-Induced Treadmill", 2 pages.

LIFECORE Ex. 1001, p. 6

(56)  **References Cited**

OTHER PUBLICATIONS

Tecmachine, "Sprint Club: User's Guide", believed to have published 2002, 33 pages.
Woodway, "Introducing the All New EcoMill Self Powered", published to YouTube on Mar. 25, 2010, https://www.youtube.com/watch?v=NcPH92DAArc.
Woodway USA, Inc., "Treadmill Owner's Manual", Oct. 2001, 56 pages.
Woodway USA, Inc., EcoMill Promotional Flyer, Oct. 18, 2011, 1 page.
Woodway USA, Inc., Owner's Manual: EcoMill Non-Motorized, Jun. 4, 2010, 35 pages.

\* cited by examiner
† cited by third party

**LIFECORE Ex. 1001, p. 7**

Appx70



FIG. 1

LIFECORE Ex. 1001, p. 8



FIG. 2

LIFECORE Ex. 1001, p. 9

Appx72



FIG. 3

LIFECORE Ex. 1001, p. 10



FIG. 4

FIG. 5

LIFECORE Ex. 1001, p. 11

Appx74



FIG. 6

LIFECORE Ex. 1001, p. 12

Appx75



FIG. 7a

FIG. 7b

FIG. 7c

FIG. 7d

FIG. 7e

**LIFECORE Ex. 1001, p. 13**



**LIFECORE Ex. 1001, p. 14**

Appx77



FIG. 8



FIG. 9

LIFECORE Ex. 1001, p. 15

Appx78



FIG. 10



FIG. 11

**LIFECORE Ex. 1001, p. 16**

Appx79



## FIG. 12



## FIG. 13

**LIFECORE Ex. 1001, p. 17**

Appx80



FIG. 14



FIG. 17

**LIFECORE Ex. 1001, p. 18**



FIG. 15



FIG. 16

LIFECORE Ex. 1001, p. 19



FIG. 20

FIG. 21

FIG. 18

FIG. 19

LIFECORE Ex. 1001, p. 20



FIG. 23

FIG. 22

FIG. 24

LIFECORE Ex. 1001, p. 21

Appx84



FIG. 26

FIG. 28

FIG. 25

FIG. 27

LIFECORE Ex. 1001, p. 22

Appx85



FIG. 29

FIG. 30

LIFECORE Ex. 1001, p. 23

Appx86



FIG. 31

FIG. 32

FIG. 33

FIG. 34

LIFECORE Ex. 1001, p. 24

Appx87



FIG. 35



FIG. 36

LIFECORE Ex. 1001, p. 25

Appx88



FIG. 37

LIFECORE Ex. 1001, p. 26



FIG. 38

LIFECORE Ex. 1001, p. 27

# MANUAL TREADMILL AND METHODS OF OPERATING THE SAME

## CROSS-REFERENCE TO RELATED PATENT APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 14/832,708, filed Aug. 21, 2015, which is a continuation of U.S. patent application Ser. No. 14/076,912 now U.S. Pat. No. 9,114,276, filed Nov. 11, 2013, which is a continuation of U.S. patent application Ser. No. 13/235,065, filed Sep. 16, 2011, which is a continuation-in-part of prior international Application No. PCT/US10/27543, filed Mar. 16, 2010, which claims priority to U.S. Provisional Application Ser. No. 61/161,027, filed Mar. 17, 2009, all of which are incorporated herein by reference in their entireties.

## BACKGROUND

The present invention relates generally to the field of treadmills. More specifically, the present invention relates to manual treadmills. Treadmills enable a person to walk, jog, or run for a relatively long distance in a limited space. It should be noted that throughout this document, the term "run" and variations thereof (e.g., running, etc.) in any context is intended to include all substantially linear locomotion by a person. Examples of this linear locomotion include, but are not limited to, jogging, walking, skipping, scampering, sprinting, dashing, hopping, galloping, etc.

A person running generates force to propel themselves in a desired direction. To simplify this discussion, the desired direction will be designated as the forward direction. As the person's feet contact the ground (or other surface), their muscles contract and extend to apply a force to the ground that is directed generally rearward (i.e., has a vector direction substantially opposite the direction they desire to move). Keeping with Newton's third law of motion, the ground resists this rearwardly directed force from the person, resulting in the person moving forward relative to the ground at a speed related to the force they are creating.

To counteract the force created by the treadmill user so that the user stays in a relatively static fore and aft position on the treadmill, most treadmills utilize a belt that is driven by a motor. The motor operatively applies a rotational force to the belt, causing that portion of the belt on which the user is standing to move generally rearward. This force must be sufficient to overcome all sources of friction, such as the friction between the belt and other treadmill components in contact therewith and kinetic friction, to ultimately rotate the belt at a desired speed. The desired net effect is that, when the user is positioned on a running surface of the belt, the forwardly directed velocity achieved by the user is substantially negated or balanced by the rearwardly directed velocity of the belt. Stated differently, the belt moves at substantially the same speed as the user, but in the opposite direction. In this way, the user remains at substantially the same relative position along the treadmill while running. It should be noted that the belts of conventional, motor-driven treadmills must overcome multiple, significant sources of friction because of the presence of the motor and configurations of the treadmills themselves.

Similar to a treadmill powered by a motor, a manual treadmill must also incorporate some system or means to absorb or counteract the forward velocity generated by a user so that the user may generally maintain a substantially static position on the running surface of the treadmill. The counteracting force driving the belt of a manual treadmill is desirably sufficient to move the belt at substantially the same speed as the user so that the user stays in roughly the same static position on the running surface. Unlike motor-driven treadmills, however, this force is not generated by a motor.

## SUMMARY

One embodiment of the disclosure relates to a manually operated treadmill comprising a treadmill frame having a front end and a rear end opposite the front end, a front shaft rotatably coupled to the treadmill frame at the front end, a rear shaft rotatably coupled to the treadmill frame at the rear end, and a running belt including a curved running surface upon which a user of the treadmill may run. The running belt is disposed about the front and rear shafts such that force generated by the user causes rotation of the front shaft and the rear shaft and also causes the running surface of the running belt to move from the front shaft toward the rear shaft. The treadmill is configured to control the speed of the running belt to facilitate the maintenance of the contour of the curved running surface.

Another embodiment of the disclosure relates to a manually operated treadmill comprising a treadmill frame, a front support member rotatably coupled to the treadmill frame, a rear support member rotatably coupled to the treadmill frame, a running belt including a curved running surface upon which a user of the treadmill may run, wherein the running belt is supported by the front support member and the rear support member, and a synchronizing system configured to cause the front support member and the rear support member to rotate at substantially the same speeds. The force generated by the user causes rotation of the front support member and the rear support member and also causes the running belt to rotate relative to the treadmill frame.

Another embodiment of the disclosure relates to a manually operated treadmill comprising a treadmill frame, a front shaft rotatably coupled to the treadmill frame, a rear shaft rotatably coupled to the treadmill frame, a running belt including a contoured running surface upon which a user of the treadmill may run, wherein the running belt is disposed about the front and rear shafts such that force generated by the user causes rotation of the front shaft and the rear shaft and also causes the running belt to rotate about the front shaft and the rear shaft without the rotation of the running belt being generated by a motor, and a one-way bearing assembly configured to prevent rotation of the running surface of the running belt in one direction.

Another embodiment of the disclosure relates to manually operated treadmill comprising a treadmill frame, a running belt including a running surface upon which a user of the treadmill may run, a front support member rotatably coupled to the treadmill frame, the front support member comprising the forwardmost support for the running belt, a rear support member rotatably coupled to the treadmill frame, the rear support member comprising the rearwardmost support for the running belt. The running surface comprises at least in part a complex curve located intermediate the front support member and the rear support member and incorporating a minimum of two geometric configurations.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a perspective view of an exemplary embodiment of a manual treadmill having a non-planar running surface.

**LIFECORE Ex. 1001, p. 28**

3

FIG. **2** is a left-hand partially exploded perspective view of a portion of the manual treadmill according to the exemplary embodiment shown in FIG. **1**.

FIG. **3** is a right-hand partially exploded perspective view of a portion of the manual treadmill according to the exemplary embodiment shown in FIG. **1**.

FIG. **4** is a perspective view of the right-hand side of the manual treadmill of FIG. **1** with a portion of the rear of the treadmill cut-away to show a portion of the arrangement of elements.

FIG. **5** is a cross-sectional view of a portion of the manual treadmill taken along line **5-5** of FIG. **1**.

FIG. **6** is an exploded view of a portion of the manual treadmill of FIG. **1** having the side panels and handrail removed.

FIG. **7a** is a side schematic view of the profile of the running surface of the manual treadmill according to an exemplary embodiment.

FIGS. **7b-7j** are sides schematic views of alternative profiles of the running surfaces of manual treadmills according to alternative exemplary embodiments.

FIG. **8** is a partially exploded, perspective view of a bearing rail for the manual treadmill according to the exemplary embodiment shown in FIG. **1**.

FIG. **9** is a side elevation view of the bearing rail of FIG. **6**.

FIG. **10** is a top elevation view of a front shaft assembly for the manual treadmill according to the exemplary embodiment shown in FIG. **1**.

FIG. **11** is a top elevation view of a rear shaft assembly for the manual treadmill according to the exemplary embodiment shown in FIG. **1**.

FIG. **12** is a partial, cross-sectional view of the manual treadmill taken along line **12-12** of FIG. **1**.

FIG. **13** is an alternative exemplary embodiment of the partial, cross-sectional view of the manual treadmill similar to FIG. **12**.

FIG. **14** is a perspective view of an alternative embodiment of a synchronizing system integrated into a manual treadmill.

FIG. **15** is a partial, cross-sectional view of a manual treadmill including an exemplary embodiment of a braking system taken along line **15-15** of FIG. **4**.

FIG. **16** is a partial, cross-sectional view of a manual treadmill including another exemplary embodiment of a braking system taken along line **16-16** of FIG. **4**.

FIG. **17** is a perspective side view of a portion of the manual treadmill according to the exemplary embodiment shown in FIG. **1** including a plurality of rollers used in place of bearing rails.

FIG. **18** is a side perspective view of a track system for use with the exemplary embodiment of a manual treadmill shown in FIG. **1** and configured to help induce and maintain a running belt in a desired non-planar shape to define a running surface.

FIG. **19** is a detail view of the track system of FIG. **18** taken along line **19-19**.

FIG. **20** is a partial cross-sectional view of the track system of FIG. **18** taken along line **20-20**.

FIG. **21** is a detail view of the track system of FIG. **20** taken along line **21-21**.

FIG. **22** is a side perspective view of another exemplary embodiment of a track system for use with the exemplary embodiment of a manual treadmill shown in FIG. **1** and configured to help induce and maintain a running belt in a desired non-planar shape to define a running surface.

4

FIG. **23** is a detail view of the track system of FIG. **22** taken along line **23-23**.

FIG. **24** is a partial cross-sectional view of the track system of FIG. **18** taken along line **24-24**.

FIG. **25** is a side perspective view of another exemplary embodiment of a track system for use with the exemplary embodiment of a manual treadmill shown in FIG. **1** and configured to help induce and maintain a running belt in a desired non-planar shape to define a running surface.

FIG. **26** is a detail view of the track system of FIG. **25** taken along a line **26-26**.

FIG. **27** is a partial cross-sectional view of the track system of FIG. **25** taken along line **27-27**.

FIG. **28** is a detail view of the track system of FIG. **27** taken along line **28-28**.

FIG. **29** is a partially exploded, right-hand perspective view of a track system for use with the exemplary embodiment of a manual treadmill shown in FIG. **1** and configured to help induce and maintain a running belt in a desired non-planar shape to define a running surface.

FIG. **30** is a detail view of the track system of FIG. **29** taken along line **30-30**.

FIG. **31** is a side perspective view of another exemplary embodiment of a track system for use with the exemplary embodiment of a manual treadmill shown in FIG. **1** and configured to help induce and maintain a running belt in a desired non-planar shape to define a running surface.

FIG. **32** is a detail view of the track system of FIG. **31** taken along a line **32-32**.

FIG. **33** is a partial cross-sectional view of the track system of FIG. **31** taken along a line **33-33**.

FIG. **34** is a detail view of the track system of FIG. **32** taken along a line **34-34**.

FIG. **35** is a perspective view of an exemplary embodiment of a manual treadmill according to another embodiment having a substantially planar running surface.

FIG. **36** is a perspective view of a one-way bearing for the manual treadmill according to the exemplary embodiment shown in FIG. **1**.

FIG. **37** is a left-hand partially exploded perspective view of a portion of the manual treadmill according to the exemplary embodiment shown in FIG. **1** including an incline adjustment system.

FIG. **38** is a perspective view of a one-way bearing for the manual treadmill shown in FIG. **1**, according to another embodiment.

DETAILED DESCRIPTION

Referring to FIG. **1**, a manual treadmill **10** generally comprises a base **12** and a handrail **14** mounted to the base **12** as shown according to an exemplary embodiment. The base **12** includes a running belt **16** that extends substantially longitudinally along a longitudinal axis **18**. The longitudinal axis **18** extends generally between a front end **20** and a rear end **22** of the treadmill **10**; more specifically, the longitudinal axis **18** extends generally between the centerlines of a front shaft and a rear shaft, which will be discussed in more detail below.

A pair of side panels **24** and **26** (e.g., covers, shrouds, etc.) are preferably provided on the right and left sides of the base **12** to effectively shield the user from the components or moving parts of the treadmill **10**. The base **12** is supported by multiple support feet **28**, which will be described in greater detail below. A rearwardly extending handle **30** is provided on the rear end of the base **12** and a pair of wheels **32** are provided at the front of the base **12**, however, the

LIFECORE Ex. 1001, p. 29

wheels **32** are mounted so that they are generally not in contact with the ground when the treadmill is in an operating position. The user can easily move and relocate the treadmill **10** by lifting the rear of the treadmill base **12** a sufficient amount so that the multiple support feet **28** are no longer in contact with the ground, instead the wheels **32** contact the ground, thereby permitting the user to easily roll the entire treadmill **10**. It should be noted that the left and right-hand sides of the treadmill and various components thereof are defined from the perspective of a forward-facing user standing on the running surface of the treadmill **10**.

Referring to FIGS. **2-6**, the base **12** is shown further including a frame **40**, a front shaft assembly **44** positioned near a front end **48** of the frame **40**, and a rear shaft assembly **46** positioned near the rear end **50** of frame **40**, generally opposite the front end **48**. Specifically, the front shaft assembly **44** is coupled to the frame **40** at the front end **48**, and the rear shaft assembly **46** is coupled to the frame **40** at the rear end **50** so that the frame supports these two shaft assemblies.

The frame **40** comprises longitudinally-extending, opposing side members, shown as a left-hand side member **52** and a right-hand side member **54**, and one or more lateral or cross-members **56** extending between and structurally connecting the side members **52** and **54** according to an exemplary embodiment. Each side member **52**, **54** includes an inner surface **58** and an outer surface **60**. The inner surface **58** of the left-hand side member **52** is opposite to and faces the inner surface **58** of the right-hand side member **54**. According to other exemplary embodiments, the frame may have substantially any configuration suitable for providing structure and support for the manual treadmill.

Similar to most motor-driven treadmills, the front shaft assembly **44** includes a pair of front running belt pulleys **62** interconnected with, and preferably directly mounted to, a shaft **64**, and the rear shaft assembly **46** includes a pair of rear running belt pulleys **66** interconnected with, and preferably directly mounted to, a shaft **68**. The front and rear running belt pulleys **62**, **66** are configured to facilitate movement of the running belt **16**. The running belt **16** is disposed about the front and rear running belt pulleys **62**, **66**, which will be discussed in more detail below. As the front and rear running belt pulleys **62**, **66** are preferably fixed relative to shafts **64** and **68**, respectively, rotation of the front and rear running belt pulleys **62**, **66** causes the shafts **64**, **68** to rotate in the same direction. The front and rear running belt pulleys **62**, **66** are formed of a material sufficiently rigid and durable to maintain shape under load. Preferably, the material is of a relatively light weight so as to reduce the inertia of the pulleys **62**, **66**. The pulleys **62**, **66** may be formed of any material having one or more of these characteristics (e.g., metal, ceramic, composite, plastic, etc.). According to the exemplary embodiment shown, the front and rear running belt pulleys **62**, **66** are formed of cast aluminum. According to another embodiment, the front and rear running belt pulleys **62**, **66** are formed of a glass-filled nylon, for example, Grivory® GV-5H Black 9915 Nylon Copolymer available from EMS-GRIVORY of Sumter, S.C. 29151, which may save cost and reduce the weight of the pulleys **62**, **66** relative to metal pulleys. To prevent a static charge due to operation of the treadmill **10** from building on a pulley **62**, **66** formed of electrically insulative materials (e.g., plastic, composite, etc.), an antistatic additive, for example Antistat 10124 from Nexus Resin Group of Mystic, Conn. 06355, maybe may be blended with the GV-5H material.

As noted above, the manual treadmill disclosed herein includes a force translation system that incorporates a variety of innovations to translate the forward force created by the user into rotation of the running belt and permit the user to maintain a substantially static fore and aft position on the running belt while running. One of the ways to translate this force is to configure the running belt **16** to be more responsive to the force generated by the user. For example, by minimizing the friction between the running belt **16** and the other relevant components of the treadmill **10**, more of the force the user applies to the running belt **16** to propel themselves forward can be utilized to rotate the running belt **16**.

Another way to counteract the user-generated force and convert or translate it into rotational motion of the running belt **16** is to integrate a non-planar running surface, such as non-planar running surface **70**. Depending on the configuration, non-planar running surfaces can provide a number of advantages. First, the shape of the non-planar running surface may be such that, when a user is on the running surface, the force of gravity acting upon the weight of the user's body helps rotate the running belt. Second, the shapes may be such that it creates a physical barrier to restrict or prevent the user from propelling themselves off the front end **20** of the treadmill **10** (e.g., acting essentially as a stop when the user positions their foot thereagainst, etc.). Third, the shapes of some of the non-planar running surfaces can be such that it facilitates the movement of the running belt **16** there along (e.g., because of the curvature, etc). Accordingly, the force the user applies to the running belt is more readily able to be translated into rotation of the running belt **16**.

As seen in FIGS. **1** and **4-5**, the running surface **70** is generally non-planar and shown shaped as a substantially complex curve according to an exemplary embodiment. The running surface can be generally divided up into three general regions each having a particular geometric configuration, the front portion **72**, which is adjacent to the front shaft assembly **44**, the rear portion **74**, which is adjacent to the rear shaft assembly **46**, and the central portion **76**, which is intermediate the front portion **72** and the rear portion **74**. In the exemplary embodiment seen in FIGS. **1** and **4**, the running surface **70** includes a substantially concave curve **80** and a substantially convex curve **82**. At the front portion **72** of the running surface **70**, the relative height or distance of the running surface **70** relative to the ground is generally increasing moving forward along the longitudinal axis **18** from the central portion **76** toward the front shaft assembly **44**. This increasing height configuration provides one structure to translate the forward running force generated by the user into rotation of the running belt **16**. To initiate the rotation of the running belt **16**, the user places her first foot at some point along the upwardly-inclined front portion **72** of the running surface **70**. As the weight of the user is transferred to this first foot, gravity exerts a downward force on the user's foot and causes the running belt **16** to move (e.g., rotate, revolve, advance, etc.) in a generally clockwise direction as seen in FIG. **1** (or counterclockwise as seen in FIG. **4**). As the running belt **16** rotates, the user's first foot will eventually reach the lowest point in the non-planar running surface **70** found in the central portion **76**, and, at that point, gravity is substantially no longer available as a counteracting source to the user's forward running force. Assuming a typical gait, at this point the user will place her second foot at some point along the upwardly-inclined front portion **72** of the running belt **16** and begin to transfer weight to this foot. Once again, as weight shifts to this second foot, gravity acts on the user's foot to continue the rotation of the

**LIFECORE Ex. 1001, p. 30**

running belt **16** in the clockwise direction as seen in FIG. **1**. This process merely repeats itself each and every time the user places her weight-bearing foot on the running belt **16** at any position vertically above the lowest point of central portion **76** of the running surface **70** of the of the running belt **16**. The upwardly-inclined front portion **72** of the running belt **16** also acts substantially as a physical stop, reducing the chance the user can inadvertently step off the front end **20** of the treadmill **10**.

A user can generally utilize the force translation system of the treadmill **10** to control the speed of the treadmill **10** by the relative placement of her weight-bearing foot along the running belt **16** of the base **12**. Generally, the rotational speed of the running belt **16** increases as greater force is applied thereto in the rearward direction. The generally upward-inclined shape of the front portion **72** thus provides an opportunity to increase the force applied to the running belt **16**, and, consequently, to increase the speed of the running belt **16**. For example, by increasing her stride and/or positioning her weight-bearing foot vertically higher on the front portion **72** relative to the lowest portion of the running belt **16**, gravity will exert a greater and greater amount of force on the running belt **16** to drive it rearwardly. In the configuration of the running belt **16** seen in FIG. **1**, this corresponds to the user positioning her foot closer to the front end **20** of the treadmill **10** along the longitudinal axis **18**. This results in the user applying more force to the running belt **16** because gravity is pulling her mass downward along a greater distance when her feet are in contact with the front portion **72** of the running surface **70**. As a result, the relative rotational speed of the running belt **16** and the relative running speed the user experiences is increased. Accordingly, the force translation system is adapted to convert a variable level of force generated by the user into a variable speed of rotation of the belt.

FIG. **5** illustrates a number of possible locations where a user may position her feet. A-C indicate locations along the front portion **72** of the running surface **70** where a user may place their weight bearing foot. When the user positions her weight bearing foot at location A, she will be running with greater speed than if her weight bearing foot was positioned at locations B or C based upon the fact that the force of gravity is able to have a greater effect as the user's weight bearing foot moves from location A towards the rear of the non-planar running surface **70** as the running belt **16** rotates. At location A, gravity is able to have the greatest impact on the user so that the greatest amount of force is translated into rotation of the running belt **16**. A user can decrease her relative running speed by positioning her weight bearing foot at locations B or C. As location B is relatively higher along the front portion **72** than C, gravity is able to exert a greater force on the user and the running belt **16** than if the user's weight bearing foot was positioned at location C.

Another factor which will increase the speed the user experiences on the treadmill **10** is the relative cadence the user assumes. As the user increases her cadence and places her weight-bearing foot more frequently on the upwardly extending front portion **72**, more gravitational force is available to counteract the user-generated force, which translates into greater running speed for the user on the running belt **16**. It is important to note that speed changes in this embodiment are substantially fluid, substantially instantaneous, and do not require a user to operate electromechanical speed controls. The speed controls in this embodiment are generally the user's cadence and relative position

of her weight-bearing foot on the running surface. In addition, the user's speed is not limited by speed settings as with a driven treadmill.

In the embodiment shown in FIGS. **1-6**, gravity is also utilized as a means for slowing the rotational speed of the running belt. At a rear portion **74** of the running surface **70**, the distance of the running surface **70** relative to the ground generally increases moving rearward along the longitudinal axis **18** from the lowest point in the non-planar running surface **70**. As each of the user's feet move rearward during her stride, the rear portion **74** acts substantially as a physical stop to discourage the user from moving too close to the rear end of the running surface. To this point, the user's foot has been gathering rearward momentum while moving from the front portion **72**, into the central portion **76**, and toward the rear portion **74** of the running surface **70**. Accordingly, the user's foot is exerting a significant rearwardly-directed force on the running belt **16**. Under Newton's first law of motion, the user's foot would like to continue in the generally rearward direction. The upwardly-inclined rear portion **74**, interferes with this momentum and provides a force to counter the rearwardly-directed force of the user's foot by providing a physical barrier. As the user's non-leading foot moves up the incline (see position D in FIG. **5**), the running surface **70** provides a force that counters the force of the user's foot, absorbing some of the rearwardly-directed force from the user and preventing it from being translated into increasing speed of the running belt **16**. Also, gravity acts on the user's weight bearing foot as it moves upward, exerting a downwardly-directed force on the user's foot that the user must counter to lift their foot and bring it forward to continue running. In addition to acting as a stop, the rear portion **74** provides a convenient surface for the user to push off of when propelling themselves forward, the force applied by the user to the rear portion **74** being countered by the force the rear portion **74** applies to the user's foot.

One benefit of the manual treadmill according to the innovations described herein is positive environmental impact. A manual treadmill such as that disclosed herein does not utilize electrical power to operate the treadmill or generate the rotational force on the running belt. Therefore, such a treadmill can be utilized in areas distant from an electrical power source, conserve electrical power for other uses or applications, or otherwise reduce the "carbon footprint" associated with the operation of the treadmill **10**.

A manual treadmill according to the innovations disclosed herein can incorporate one of a variety of shapes and complex contours in order to translate the user's forward force into rotation of the running belt or to provide some other beneficial feature or element. FIG. **7a** generally depicts the curve defined by the running surface **70** of the exemplary embodiment shown in FIG. **1**, specifically, substantially a portion of a curve defined by a third-order polynomial. The front portion **72** and the central portion **76** define a concave curve and the rear portion **74** of the running surface **70** defines a convex curve. As the central portion **76** of the running surface **70** transitions to the rear portion **74**, the concave curve transitions to the convex curve. In the embodiment shown, the curvature of the front portion **72** and the central portion **76** is substantially the same; however, according to other exemplary embodiments, the curvature of the front portion **72** and the central portion **76** may differ. Please note, the description of the running surfaces as concave and convex provided herein is related to the relative curve which the user's foot would experience on the running surface **70**.

LIFECORE Ex. 1001, p. 31

9 10

FIGS. 7*b*-7*h* illustrate the side profiles of some exemplary non-planar, contoured running surfaces according to the innovations disclosed herein, each including a front portion, a central portion, and a rear portion. Each portion has a particular geometric configuration that is concave, convex, or linear; collectively, the portions define the non-planar running surface. For example, FIG. 7*b* shows an exemplary embodiment of the profile of a non-planar surface including a concave front portion **100**, a concave central portion **102**, and a concave rear portion **104** according to an exemplary embodiment. In this embodiment, the front portion **100**, central portion **102**, and rear portion **104** each have different curvatures. According to other exemplary embodiments, one or more of the front, central, and rear portions may have the same curvature.

FIG. 7*c* shows an exemplary embodiment of the profile of a non-planar surface including a convex front portion **110**, a concave central portion **112**, and a concave rear portion **114** according to an exemplary embodiment. Once again, this embodiment incorporates a smooth transition between the different curvatures of the front, central, and rear portions.

FIG. 7*d* shows an exemplary embodiment of the profile of a non-planar surface including a convex front portion **120**, a concave central portion **122**, and a convex rear portion **124** according to an exemplary embodiment. In this embodiment, the front portion **120** and the rear portion **122** have different curvatures, but these curvatures may be the same according to other exemplary embodiments.

FIG. 7*e* shows an exemplary embodiment of the profile of a non-planar surface including a convex front portion **130**, a convex central portion **132**, and a convex rear portion **134** according to an exemplary embodiment. In this embodiment, the front portion **130**, the central portion **132**, and the rear portion **134** each have the same convex curvature, but the curvature of one of more of the front portion **130**, the central portion **132**, and the rear portion **134** may differ according to other exemplary embodiments.

FIG. 7*f* shows an exemplary embodiment of the profile of a non-planar surface including a concave front portion **140**, a convex central portion **142**, and a convex rear portion **144** according to an exemplary embodiment. In this embodiment, the central portion **142** and the rear portion **144** having the same curvatures, but these curvatures may differ from each other according to other exemplary embodiments.

FIG. 7*g* shows an exemplary embodiment of the profile of a non-planar surface including a convex front portion **150**, a convex central portion **152**, and a concave rear portion **154** according to an exemplary embodiment. In this embodiment, the front portion **150** and the central portion **152** having the same curvatures, but these curvatures may differ from each other according to other exemplary embodiments.

FIG. 7*h* shows an exemplary embodiment of the profile of a non-planar surface including a concave front portion **160**, a convex central portion **162**, and a concave rear portion **164** according to an exemplary embodiment. In this embodiment, the front portion **160** and the rear portion **164** have different curvatures, but these curvatures may be the same according to other exemplary embodiments.

According to one exemplary embodiment, the non-planar running surface of the manual treadmill **10** is substantially curved, but that curve integrates one or more linear portions (e.g., that replace a "curved portion" or the curve or that are added/inserted into the curve). The linear portions may be substantially parallel to the longitudinal axis **18** or disposed at an angle relative thereto. FIG. 7*i* illustrates the profile of a non-planar surface wherein a substantially linear portion **170** has been integrated with a concave curve having a first

concave portion **174** to one side of the linear portion **170** and a second concave portion **176** to the opposite side of the linear portion **170** according to an exemplary embodiment. In addition to the linear portion **170**, the first concave portion **174** and the second concave portion **176**, the profile further includes a fourth portion shown as a convex portion **178**. According to an another exemplary embodiment, a linear portion may replace all or a portion of the curve. Alternatively, multiple linear portions may be included in a profile of a non-planar surface.

FIG. 7*j* illustrates a linear portion **180** provided at the front of the running surface which transitions into a concave curve **182** which then transitions into a convex curve **184**.

According to an exemplary embodiment, the non-planar running surface of the manual treadmill **10** may include (or be so defined as to include) more or less than three portions. For example, FIG. 7*g* could be interpreted as defined two portions, the first portion including the front portion and the central portion, which comprise a convex curve having the same curvature throughout the front portion **150** and the central portion **152**, and the second portion including the rear portion **154** which generally comprises a concave curve. According to some exemplary embodiments, some non-planar running surfaces include at least three or more portions.

According to an exemplary embodiment, the profile defined by the non-planar running surface is substantially a portion of a curve defined by any suitable second-order polynomial, but, as clearly demonstrated in FIGS. 7*a-j*, the profile defined by the non-planar running surface can be a portion of a curve that is a third-order polynomial or a fourth-order polynomial. According to yet another exemplary embodiment, the running surface profile can be substantially defined by a first-order polynomial, in other words, the running surface is substantially planar. An exemplary embodiment of a manual treadmill including a planar running surface will be discussed in more detail below (see e.g., FIG. **35**).

According to an exemplary embodiment, the relative length of each portion of the running surface may vary. In the exemplary embodiment shown, the central portion is the longest. In other exemplary embodiments, the rear portion may be the longest, the front portion may be shorter than the intermediate portion, or the front portion may be longer than the rear portion, etc. It should be noted that the relative length may be evaluated based on the distance the portion extends along the longitudinal axis or as measured along the surface of the running belt itself. One of the benefits of integrating one or more of the various curves or contours into the running surface is that the contour of the running surface can be used to enhance or encourage a particular running style. For example, a curve integrated into the front portion of the running surface can encourage the runner to run on the balls of her feet rather than a having the heel strike the running belt **16** first. Similarly, the contour of the running surface can be configured to improve a user's running biomechanics and to address common running induced injuries (e.g., plantar fasciitis, shin splints, knee pain, etc.). For example, integrating a curved contour on the front portion of the running surface can help to stretch the tendons and ligaments of the foot and avoid the onset of plantar fasciitis.

One of the difficulties associated with using a running surface that has a non-planar shape is inducing the running belt **16** to assume the non-planar shape and then maintaining the running belt **16** in that non-planar shape when the treadmill is being operated. In addition to discussing this

LIFECORE Ex. 1001, p. 32

difficulty in more detail below, a number of running belt retention systems providing ways to induce and maintain a belt in a desired non-planar shape to define the running surface are discussed below. Generally, these running belt retention systems are adapted to control the relative contour of the running belt so that the running belt substantially follows the contour of the running surface

One embodiment of a running belt retention system used to induce the running belt 16 to take-on the non-planar shape and then maintaining that shape, as shown in FIG. 5, is discussed in reference to FIGS. 5-6 and 8-11 in which base 12 is shown further including a pair of opposed bearing rails 200 to support the running belt 16 along with a front synchronizing belt pulley 202, a rear synchronizing belt pulley 204, and a synchronizing belt 206 all of which are interconnected to the running belt 16. The front rear synchronizing belt pulleys 202, 204 may be formed of the same or different materials as the front and rear running belt pulleys 62, 66.

Referring to FIGS. 6 and 8-9, in particular, the bearing rails 200 are shown including a plurality of bearings 208 and an upper or top profile 210, shown shaped as a complex curve, according to an exemplary embodiment. The bearing rails 200 shown are supported by and preferably mounted to the frame 40 substantially between the front shaft assembly 44 and the rear shaft assembly 46, the support members or elements about which the running belt 16 is disposed. One bearing rail 200 is coupled to one or more of the cross-members 56 proximate to the inner surface 58 of the left-hand side member 52 and the other bearing rail 200 is coupled to one of more of the cross-members 56 proximate to the inner surface 58 of the right-hand side member 54 thereby fixing the position of the bearing rails 200 relative to the frame 40.

The bearing rails 200 are preferably configured to facilitate movement of the running belt 16. In the exemplary embodiment seen in FIGS. 8-9, the running belt 16 moves substantially along the top profile 210 of the bearing rails 200. The running belt 16 contacts and is supported in part by the bearings 208 of the bearing rails and bearing 208 are configured to rotate, thereby decreasing the friction experienced by the running belt 16 as the belt moves along the top profile 210. The bearing rails 200 are configured to help achieve the desired shape of the running surface. The shape of the top profile 210 of the bearing rails 200 at least partially corresponds to the desired shape for the running surface 70. The at least somewhat flexible running belt 16 substantially assumes the shape of top profile 210 of the bearing rails 200 by being maintained substantially thereagainst, as will be discussed in more detail later. Accordingly, the running surface 70 has a shape that substantially corresponds to the shape of the top profile 210 of the bearing rails 200. It should be noted that the front and/or rear running belt pulleys may also help define a portion of the shape of the running surface. Also, other suitable shape-providing components may be used in combination with the bearing rails.

FIG. 9 provides a side view of one of the bearing rails 200 to more clearly show the top profile 210 according to an exemplary embodiment. Similar to the running surface 70, discussed above, the top profile 210 of the bearing rails 200 can be generally divided up into three general regions, the front portion 212 which is adjacent to the front shaft assembly 44 (see e.g., FIG. 5), the rear portion 214 which is adjacent to the rear shaft assembly 46 (see e.g., FIG. 5), and the central portion 216, intermediate the front portion 212 and the rear portions 214. The central portion 216 is shown as a concave curve 218 that has a radius of curvature R1. The

front portion 212 is further shown as a continuation of the concave curve 218 of the central portion 216, and, thus, also has a radius of curvature of R1. The rear portion 214 is shown as a convex curve 220 that has a radius of curvature R2. The front portion 212 is shown disposed substantially tangential to the central portion 216, providing a smooth transition therebetween, and helping provide a smooth shape for the running surface 70. The shape of the rear portion 214 also helps provide a smooth transition for the running belt 16 from the bearing rails 200 onto the rear running belt pulleys 66, which helps ensure as much contact as possible between the running belt 16 and the rear running belt pulleys 66. As the shape of the running surface substantially corresponds to the shape of top profile the bearing rails, the shape of the top profile of the bearing rails can necessarily be any of the shapes and/or have any of the variations (e.g., in length of portions, etc.) discussed above in FIGS. 7a through 7j with reference to possible shapes of the running surface.

According to an exemplary embodiment, each portion of the top profile is disposed substantially tangential to the portions adjacent thereto. According to other exemplary embodiments, less than all of the adjacent portions are disposed substantially tangential to the portions adjacent thereto, meaning the profile does not have an entirely smooth contour.

According to an exemplary embodiment shown in FIG. 9, R1 is approximately 7.26 feet. However, it is understood that a radius anywhere from 5 feet to 100-plus feet can be used. The size of the radius which can be used is typically a function of the length of the treadmill which can be accommodated. The range of possible radiuses for a convex bearing rail depends on the shaft-to-shaft distance of the treadmill (see e.g., measurement "x" in FIG. 5, discussed in more detail below). Assuming that the radius of curvature of the curve is $R_C$, the radius of the front running belt pulley is $R_f$, and the radius of the rear running belt pulley is $R_r$, the range of possible radiuses is approximately: $\infty > R_C > (x - R_f - R_r)/2$. For most commercial-available treadmills, x is approximately between 14 inches and 10 feet but the treadmill can certainly be as great as 25 feet in length. According to the exemplary embodiment shown in FIG. 5, x is approximately 57.8 inches in length. According to another exemplary embodiment, x is approximately 77.2 inches in length, with a radius R1 of approximately 8.67 feet, wherein the greater length x and radius R1 may facilitate use of the treadmill 10 by users with a longer running gait. The limiting factors in the length are the available space to accommodate the treadmill and the relative cost of constructing such a large treadmill.

When the treadmill 10 is being operated, the running belt 16 is driven rearwardly and the goal is to ensure that the running belt 16 follows the profile defined by a portion of the circumference of the front running pulleys 62, the contoured profile defined by the bearings 208 supported on the bearing rails 200 and finally by a portion of the circumference of the rear running belt pulleys 66. The particular contour which the running belt 16 assumes on the bottom of the base 12 between the rear running belt pulleys 66 and front running belt pulleys 62 is not terribly critical provided that the running belt continues to move with minimal friction and is not subject to excessive wear or obstruction.

Following the shape of the bearing rails 200 is not the natural tendency of the running belt for the particular contour seen in FIG. 5. Rather, without more, the running belt 16 tends to be pulled upward, away from the curved bearing rails and across the central portion 76 of the treadmill 10. Under the force of gravity, the weight of the running

LIFECORE Ex. 1001, p. 33

13

14

belt **16** coupled with the relative spacing between the front and rear running belt pulleys **62** and **66**, respectively, would likely result in the top surface of the running belt **16** assuming a position of the shortest distance between the two pulleys, namely, a substantially straight line between the two pulleys with any excess length of the running belt **16** collecting on the bottom of the treadmill and hanging below the front and rear running belt pulleys **62** and **66**, respectively. Therefore, a system of some sort needs to be integrated into a non-planar running surface treadmill to ensure that the running belt **16** follows the desired contour over the running surface.

Further referring to FIGS. **5-6** and **8-11**, one way to ensure that the running belt **16** follows the contour of the bearing rails **200** and the front and rear running belt pulleys **62**, **66** is to utilize the weight of the running belt **16** itself in addition to adjusting the relative size of the front and rear running belt pulleys **62**, **66**; and/or providing a synchronizing system **222** according to an exemplary embodiment.

As discussed above, the running belt **16** is disposed about the front and rear running belt pulleys **62**, **66** which in turn are disposed about front and rear shafts **64**, **68**, respectively. Measured along the longitudinal axis **18** between the centerlines of the front and rear shafts **64**, **68**, the front and rear shafts **64**, **68** are spaced a distance x from each other, as shown in FIG. **5**. Accordingly, when positioning the running belt **16** about the front and rear running belt pulleys **62**, **66**, the length of the running belt **16** provided therebetween must be at least x (e.g., the straight-line distance therebetween). It follows that, when the profile of the running surface **70** is non-planar, the length of the running belt provided between the front and rear shafts **64**, **68** will be greater than x.

In the exemplary embodiment shown in FIG. **5**, when positioning the running belt **16** about the front and rear running belt pulleys **62**, **66**, a length of the running belt **16** sufficient to permit the running belt **16** to correspond to (e.g., follow, be positioned against or above, etc.) the desired contours of the bearing rails **200** and the front and rear running belt pulleys **62**, **66** is generally disposed between the front and rear shafts **64**, **68**. At each location between the front and rear shafts **64**, **68**, the force of gravity pulls downward on the running belt **16**. Generally, this force will help pull the running belt **16** downward and against the desired components of base **12**. However, gravity can also cause slippage (e.g., over the front running belt pulley **62**, over the rear running belt pulley **66**, down along curves of the bearing rail **200**, etc.) in an amount that is undesirable and the magnitude of these slippage-problems tends to increase when the treadmill **10** is being operated. Accordingly, the solution typically relies on more than the weight of the running belt alone.

Further referring to FIGS. **5-6** and **8-11**, the preferred embodiment of the running belt **16** is shown including two reinforcing belts shown as endless belts **226** and a plurality of slats **228** according to an exemplary embodiment. The endless belts **226** are configured to provide support for the running belt **16** in order to support the weight of a user. The endless belts **226** are shown disposed on opposite sides of the running belt **16**, generally interior to the outer, lateral edge of the slats **228**. The endless belts **226** are themselves reinforced, and thus help stabilize the sides of the running belt and help prevent stretching of the running belt **16**. For example, the endless belts may be reinforced with metal wiring, which is surrounded by a molded plastic coating. According to some exemplary embodiments, more or less than two endless belts may be used. According to other exemplary embodiments, other suitable support elements may be used to provide support for the running belt. Further details regarding the structure of the running belt and endless belt structure are seen in U.S. Pat. No. 5,470,293, titled "Toothed-Belt, V-Belt, and Pulley Assembly, for Treadmills," which is incorporated by reference herein.

The endless belts **226** are further configured to interact with the front running belt pulleys **62** and the rear running belt pulleys **66**. The location of each endless belt **226** laterally, along the width of the running belt **16**, substantially corresponds to the location of a longitudinally aligned front running belt pulley **62** and rear running belt pulley **66**. Each endless belt **226** includes a first or inner portion **230** and a second or outer portion **232** at an interior surface **236** according to an exemplary embodiment. The inner portion **230** is in contact with an exterior surface **234** of the corresponding running belt pulleys **62**, **66**. According to some exemplary embodiments, the outer portion **232** is also in contact with the exterior surface **234** of the corresponding running belt pulleys **62**, **66**.

FIG. **12** illustrates a running belt and running belt pulley combination wherein the exterior surfaces **234** of the front running belt pulleys **62** are substantially smooth and are in contact with the interior surface **236** of the endless belts **226**, which is also substantially smooth according to an exemplary embodiment. The outer portion **232** is shown substantially not in contact with the exterior surfaces **234** of the front running belt pulleys **62**. The outer portion **232** is further shown including a plurality of teeth **238** (e.g., being toothed); however, according to other exemplary embodiments, the outer portion may be smooth or have any suitable texture and/or configuration. In this embodiment, both of the running belt pulleys come in contact with the inner, substantially smooth portion of the endless belts, and a toothed portion of the endless belts is disposed to the outside of the running belt pulleys on both sides.

FIG. **13** illustrates an alternative running belt and running belt pulley combination according to an exemplary embodiment. In this exemplary embodiment, the front running belt pulleys **62'** include a first or inner portion **230'** and a second or outer portion **232'**. The inner portion **230'** of the front running belt pulleys **62'** is substantially smooth, while the outer portion **232'** includes a plurality of teeth, to correspond to the inner and outer portions **230'**, **232'**, of the endless belts **226'**, respectively. In this embodiment, both of the running belt pulleys include an inner, smooth portion and an outer, toothed portion. These portions correspond to an inner, smooth portion of the endless belt and an outer, toothed portion of the endless belt. This endless belt/front running belt pulley configuration is discussed in more detail in U.S. Pat. No. 5,470,293, titled "Toothed-Belt, V-Belt, and Pulley Assembly, for Treadmills," which is herein incorporated by reference in its entirety.

According to still another an exemplary embodiment, a combination of the endless belt/front running belt pulley configurations shown in FIGS. **12** and **13** is used. In this exemplary embodiment, the smooth belt and pulley configuration shown in FIG. **12** is used for the front running belt pulleys and the combination of smooth and toothed belt and pulley configuration shown in FIG. **13** is used for the rear running belt pulleys. In another exemplary embodiment, the configuration shown in FIG. **13** is used for the front running belt pulleys and the configuration shown in FIG. **12** is used for the rear running belt pulleys.

The slats **228** of the running belt **16** are configured to help support a user of the treadmill **10**. The slats **228** may be made of substantially any suitably sturdy material (e.g.,

**LIFECORE Ex. 1001, p. 34**

15

wood, plastic, metal, etc.) and extend generally laterally between the endless belts 226. Each slat 228 is coupled at its ends 252, 254 to the second portions 232 of the endless belts 226 using fasteners. According to other exemplary embodiments, the slats may be otherwise coupled to the endless belts (e.g., adhered, welded, etc.) in the manner disclosed in U.S. Pat. No. 5,470,293, titled "Toothed-Belt, V-Belt, and Pulley Assembly, for Treadmills," which is incorporated herein by reference. Each slat is shown to include a portion 229 (e.g., stem, web, etc.) extending inwardly from an interior surface 256 of the slat 228.

According to an exemplary embodiment, the running belt may be substantially any suitable, continuous loop element, including, but not limited to, a continuous urethane (e.g., polyurethane) loop, a continuous loop made of plastics other than polyurethane, a plastic belt reinforced with reinforcing elements (e.g., metal wire, a relatively harder plastic, wood, etc.), a continuous foam loop, a loop formed by a plurality of interconnected members (e.g., metallic members, wooden members, etc.) in a manner to provide at least some flexibility, etc.

Referring to FIGS. 6, 10 and 11, another aspect of the solution to ensuring the running belt 16 follows the desired contour involves the utilizing front running belt pulleys 62 that are slightly larger than the rear running belt pulleys 66. That is, the radius of the front running belt pulleys, $R_f$, is greater than the radius of the rear running belt pulleys, $R_r$. Assuming the front running belt pulleys 62 are rotating with the same rotational velocity (e.g., angular speed) as the rear running belt pulleys 66, the tangential velocity of the front running belt pulleys 62 is slightly greater than the tangential velocity of the rear running belt pulleys 66. Thus, as the running belt 16 is driven, the portion of the running belt 16 disposed proximate the front end 20 of the treadmill 10 will be moved over the front running belt pulleys 62 and rearward with slightly greater speed than the rear running belt pulleys 66 move the portion of the running belt 16 proximate thereto. Thus, the front running belt pulleys 62 essentially "push" the running belt 16 rearward, creating a slight amount of excess running belt 16 in the area between the front running belt pulleys 62 and the rear running belt pulleys 66, which helps to counter the force of gravity which would attempt to gather any excess length of running belt 16 on the bottom of the treadmill 10 thereby causing the top surface of the running belt 16 to assume a position of the shortest distance between the two pulleys, namely, a substantially straight line between the two pulleys. Obviously the system cannot tolerate too much excess length of running belt feeding off the front running belt pulley 62 so periodically, a portion of this excess running belt 16 will slip over the rear running belt pulley 66. By specifically balancing the excess running belt 16 coming off the front running belt pulley 62 against the slippage allowed on the rear running belt pulley 66, the running belt 16 will follow the desired concave, convex or linear (or combinations thereof) contours of the running surface.

If the difference between the radius of the front running belt pulleys 62 and the radius of the rear running belt pulleys 66 is too large, the running belt 16 will begin to bunch up atop the base 12 as too much excess is generated. Accordingly, there is a practical limit of differences between the radius of each of the front running belt pulleys 62 and the radius of each of the rear running belt pulleys 66. Generally, this range may be dependent on the length of the running surface, as measured along the running belt, and/or the shape of the running surface. According to an exemplary embodiment, the size difference between the radii of the front and

16

rear running belt pulleys, $R_f-R_r$, is within the range of approximately $0<R_f-R_r, <0.100$ inches. Preferably, the size difference between the radii of the front and rear running belt pulleys, $R_f-R_r$, is within the range of approximately $0.005<R_f-R_r, <0.035$ inches. In one embodiment, the radius of the front running belt pulleys is approximately 7.00"+/−0.010" and the radius of the rear running belt pulleys is approximately 6.985"+/−0.010. According to another exemplary embodiment, instead of using front and rear running belt pulleys having a radial size difference, the synchronizing belt pulleys may have a radial size difference. Similar to the differently sized front and rear running belt pulleys, the differently sized front and rear synchronizing pulleys would be used to essentially "push" the running belt rearward, creating a slight amount of excess running belt 16 in the area between the front running belt pulleys and the rear running belt pulleys.

Another means for ensuring that the running belt 16 follows the desired complex curve is to match the rotational velocity of the front running belt pulleys 62 to that of the rear running belt pulleys 66 utilizing a synchronizing system 222. Further referring to FIGS. 5-6 and 8-11, the synchronizing system 222 is shown generally to comprise the front synchronizing belt pulley 202, the rear synchronizing belt pulley 204, and the synchronizing belt 206 according to an exemplary embodiment.

The front synchronizing belt pulley 202 is rotatably mounted relative to the front shaft 64, similar to the front running belt pulleys 62. Preferably, the front synchronizing belt pulley 202 is securely mounted directly to the front shaft 64. Similarly, the rear synchronizing belt pulley 204 is fixed relative to the rear shaft 68 and preferably securely mounted to the rear shaft 68. Accordingly, the front synchronizing belt pulley 202 will move with substantially the same rotational speed as the front running belt pulleys 62, and the rear synchronizing belt pulley 204 will move with the same rotational speed as the rear running belt pulleys 66. When the front shaft assembly 44 and the rear shaft assembly 46 are coupled to the frame 40, the front and rear synchronizing belt pulleys 202, 204 are shown disposed exterior to the outer surface 60 of the left-hand side member 52. According to another exemplary embodiment, the front and rear synchronizing belt pulleys may be placed exterior to the outer surface of the right-hand side member of the frame. According to other exemplary embodiments, the synchronizing system may be disposed substantially between the left-hand side member and the right-hand side member of the frame.

The synchronizing belt 206 is configured to provide a force that helps ensure that the front and rear shafts 64, 68 are rotating (e.g., moving, spinning, etc.) at the same rotational velocity. The synchronizing belt 206 is shown as an endless belt that is adapted to be supported in tension about the front synchronizing belt pulley 202 and the rear synchronizing belt pulley 204, as shown in FIGS. 4-5. As the running belt pulleys 62, 66 and the synchronizing belt pulleys 202, 204 are both substantially fixed relative to the front shaft 64 and the rear shaft 68, the rotation of the front shaft 64 and the rear shaft 68 causes the front synchronizing belt pulley 202 and the rear synchronizing belt pulley 204 to similarly rotate. In response to the motion of the front synchronizing belt pulley 202 and the rear synchronizing belt pulley 204, the synchronizing belt 206, which connects the front shaft assembly 44 and the rear shaft assembly 46, similarly rotates. Because of the tension in the synchronizing belt 206 and the fact that the synchronizing belt pulleys 202, 204 are the same size, the synchronizing belt 206 provides a counter force in response to any deviation in

LIFECORE Ex. 1001, p. 35

rotational velocity between the front shaft assembly 44 and the rear shaft assembly 46. For example, if the rear shaft assembly 46 was induced to start moving with greater rotational velocity than the front shaft assembly 44, the tension in the upper portion of the synchronizing belt (i.e., that portion of the synchronizing belt that extends generally between the tops of the synchronizing pulleys) would resist any differential rotation between the front and rear synchronizing belt pulleys 202, 204. Continuing with the example, any discrepancy between the rotational velocity of the front and rear shafts 64, 68 is similarly resisted by the engagement of the synchronizing belt 206. Thus, by constraining the relative motion of the front shaft assembly 44 and the rear shaft assembly 46, the synchronizing system 222 keeps their rotational velocity in sync, substantially preventing the front and rear running belt pulleys 62, 66 from becoming unsynchronized and moving at different rotational velocities.

So, in practice, the running belt 16 is initially installed on the front and rear running belt pulleys 62, 66 and the running belt 16 is manually positioned in the desired position so that a sufficient length of the running belt 16 is positioned along the top of the treadmill and the running belt 16 assumes the desired contour. While the running belt 16 is maintained in this position, the synchronizing belt 206 is mounted to the synchronizing belt pulleys 202, 204 and once the synchronizing belt 206 is installed, it effectively resists differential rotation of the running belt pulleys 62, 66 which could result in loss of the desired contour of the running belt 16.

It should be noted that the tension in the synchronizing belt 206 also helps maintain the position of the synchronizing belt 206 relative to the synchronizing belt pulleys 202, 204. The tension helps enhance friction between an interior surface 244 of the synchronizing belt 206 and exterior surfaces 246 of the synchronizing belt pulleys 202, 204, making it less likely that the synchronizing belt 206 will slip relative to the synchronizing belt pulleys 202, 204.

One or more tensioning assemblies 248 may be provided to adjust the tension in the synchronizing belt 206 (see e.g., FIGS. 3 and 6 illustrating tensioning assemblies 248). Tensioning assemblies 248 are configured to move portions of the synchronizing belt 206 relative to one another, stretching the synchronizing belt 206 and maintaining this stretch so that the synchronizing belt 206 can provide the necessary resistance to differential rotation of the front and rear running belt pulleys 62, 66. Alternatively, the tensioning assemblies 248 can be adjusted to release some of the tension in the synchronizing belt 206. Releasing some of the tension may be desirable if the synchronizing belt 206 is too tight, causing excess friction between the synchronizing belt 206 that makes it too difficult to rotate the front and rear shaft assemblies 44, 46 (e.g., greater than desired by the user, too great to function, etc.). The tensioning assemblies 248 are also used when the synchronizing belt 206 is being installed and removed. According to another exemplary embodiment, a single tensioning assembly is used in conjunction with one or more stationary idlers. According to still another exemplary embodiments, any devices or elements suitable for maintaining and/or adjusting the tension in the synchronizing belt may be used.

Referring to FIG. 14, a synchronizing system 300 is shown according to another exemplary embodiment. The synchronizing system 300 would typically be used in lieu of the previously described synchronizing system 222. In this next exemplary embodiment, the synchronizing system 300 is shown comprising a synchronizing shaft 302 mechanically connected at a first end 304 to a front gear 306 and at a second end 308 to a rear gear 310. The front gear 306 is

interconnected with, and preferably directly mounted and fixed relative to, the front shaft 64, and the rear gear 310 is interconnected with, and preferably directly mounted and fixed relative to, the rear shaft 68. Accordingly, the front gear 306 will move with substantially the same rotational speed as the front running belt pulleys 62, and the rear gear 310 will move with the same rotational speed as the rear running belt pulleys 66. When the front shaft assembly 44 and the rear shaft assembly 46 are coupled to the frame 40, the front and rear gears 306, 310 are shown disposed exterior to the outer surface 60 of the right-hand side member 54. According to another exemplary embodiment, the front and rear gears 306, 310 may be placed exterior to the outer surface of the left-hand side member of the frame. According to other exemplary embodiments, the synchronizing system may be disposed substantially between the left-hand side member and the right-hand side member of the frame.

The synchronizing shaft 302 is configured to provide a force that helps ensure that the front and rear shafts 64, 68 are rotating (e.g., moving, spinning, etc.) at the same rotational velocity. The synchronizing shaft 302 is shown as an elongated, substantially cylindrical member that extends generally between the front shaft 64 and the rear shaft 68. A first threaded portion 312 including a plurality of threads 314 is shown located at the first end 304 of the synchronizing shaft 302 and is configured to mesh with a plurality of teeth 316 of the front gear 306 that is fixed relative to the front shaft 64. A second threaded portion 318 including a plurality of threads 320 is shown located at the second end 308 of the synchronizing shaft 302 and is configured to mesh with a plurality of teeth 322 of the rear gear 310 that is fixed relative to the rear shaft 68.

The synchronizing shaft 302 rotates in response to the motion of the front gear 306 and the rear gear 310. When the front shaft 64 and the rear shaft 68 rotate in response to the user driving the running belt 16, the front gear 306 and the rear gear 310, which are fixed relative to the front shaft 64 and the rear shaft 68, respectively, similarly rotate. The front gear 306 meshes with and imparts rotational motion to the first threaded portion 312, and, thereby, imparts rotational motion to the synchronizing shaft 302. The rear gear 310 meshes with and imparts rotational motion to the second threaded portion 318, and, thereby, imparts rotational motion to the synchronizing shaft 302.

Because the synchronizing shaft 302 is rigid and the front and rear gears 306, 310 are the same size, the synchronizing shaft 302 provides a counter force in response to any deviation in rotational velocity between the front shaft assembly 44 and the rear shaft assembly 46. For example, if the rear shaft assembly 46 was induced to start moving with greater rotational velocity than the front shaft assembly 44, the rear gear 310 would be prevented from moving with greater rotational velocity than the front gear 306 because of the synchronizing shaft 302. The second threaded portion 318 is meshed with the rear gear 310. The second threaded portion 318 is fixed relative to the first threaded portion 312. The first threaded portion 312 is meshed with the front gear 306, which is moving with less rotational velocity than the rear gear 310. The front gear 306, being fixed relative to the front shaft assembly 44 which is also traveling at the same rotational velocity, seeks to continue at this rotational velocity. Thus, the force transmitted to the front gear 306 from the rear gear 310 by the synchronizing shaft 302 is met with a counter force. Specifically, the teeth 322 of the front gear 306 counter the force applied thereto by the threads 314 of the first threaded portion 312 at the first end 304. This counter force substantially prevents the rotational velocity of

LIFECORE Ex. 1001, p. 36

the synchronizing shaft **302**, which includes the second threaded portion **318**, from increasing. Stated otherwise, the force applied is sufficient to prevent the second end **308** of the synchronizing shaft **302** from rotationally advancing ahead of the first end **304**. As the second threaded portion **318** is prevented from experiencing an increase in rotational velocity, the second threaded portion **318** provides a counter force to the rear gear **310**. Specifically, the threads **320** of the second threaded portion **318** counter the force applied thereto by the teeth **322** of the rear gear **310**. Thus, the synchronizing shaft **302** constrains the relative motion of the front gear **306** and rear gear **310**, and, thereby constrains the relative motion of the front shaft assembly **44** and the rear shaft assembly **46**.

Another embodiment of a running belt retention system used to induce and maintain the running belt in a desired non-planar shape to define the running surface is seen in FIG. **15**, specifically a braking system **400** configured to help induce and maintain the running belt in a desired non-planar shape to define the running surface is shown according to an exemplary embodiment. Please note, the section lines **15-15** shown in FIG. **4** do not necessarily suggest that the braking system **400** seen in FIG. **15** is integrated into the manual treadmill depicted in FIG. **4**, rather, the section line **15-15** is included in FIG. **4** to show one potential location for the integration of a braking system into a manual treadmill according to the various innovations disclosed herein. The braking system **400** is shown in cooperation with the rear shaft assembly **402** and the synchronizing system **222**. The rear shaft assembly **402** differs from the above-discussed rear shaft assembly **46** in that the rear shaft assembly **402** includes a pair of rear running belt pulleys **404** that are substantially the same size as the front running belt pulleys (not shown).

The braking system **400** has substantially the same effect as the differently sized front and rear running belt pulleys discussed above. That is, the braking system **400** causes a slight amount of excess running belt **16** in the area between the front running belt pulleys and the rear running belt pulleys. More specifically, the braking system **400** causes the rotational velocity of the rear shaft assembly **402** to be slightly lower than the rotational velocity of the front shaft assembly by applying a frictional force to the rear synchronizing belt pulley **204**. Thus, the braking system **400** acts on the synchronizing system **222** to force (e.g., urge, push, move, etc.) the rear shaft assembly **402** out of synch with the front shaft assembly.

The braking system **400** includes a generally elongated member **406** in cooperation with the synchronizing system **222**. The elongated member **406** is coupled to the rear shaft assembly **402** by a bracket **408** having a first side **410** spaced a distance apart from an outer surface **250** of the rear synchronizing belt pulley **204**. The elongated member **406** is disposed through an aperture **412** of the bracket **408** and includes a first end **414** disposed to the inside of the first side **410** and a second end **416** disposed to the outside of the first side **410**. The first end **414** includes a surface **418** configured to contact the outer surface **250** of the rear synchronizing belt pulley **204**. The second end **416** includes a knob **420** configured to be gripped by a person (e.g., a user, a trainer, etc.) and to have a rotational force imparted thereto. An exterior surface of the elongated member **406** is at least partially threaded to correspond to threading at an interior surface defining the aperture **412**. Rotating the knob **420**, and, thereby, the elongated member **406**, in one direction, causes the surface **418** to be advanced toward the outer surface **250** of the rear synchronizing belt pulley **204**, and

rotating the knob **420** in the opposite direction causes the surface **418** to retreat or be moved away from the outer surface **250** of the rear synchronizing belt pulley **204**.

During operation of the treadmill, the surface **418** of the elongated member **406** is substantially in contact with the outer surface **250** of the rear synchronizing belt pulley **204**, creating friction therebetween. As the rear synchronizing belt pulley **204** of the synchronizing system **222** is fixed relative to the rear shaft assembly **402**, some of the force directed to the rear shaft assembly **402** to impart rotation thereto must be used to overcome the frictional force between the surface **418** of the elongated member **406** and the outer surface of the rear synchronizing belt pulley **204**. As the force needed to overcome the frictional force between the surface **418** of the elongated member **406** and the outer surface **250** of the rear synchronizing belt pulley **204** is no longer being directed into rotation of the rear shaft assembly **402**, the rotational velocity of the rear shaft assembly **402** is less than the rotational velocity of the front shaft assembly. Thus, the front running belt pulleys of the front shaft assembly will "push" the running belt rearward, creating a slight amount of excess running belt **16** in the area between the front running belt pulleys and the rear running belt pulleys. This excess length of running belt **16** helps to counter the force of gravity, discussed in more detail above. It should be noted that, because the friction between the surface **418** of the elongated member **406** and the outer surface **250** of the rear synchronizing belt pulley **204** is substantially constant during operation, the rotational velocity will be substantially maintained at the lower rotational velocity.

The length of excess running belt "pushed" rearward by the front running belt pulleys can be varied by adjusting the position of the surface **418** relative to the outer surface **250** of the rear synchronizing belt pulley **204**. If one moves the surface **418** laterally closer to the outer surface **250**, the friction therebetween will increase, the differential between the rotational velocity of the rear shaft assembly and the front shaft assembly will increase, and the length of the excess will increase. If one moves the surface **418** away from the outer surface **250**, the friction therebetween will decrease (or be removed if they are brought out of contact), the differential between the rotational velocity of the rear shaft assembly and the front shaft assembly will decrease, and the length of the excess will decrease.

According to another exemplary embodiment, the braking system **400** may be used with front and rear running belt pulleys that have a size differential. In such an embodiment, the braking system **400** would be used to fine tune the length of excess running belt pushed rearward with each rotation of the front and rear running belt pulleys.

FIG. **16** illustrates another exemplary embodiment of a braking system, shown as braking system **500**, configured to help induce and maintain the running belt in a desired non-planar shape to define the running surface. Please note, the section lines **16-16** shown in FIG. **4** do not necessarily suggest that the braking system **500** seen in FIG. **16** is integrated into the manual treadmill depicted in FIG. **4**, rather, the section line **16-16** is included in FIG. **4** to show one potential location for the integration of a braking system into a manual treadmill according to the various innovations disclosed herein. The braking system **500** includes a pulley **502** mounted to a rear shaft assembly **504** generally opposite a front shaft assembly, both shaft assemblies having running belt pulleys that are substantially the same size. A belt **506** rotationally couples the pulley **502** to an idler pulley **508**. The idler pulley **508** is configured to be adjustable so that it

**LIFECORE Ex. 1001, p. 37**

may be moved towards or away from the pulley **502** along an axis generally parallel to the longitudinal axis **18**. Though, it should be noted that the idler pulley may be moved relative to the pulley **502** mounted to the rear shaft assembly along an axis other than one generally parallel to the longitudinal axis **18**.

By adjusting the position of the idler pulley **508** relative to the pulley **502**, one can adjust the friction between the belt **506** and the pulleys **502**, **508**. Moving the idler pulley **508** away from the pulley **502**, increases the tension in the belt **506**, and, accordingly, increases the friction between the belt **506** and the pulleys **502**, **508**. Moving the idler pulley **508** toward the pulley **502**, decreases the tension in the belt **506**, and, accordingly, decreases the friction between the belt **506** and the pulleys **502**, **508**.

Similar to the discussion of braking system **400**, increasing the friction between the belt **506** and the pulleys **502**, **508**, increases the differential between the rotation of the rear shaft assembly to which the braking system **500** is coupled and the front shaft assembly. As a corollary, decreasing the friction between the belt **506** and the pulleys **502**, **508**, decreases the differential between the rotational velocity of the rear shaft assembly **504** and the front shaft assembly. As discussed above, the greater the differential, the greater the length of the excess that the front running belt pulleys push rearward.

FIG. **17** illustrates another exemplary embodiment of a running belt retention system of the treadmill **10** used to help induce and maintain the running belt in a desired non-planar shape to define the running surface. The treadmill **10** is shown including a plurality of rollers **600** used to support the running belt **16** in place of bearing rails **200**, discussed above.

The each roller **600** is shown extending laterally generally between the left-hand side member **52** and the right-hand side member **54** of the frame **40**. Along the longitudinal axis **18**, the rollers **600** are disposed adjacent to one another generally between one or more front running belt pulleys **604** and one or more rear running belt pulleys **606**. Typically, the running belt used with this exemplary embodiment is a continuous polymer belt without slats; the use of a continuous polymer belt having greater flexibility in the lateral direction than running belt **16** improves the ease of movement of the running belt along the rollers **600**. However, other suitable continuous belts may be used according to other exemplary embodiment

In the exemplary embodiment shown, the one or more front running belt pulleys is shown as a single, front running belt pulley **604** that is substantially a large roller, disposed at the front end **48** of the frame **40**. Similarly, the one or more rear running belt pulleys is shown as a single, rear running belt pulley **606** that is a substantially a large roller, disposed at the rear portion of the frame **40**. According to other exemplary embodiments, any multiple of running pulleys may be used at one or both of the front end and the rear end, such as front running belt pulleys **62**.

Collectively, the rollers **600** define a top profile **608** similar to the top profile **210** defined by the bearing rails **200**, discussed above, and provide for a running belt to move therealong. Similar to the top profile of the bearing rails, the top profile **608** defined by the rollers may be varied (e.g., may include a convex portion and a concave portion, may be modeled by a third-order polynomial, may be modeled by a fourth-order polynomial, etc.).

The front and rear running belt pulleys **604**, **606** and the rollers **600** help define the running surface. In use, the running belt is disposed over the front running belt pulley

**604**, along the top profile **602** defined by the rollers **600**, and over the rear running belt pulley **606**. The running belt is maintained in a position substantially along these elements primarily by the weight of the running belt; however, according to other exemplary embodiments, a synchronizing system may also be used to ensure that the running belt is maintained in the desired position.

Referring to FIGS. **18-21**, an embodiment of a running belt retention system including a track system **700** and configured to help induce and maintain the running belt in a desired non-planar shape to define the running surface according to an exemplary embodiment.

A treadmill according to this exemplary embodiment does not include front and rear shaft assemblies or bearing rails, but, rather, includes a pair of opposed tracks **702** configured to provide for movement of a running belt **16** therealong. The tracks **702** are spaced apart, generally define the path that the running belt **16** will travel, and substantially replicate at least a portion of the running surface. Each track **702** includes a side support wall **708** and a guide portion **710** generally centrally-disposed along the side support wall **708**. The guide portion **710** extends from an inner side **712** of the side support wall **708** towards the interior of the treadmill frame, defined generally between the left-hand side member and the right-hand side member. The guide portion **710** generally defines the contour of the running surface that is defined by the running belt **16** when coupled to the tracks **702**. An outer side **714** each side support wall **708** is disposed substantially adjacent to an inner surface of one of the side members of the treadmill frame.

A plurality of roller or wheel assemblies **716** are connected with, preferably mounted directly to or integral with, each of a plurality of slats **228** of the running belt **16**. Each a laterally-oriented slat **228** includes a left-hand end **252** generally opposite a right-hand end **254**. One of a plurality of wheel assemblies **716** is coupled at each end **252**, **254** of each slat **228** at an interior surface **256**. The wheel assemblies **716** are configured to be mated with the tracks **702** and provide for motion of the running belt **16** along the tracks **702**.

Each wheel assembly **716** is shown including first roller or wheel **720** and a second roller or wheel **722** rotatably coupled to a support shown as an elongated connecting member **724**. The connecting member **724** connects each wheel assembly **716** to a slat **228** and maintains the relative position of the first wheel **720** and the second wheel **722**. When coupled to the track **702**, the first wheel **720** of a wheel assembly **716** is disposed to one side the guide portion **710** and rotatably movable therealong, and the second wheel **722** of the wheel assembly **716** is disposed generally opposite the first wheel **720** to the other side of the central guide portion **710**.

The wheels **720**, **722** and the tracks **702** are shaped such that when they are mated, the wheels **720**, **722** cannot be pulled inwardly off of or pushed outwardly off of the track **702**. In the exemplary embodiment shown, the guide portion **710** is shown having a substantially-circular cross section **724** and the wheels **720**, **722** are shown having circumferentially-disposed arcuate depressions **726** that receive and travel along an outer curved portion **728** and an inner curved portion **730** of the guide portion **710** of the track **702**. According to other exemplary embodiments, the wheels and the track guide portion can have substantially any corresponding shapes that provide for the wheels and the track to mate and that provide for movement of the wheels therealong.

**LIFECORE Ex. 1001, p. 38**

23                                                                    24

When the running belt **16** is being driven by a user, the interaction of the guide portion **710** and the first and second wheels **720, 722** helps maintain the belt in the desired non-planar shape. As mentioned above, the tracks **702** generally defines the contour of the running surface defined by the running belt **16**. Being coupled to the guide portion **710** of the track **702**, each wheel assembly **716** rotates about the track **702**, following the contour defined thereby.

If the running belt **16** began to deviate from the desired path, the interaction between the wheels **720, 722** and the guide portion **710** would substantially prevent undesirable shifting. While being rotatably coupled to the elongated connecting member **724**, the axes **732** and **734** of the first wheel **720** and second wheel **722**, respectively, are a fixed distance apart. Further, the arcuate depressions **726** of the wheels **720, 722** are in contact with the outer curved portion **728** and inner curved portion **730**, respectively. Thus, as a result the interactions between the arcuate depressions **726** and the curved portions **728, 730**, any movement of a wheel assembly **716** relative to the track **702** other than along the path defined by the track **702** is countered by a force from the guide portion **710**. It should also be noted that the interactions between the depressions **726** of adjacent wheel assemblies **716** and the curved portions **728, 730** of the track **702** may also help keep a wheel assembly **716** in place.

Referring to FIGS. **22-24**, the treadmill **10** is shown including another exemplary embodiment of a track system configured to help induce and maintain the running belt in a desired non-planar shape to define the running surface, shown as a track system **800**. Similar to track system **700**, a treadmill according to this exemplary embodiment does not include front and rear shaft assemblies or bearing rails, but, rather, includes a pair of tracks **802** configured to provide for movement of a running belt **16** therealong. In this exemplary embodiment, each track **802** is shown as an elongated member having a substantially C-shaped cross section that defines a channel **804** having an opening **806** that faces the interior of the frame **40**. An outer wall **808** each of the tracks **802** is disposed substantially adjacent to an inner surface of a left-hand or right-hand side member **52, 54** (shown, e.g., in FIG. **2**) such that the openings **806** face each other. The outer wall **808** is substantially opposite an inner wall **810**.

As discussed above, the running belt **16** includes a plurality of laterally-oriented slats **228** each having a left-hand end **252** generally opposite a right-hand end **254**. One of a plurality of roller or wheel assemblies **812** is coupled at each end **252, 254** of each slat **228** to mate with the tracks **802** and to provide for motion of the running belt **16** along the tracks **802**.

Each wheel assembly **812** is shown including a support shown as a mounting block **814** and a wheel **816** rotatably coupled to the mounting block **814**. The mounting block **814** mounted to an interior surface **256** of a slat **228**. The wheel **816** is supported relative to the mounting block **814** by an axis **818** that extends substantially parallel to the slats **228** to facilitate positioning the wheel **816** in the channel **804**. The wheel **816** is received in the channel **804** and is rotatably movable therewithin to facilitate travel of the running belt **16** along the contour defined by the channel **804**. The shape of the channel **804** generally corresponds to the shape of the wheel **816**.

When the running belt **16** is being driven by a user, the walls of the track **802** defining the C-shaped channel **804** help forcibly retain the wheel **816** therein, preventing the wheel from moving in any direction other than along the contour defined by the channel **804**, and, thereby, maintaining the running belt **16** in the desired non-planar shape to

define the running surface. The outer wall **808** and the inner wall **810** limit the side-to-side, lateral movement of the wheel **816** when it is disposed in the channel **804**. Limiting the motion of the wheel **816**, similarly limits the motion of the wheel assembly **812** and the slat **228** fixed relative thereto. Further, a first wall **820** substantially opposite a second wall **822** substantially limits the up-and-down motion of the wheel **816** relative to the channel **804**. In circumstances where side-to-side and/or up-and-down motion of the wheel **816** occurs, the walls **808, 810, 820, 822** defining the channel **804**, providing counter forces to maintain the wheel **816** in the desired position and help direct the wheel **816** along the desired path.

Referring to FIGS. **25-28**, the treadmill **10** is shown including still another exemplary embodiment of a track system configured to help induce and maintain the running belt in a desired non-planar shape to define the running surface, shown as a track system **900**. Similar to track system **800**, the treadmill according to this exemplary embodiment does not include bearing rails, but, rather, includes a pair of tracks **902** configured to provide for movement of a running belt **16** therealong. In this exemplary embodiment, each track **902** is shown as an elongated member having a substantially C-shaped cross section that defines a channel **904** having an opening **906** that faces the exterior of the track **902**. Stated otherwise, each channels **904** extend about an outer periphery **908** of a tracks **902**.

As discussed above, the running belt **16** includes a plurality of laterally-oriented slats **228** each having a left-hand end **252** generally opposite a right-hand end **254**. One of a plurality of roller or wheel assemblies **910** is coupled at each end **252, 254** of each slat **228** to mate with the tracks **902** and to provide for motion of the running belt **16** along the tracks **902**.

Each wheel assembly **910** is shown including a support shown as a connecting bar **912** that is substantially T-shaped and connected to a first wheel **914** and a second wheel **916**. A first portion **918** of the connecting bar **912** is fixed relative to the interior surface **256** of a slat **228**. A second portion **920** extends substantially perpendicular to the first portion **918** and away from the interior surface **256** of the slat **228**. The first wheel **914** and the second wheel **916** are connected to the connecting bar **912** by an axis **922** that extends generally parallel to the first portion **918** and perpendicular to the second portion **920** of the connecting bar **912**. The first wheel **914** is disposed to one side of the second portion **920** of the connecting bar **912** and the second wheel **916** is disposed opposite the first wheel **914** to the other side of the second portion **920**.

When the wheel assemblies **910** are mated with the tracks **902**, the second portion of the connecting bar **912** extends partially into the channel **904**, the first wheel **914** is received within a first portion **924** of the channel **904** and the second wheel **916** is disposed within a second portion **926** of the channel **904**. The first portion **924** of each channel **904** is disposed proximate to an outer surface **928** of the track **902** relative to the second portion **926**.

When the running belt **16** is being driven by a user, the first wheel **914** and the second wheel **916** of a given wheel assembly rotate within the channel **904**, facilitating moment of the running belt **16** in the path defined by the track **902**. As the running belt **16** is rotated, the slats **228** are disposed generally exterior to the periphery **908** of the track **902**. The walls of the track **902** defining the channel **904** help forcibly retain the wheels **914, 916**. An outer wall **930** and an inner wall **932** limit the side-to side movement of the wheels **914, 916**, either by coming into contact with the wheels **914, 916**

**LIFECORE Ex. 1001, p. 39**

themselves or by coming into contact with another part of the wheel assembly **910** (e.g., the connecting bar **912**). Limiting the motion of the wheels **914**, **916** and the wheel assembly **910** similarly limits the motion of the slat fixed relative thereto, helping each slat, and, thereby, the running belt **16** to follow the desired path. Further, a first wall **934** substantially opposite a second wall **936** substantially limits the up-and-down motion of the wheels **914**, **916** relative to the channel **904**. In circumstances where side-to-side and/or up-and-down motion of the wheel **916** occurs, the walls **930**, **932**, **934**, **936** defining the channel **904**, providing counter forces to maintain the wheels **914**, **916** in the desired position and help direct the wheels **914**, **916** along the desired path.

Referring to FIGS. **29-30**, the treadmill **10** is shown including another exemplary embodiment of a track system configured to help induce and maintain the running belt in a desired non-planar shape to define the running surface, shown as a track system **1000**.

Instead of using wheel assemblies, such as **716** and **910**, discussed above, the treadmill according to this exemplary embodiment utilizes a plurality of magnets **1002** to maintain the running belt **16** in the desired position. One or more magnets **1002** are fixed relative to the interior surface **256** of the slats **228** at locations substantially corresponding to the position of a track **1004**, which is typically along the left-hand end **252** and the right-hand end **254** of the slats **228**. The magnets **1002** may be coupled by any variety of fasteners or fastening mechanisms. Generally, it is preferable that, when the magnets **1002** are fixed relative to the slats, the fasteners do not directly contact the periphery **1006** of the tracks **1004** to avoid scratching and damage thereto. While it is generally desirable to mount a magnet **1002** to each slat, **228**, the number of magnets used will vary depending upon a variety of factors such as the relative weight of the belt and the relative magnetic strength of each magnet.

The magnets **1002** are configured to magnetically couple the running belt **16** to the track **1004**, which is made of metal (e.g., steel) or includes a peripheral metal portion. The magnets **1002** have strength suitable to maintain the running belt **16** in close proximity to a periphery **1006** of the tracks **1004**.

When the treadmill is driven by a user, the force imparted to the running belt **16** is sufficient to permit the magnets to move relative bearing rails, but not to lose the magnetic connection therebetween. According to one exemplary embodiment, as the running belt **16** moves relative to the track **1004**, the magnets **1002** are generally spaced a small distance from the periphery **1006** of the track **1004**, helping to further reduce the noise associated with operation of the treadmill. According to other exemplary embodiments, the magnets **1002** are in physical contact with the periphery **1006** of the track **1004** in addition to being magnetically coupled thereto.

According to an exemplary embodiment similar to track system **1000**, a plurality of magnets may be positioned on the frame, track, or other fixed component of the treadmill base to apply a downwardly-directed force to the metal slats of the running belt as it passes over the magnets. For example, the magnets may be positioned on the cross-members **56**. As the running belt rotates, the portion passing above the magnets will be drawn downward by the force of the magnets, helping maintain that portion of the running belt (i.e., defining the running surface) in the desired shape.

Referring to FIGS. **31-34**, the treadmill **10** is shown including another exemplary embodiment of a track system

configured to help induce and maintain the running belt in a desired non-planar shape to define the running surface, shown as a track system **1100**.

The track system **1100** is substantially similar to track system **700**, but configured to be operable with a running belt **1102** that is a conventional running belt rather than a slatted running belt **16**. The track system **1100** includes a pair of tracks **702** and a wheel assemblies **1104** having substantially the same configuration as wheel assembly **716** with the exception that a securing device shown as a clip **1106** is used to connect the wheel assembly **1104** to the running belt **1102**, rather than the elongated connecting member **724**. The clip **1106** is shown extending and having a first portion **1108** and a second portion **1110** that opening towards the interior of the treadmill **10** before being secured. When the running belt **1102** shown as a continuous polymer (e.g., urethane) belt is in position, a first edge **1112** of the running belt **1102** is received between a first portion **1108** and a second portion **1110** of the clip **1106** and fixed relative thereto (e.g., by a fastener, etc.). The polymer belt is a urethane belt according to an exemplary embodiment. The urethane belt is desirable heavy enough to help assume the shape of the rollers, but not so thick or heavy that it undesirably impedes movement. The clips extend along the first edge **1112** and the second edge **1114** of the running belt **1102**, substantially suspending the belt between the tracks **702**. According to an exemplary embodiment, the securing device may be any securing device suitable for securing an edge portion of the running belt **1102** relative thereto (e.g., a bolt, a clamp, etc.).

According to still another exemplary embodiment, a treadmill has a track system including a pair of tracks and wheel assemblies. The wheel assemblies include hangers (e.g., magnetic hangers) that are received in channels that are interior to the track, the hangers being slidably movable within the channels. According to one exemplary embodiment, the hangers are substantially I-shaped, having one transverse portion received in the channel and the other transverse portion fixed to an interior side of a slat. According to some exemplary embodiments, the system further includes bearing rails that facilitate motion of the running belt itself and the hangers within the track. The hangers and the channel of the track may have any configuration suitable for facilitating movement of the running belt and maintaining the running belt in the desired non-planar shape.

The above-described ways of inducing and maintaining the running belt in the desired non-planar shape can also be used with or adapted to a manual treadmill having a planar running surface, such as treadmill **1200** having planar running surface **1202** shown in FIG. **35**. The treadmill **1200** is shown substantially similar to treadmill **10**, but the running surface is substantially planar. Accordingly, the ability to manually drive the treadmill is substantially dependent on the incline of the running surface **1202** relative to the ground. Ways to adjust this incline for any treadmill disclosed herein will be discussed in more detail later.

In the exemplary embodiment shown, the running surface **1202** is defined by a running belt **1204** that is disposed about front and rear running belt pulleys of a front and rear shaft assembly, respectively. The running belt **1204** also travels along a pair of bearing rails having a substantially linear top profile that facilitate motion of the running belt **1204**.

As discussed above, the speed controls for the manual treadmill **10** and the various embodiments thereof are generally the user's cadence and relative position of her weight-bearing foot on the running surface. More generally, the running belt **16** of the treadmill **10** is responsive to the

LIFECORE Ex. 1001, p. 40

27 28

weight of the user mounting, dismounting, or running on the treadmill 10. While it is generally desirable for the running belt 16 to be moved rearward, the running belt is capable of rotating forward. Forward rotation of the running belt can create safety concerns. For example, if a user were to mount the treadmill by placing her weight bearing foot at a location (e.g., location D shown in FIG. 5) along the rear portion 74 of the running surface 70, the running belt 16 may move forward and cause them to loose their footing, resulting in an injury or simply an unpleasant user experience.

A number of safety devices may be used with the treadmill 10 to help prevent undesirable forward rotation of the running belt 16. FIG. 36 illustrates a safety device shown as a one-way bearing assembly 1300 according to an exemplary embodiment. The one-way bearing assembly 1300 is a motion restricting element that is configured to permit rotation of at least one of the front and rear shaft assemblies 44, 46 (and hence the running belt 16) in only one direction, preferably clockwise as seen in FIGS. 1 and 5.

In the exemplary embodiment shown, the one way bearing assembly 1300 is disposed about and cooperates with the rear shaft 68 as shown in FIG. 2. The one-way bearing assembly 1300 comprises a housing 1302 which supports an inner ring 1304 that cooperates with the rear shaft 68 and supports an outer ring 1306 fixed relative to the housing 1302. A plurality of sprags (not shown) are disposed between the inner ring 1304 and the outer ring 1306. The sprags are asymmetric, and, thus, provide for motion in one direction and prevent rotation in the opposite direction. The housing 1302 is fixed to a bracket 1310 that is connected to, and preferably directly mounted to, the frame 40 to fix the location of the housing 1302 and prevent movement of the housing 1302 in response to the rotation of the rear shaft 68. It should be noted that the location at which the bracket 1310 is mounted to the frame 40 can be adjusted depending on the location of the rear shaft 68, which may change depending on the shape of the non-planar running surface or the desired tension in the running belt. According to another exemplary embodiment, the one-way bearing may be transitionally fit into the housing, rather than press fit. According to yet another exemplary embodiment, the one-way bearing may include rollers in addition to sprags.

The one-way bearing assembly 1300 further includes a key 1312 that is fixed relative to the inner ring 1304 and configured to cooperate with a keyway 1314 formed in the rear shaft 68. Viewed from the perspective shown in FIGS. 1 and 5, when the running belt 16 is moving rearward, rotating in the clockwise direction, the rear shaft 68 similarly rotates in the clockwise direction. The inner ring 1304 of the one-way bearing assembly 1300 rotates with rotational velocity corresponding to the rotational velocity of the rear shaft 68 because of the interaction between the key 1312 and the keyway 1314. If a force is applied by the user to the running belt 16 that urges the rear shaft 68 to rotate counterclockwise, the one-way bearing assembly 1300 provides a counter force, preventing the counterclockwise rotation of the rear shaft 68 and the forward rotation of the running belt 16. Specifically, as the rear shaft 68 begins to move counterclockwise, the interaction of the key 1312 and the keyway 1314 begins to drive the inner ring 1304 of the one-way bearing assembly 1300 rearward. The sprags become wedged between the inner ring 1304 and the outer ring 1306, preventing the counterclockwise rotation of the inner ring and key 1312 disposed therein. The key 1312, by virtue of its inability to rotate, provides a counterforce to the keyway 1314 as the keyway continues to attempt to rotate counterclockwise. By preventing the keyway 1314 from

moving counterclockwise, the one-way bearing assembly 1300 thus prevents the rear shaft 68, the rear running belt pulleys 66, and running belt 16 from rotating counterclockwise as seen in FIGS. 1 and 5.

FIG. 38 illustrates another safety device that may be used with the treadmill 10, shown as a one-way bearing assembly 1500 according to an exemplary embodiment. The one-way bearing assembly 1500 is a motion restricting element that is configured to permit rotation of at least one of the front and rear shaft assemblies 44, 46 (and hence the running belt 16) in only one direction, preferably clockwise as seen in FIGS. 1 and 5.

In the exemplary embodiment shown, the one-way bearing assembly 1500 is disposed about and cooperates with the rear shaft 68. The one-way bearing assembly 1500 comprises a housing 1502 which supports an inner ring 1504 that cooperates with the rear shaft 68 and supports an outer ring 1506 fixed relative to the housing 1502. A plurality of sprags (not shown) are disposed between the inner ring 1504 and the outer ring 1506. The sprags are asymmetric, and, thus, provide for motion in one direction and prevent rotation in the opposite direction. The one-way bearing assembly 1500 is further shown to include a first snap ring 1532 and a second snap ring 1534, which are configured to seat in a first circumferential groove 1536 and a second circumferential groove 1538 on the rear shaft 68, respectively. When installed, the first snap ring 1532 is supported inboard of and adjacent to the inner ring 1504, and the second snap ring 1534 is supported outboard of and adjacent to the inner ring 1504, thereby further restricting axial motion of the one-way bearing assembly 1500 relative to the rear shaft 68.

The housing 1502 is supported by a stud 1520 which is coupled to the frame 40. The stud 1520 may be separated or spaced apart from the housing 1502 by a spacer 1522 and a sleeve 1523 which may be restrained on the stud 1520 by a nut 1524 and a washer 1526. The sleeve 1523 of the embodiment shown is formed of rubber and is configured to reduce noise, wear, and shock load between the housing 1502 and the stud 1520 and/or the spacer 1522. The housing 1502 includes a plurality of legs, shown as a first leg 1516 and a second leg 1518, which extend on either side of the stud 1520. Accordingly, the stud 1520 resists rotational motion of the housing 1502 in response to rotation of the rear shaft 68 and may provide sufficient reactive or counter force to the housing 1502 to enable the one-way bearing assembly 1500 to prevent counterclockwise rotation of the rear shaft 68. Supporting the one-way bearing assembly 1500 in this manner negates the need for fixing the housing 1502 to the frame 40 or an intermediary bracket. Accordingly, the housing 1502 may move with the rear shaft 68 (e.g., the housing 1502 may pivot about the stud 1520) as the rear shaft 68 flexes under load, thereby reducing side loading on the inner ring 1504, which in turn reduces wear on, and extends the life of, the one-way bearing assembly 1500.

It should be noted that the location at which the stud 1520 is mounted to the frame 40 can be adjusted depending on the location of the rear shaft 68, which may change depending on the shape of the non-planar running surface or the desired tension in the running belt. Furthermore, the stud 1520 need not be positioned below or downward from the rear shaft 68, as shown, but may be located in any direction relative to the rear shaft 68. According to another exemplary embodiment, the one-way bearing may be transitionally fit into the housing, rather than press fit. According to yet another exemplary embodiment, the one-way bearing may include rollers in addition to sprags.

**LIFECORE Ex. 1001, p. 41**

29

30

The one-way bearing assembly **1500** further includes a key **1512** that is fixed relative to the inner ring **1504** and configured to cooperate with a keyway **1514** formed in the rear shaft **68**. Viewed from the perspective shown in FIGS. **1** and **5**, when the running belt **16** is moving rearward, rotating in the clockwise direction, the rear shaft **68** similarly rotates in the clockwise direction. The inner ring **1504** of the one-way bearing assembly **1500** rotates with rotational velocity corresponding to the rotational velocity of the rear shaft **68** because of the interaction between the key **1512** and the keyway **1514**. If a force is applied by the user to the running belt **16** that urges the rear shaft **68** to rotate counterclockwise as seen in FIGS. **1** and **5**, the one-way bearing assembly **1500** provides a counter force, preventing the counterclockwise rotation of the rear shaft **68** and the forward rotation of the running belt **16**. Specifically, as the rear shaft **68** begins to move counterclockwise, the interaction of the key **1512** and the keyway **1514** begins to drive the inner ring **1504** of the one-way bearing assembly **1500** rearward. The sprags become wedged between the inner ring **1504** and the outer ring **1506**, preventing the counterclockwise rotation of the inner ring and key **1512** disposed therein. The key **1512**, by virtue of its inability to rotate, provides a counterforce to the keyway **1514** as the keyway continues to attempt to rotate counterclockwise. By preventing the keyway **1514** from moving counterclockwise, the one-way bearing assembly **1500** thus prevents the rear shaft **68**, the rear running belt pulleys **66**, and running belt **16** from rotating counterclockwise as seen in FIGS. **1** and **5**.

Other safety devices to help prevent undesirable forward rotation of the running belt **16** may include cam locking systems, which may be particularly well-suited for use in conjunction with track systems **700**, **800**, and **900**. Also, taper locks, a user operated pin system, or a band brake system with a lever may be utilized.

Controlling the operation of the running belt **16** in ways in addition to preventing rearward rotation, can help improve the safety of the treadmill and/or help a user adjust the treadmill for a desirable level of performance. Including an incline or elevation adjustment system is one way to provide these benefits. As mentioned above, as the increasing or decreasing of the relative height or distance of the running surface relative to the ground is one way that the operation, most typically the speed, of the treadmill can be adjusted. Accordingly, adjusting the incline of the base of the treadmill results in an adjustment to the speeds a user can achieve and/or how easy or challenging it is for the user to achieve certain speeds.

Referring back to FIGS. **1-6**, a plurality of nuts **270** are fixed, and more preferably welded, to the bottom of the frame **40** allow the feet **28** to be adjusted. The feet **38** include a lower or base portion **272** and a threaded shaft **274** extending vertically upward from the base portion **272** according to an exemplary embodiment. Generally, by increasing the distance between the nuts **270** and the base portions **272** of the feet **28** at the front end **48** of the frame **40** relative to the rear end **50**, the incline of the base **12** will increase. Stated otherwise, the angle between the longitudinal axis **18** and the ground will increase. Similarly, the distance between the nuts **270** and the base portions **272** of the feet at the rear end **50** may be decreased relative to the feet **28** at the front end **48**, thereby increasing the incline. By increasing the incline, a user is typically able to achieve greater speeds on the treadmill **10**.

Treadmill **1200** shown in FIG. **35** preferably has at least some incline (i.e., the longitudinal axis of the treadmill to be other than parallel to the ground) when in operation as the shape of the running surface, substantially planar, does not provide for increases and decreases in height in and of itself. On the other hand, the longitudinal axes of the treadmills having non-planar running surfaces may be parallel to the ground or at an incline thereto during operation. It should be noted that, while it is generally desirable to have the front shaft at a height at or above the height of the rear shaft, with some running surface configurations, desirable orientations can be achieved by raising the rear shaft to a location above the front shaft relative to the ground.

In some cases, the user may want to decrease the incline of the treadmill (e.g., to decrease the speeds the treadmill can achieve, etc.). For example, the user may want to utilize a relatively long stride, but does not want to be running at such high speeds. This can be accomplished by lowering the incline of the treadmill from the higher incline position. Once in the lowered position, the same stride the user was using at the higher incline position will typically result in the user running at lower speeds in the lower incline position. This same principle can also be applied for the purposes of safety. That is, keeping the front of the treadmill at a lower incline position or lowering the treadmill to a lower incline position can help prevent a user from achieving speeds that are too great for them (e.g., that would cause them to be off-balance, lose control, be injured, etc.).

Because the treadmill is preferably manually operated, it does not have an external power source which can be utilized to operate a height adjusting motor as is found in conventional treadmills. Therefore, a manual height adjusting system is preferably integrated into the treadmill. Referring to FIG. **37**, an example of a manual incline or elevation adjustment system **1400** is shown according to an exemplary embodiment. A hand crank **1402** configured to be operated by a person, such as the user, is provided allow a user to operate the incline adjustment system **1400** to adjust the incline of the base **12** of the treadmill **10** relative to the ground. The front shaft **64** may be lowered relative to the rear shaft **68** and/or the front shaft **64** may be raised relative to the rear shaft **68** using the hand crank **1402**. In an alternative exemplary embodiment, the front shaft may be maintained at a position above the ground, and the rear shaft may be raised or lowered relative thereto adjust the incline.

Generally, the hand crank **1402** includes a handle portion **1404** disposed parallel to and spaced a distance from a shaft **1406** that is coupled to the frame **40** (e.g., with a bracket). When assembled, a drive belt or chain **1407** is disposed about a gear **1408** that is positioned about the shaft **1406** of the hand crank **1402**. Rotational motion can be imparted to the gear **1408** by rotating the handle portion **1404**. In response to rotation of the gear **1408**, the drive belt **1407** causes a sprocket **1410** is fixed relative to an internal connecting shaft **1412** of the internal connecting shaft assembly **1414** to rotate. The internal connecting shaft assembly **1414** further includes a pair of drive belts or chains **1416** that are operably coupled to gears **1418** of rack and pinion blocks **1420**. The rotation of the internal connecting shaft **1412** causes the drive belts or chains **1416** to rotate gears **1418**. As the gears **1418** rotate, a pinion (not shown) disposed within the rack and pinion blocks **1420** imparts linear motion to the racks **1422**, thereby operably raising or lowering the base **12** of the treadmill **10** depending on the direction of rotation of the handle portion **1404** of the hand crank **1402**.

According to another exemplary embodiment, an incline adjustment system that is a gas assisted un-weighting incline adjustment system may be utilized. According to other

**LIFECORE Ex. 1001, p. 42**

exemplary embodiments, any suitable linear actuator may serve as an incline adjustment system for the manual treadmill disclosed herein.

According to an exemplary embodiments, the incline of one or more portions of the running surface may be adjusted independent of adjusting the incline of the base. For example, one or more portions of a bearing rail may be configured to be movable relative to one or more other portion of the bearing rail. In one exemplary embodiment, a bearing rail is divided into a first portion and a second portion movable relative to each of the about a pivot point disposed therebetween. A person (e.g., a user, trainer, technician, etc.) can adjust the operational characteristics of the treadmill (similar to the discussion of using running surfaces having different curved profiles above) by merely adjusting the relative position of the bearing rail portions. If the user wants to achieve greater speeds, they may increase the incline of the front portion, while leaving the center and rear portions unchanged. If the user would like to alter the configuration of the treadmill to more strongly encourage running on the balls of their feet, they might increase the incline of the front and rear portions from a higher radius of curvature so that they collectively define a lower radius of curvature. Adjustments to the position of the bearing rails may be imparted using a crank, or other suitable device.

It is further contemplated that, because the treadmill **10** does not require an electric motor for operation, it is well suited for operation in an aquatic environment. For example, the treadmill **10** may be at least partially submerged in a pool, thereby providing added resistance due to hydrodynamic drag on a user and/or reducing footfall impact due to the buoyancy of the user. Accordingly, a submerged embodiment of the treadmill **10** may be used for training and/or rehabilitation purposes. Modifications may be made to the treadmill **10** for use in an aquatic environment. For example, the treadmill **10** may include sealed bearings and components formed of corrosion-resistant materials (e.g., plastic, composite, stainless steel, brass, etc.) to extend its useful life. Further, the shape of the running surface **70** may also be modified to compensate for the buoyancy of the user in water and to compensate for the effects of salinity on buoyancy. For example, it is contemplated that the shape of the running surface **70** may be different for a treadmill **10** used in a freshwater environment and a highly saline environment.

A number of other devices, both mechanical and electrical, may be used in conjunction with or cooperate with a treadmill according to this disclosure. FIG. **1**, for example, shows a display **280** adapted to calculate and display performance data relating to operation of the treadmill according to an exemplary embodiment. The display **280** includes an independent power source (e.g., a battery) that provides for the display **280** to be electrically-operative. The feedback and data performance analysis from the display may include, but are not limited to, speed, time, distance, calories burned, heart rate, etc. For example, a the display may include a sensor that is responsive to the position of a magnet on one of the running belt pulleys. The sensor is configured to recognize every time the magnet rotates past (e.g., moves past, crosses, etc.) a certain location. With this data, the display may calculate the speed at which the user is running and then provide this data to them via a user interface. According to other exemplary embodiments, other displays, cup holders, cargo nets, heart rate grips, arm exercisers, TV mounting devices, user worktops, and/or other devices may be incorporated into the treadmill.

As utilized herein, the terms "approximately," "about," "substantially," and similar terms are intended to have a broad meaning in harmony with the common and accepted usage by those of ordinary skill in the art to which the subject matter of this disclosure pertains. It should be understood by those of skill in the art who review this disclosure that these terms are intended to allow a description of certain features described and claimed without restricting the scope of these features to the precise numerical ranges provided. Accordingly, these terms should be interpreted as indicating that insubstantial or inconsequential modifications or alterations of the subject matter described and are considered to be within the scope of the disclosure.

It should be noted that the term "exemplary" as used herein to describe various embodiments is intended to indicate that such embodiments are possible examples, representations, and/or illustrations of possible embodiments (and such term is not intended to connote that such embodiments are necessarily extraordinary or superlative examples).

For the purpose of this disclosure, the term "coupled" means the joining of two members directly or indirectly to one another. Such joining may be stationary or moveable in nature. Such joining may be achieved with the two members or the two members and any additional intermediate members being integrally formed as a single unitary body with one another or with the two members or the two members and any additional intermediate members being attached to one another. Such joining may be permanent in nature or may be removable or releasable in nature.

It should be noted that the orientation of various elements may differ according to other exemplary embodiments, and that such variations are intended to be encompassed by the present disclosure.

It is important to note that the constructions and arrangements of the manual treadmill as shown in the various exemplary embodiments are illustrative only. Although only a few embodiments have been described in detail in this disclosure, those skilled in the art who review this disclosure will readily appreciate that many modifications are possible (e.g., variations in sizes, dimensions, structures, shapes and proportions of the various elements, values of parameters, mounting arrangements, use of materials, colors, orientations, etc.) without materially departing from the novel teachings and advantages of the subject matter recited in the claims. For example, elements shown as integrally formed may be constructed of multiple parts or elements, the position of elements may be reversed or otherwise varied, and the nature or number of discrete elements or positions may be altered or varied. The order or sequence of any process or method steps may be varied or re-sequenced according to alternative embodiments. Other substitutions, modifications, changes and omissions may also be made in the design, operating conditions and arrangement of the various exemplary embodiments without departing from the scope of the present disclosure.

What is claimed:

1. A manually powered treadmill, comprising:

a frame having a front end and a rear end positioned opposite the front end;

a front shaft coupled to the frame proximate the front end;

a rear shaft coupled to the frame proximate the rear end;

a plurality of bearings coupled to the frame;

a running belt at least partially supported by the plurality of bearings, wherein the running belt includes a curved running surface; and

**LIFECORE Ex. 1001, p. 43**

a safety device coupled to the running belt and to at least one of the front shaft and the rear shaft, wherein a portion of the safety device is at least partially supported by a housing of the safety device so that the portion of the safety device, the running belt and the at least one of the front shaft and the rear shaft freely rotate when the portion of the safety device rotates in a first direction of rotation relative to the housing, however, in a second direction of rotation, opposite the first direction of rotation, interference between the housing and the portion of the safety device substantially prevents rotation of the portion of the safety device, the running belt and the at least one of the front shaft and the rear shaft.

2. The manually powered treadmill of claim 1, wherein the frame includes a left side member, a right side member, and at least one cross-member extending between the left side member and the right side member, wherein the plurality of bearings includes a first plurality of bearings coupled to a left-side of the frame and a second plurality of bearings coupled to a right-side of the frame.

3. The manually powered treadmill of claim 2, wherein the first plurality of bearings and the second plurality of bearings each at least partially define a curved top profile, wherein the curved top profile substantially corresponds to at least a portion of the curved running surface.

4. The manually powered treadmill of claim 1, wherein the portion of the safety device is a one-way bearing.

5. The manually powered treadmill of claim 1, further comprising at least one support foot coupled to the frame, wherein the at least one support foot is adjustable to enable an adjustment of the relative vertical incline of at least a portion of the manually powered treadmill in relation to a surface supporting the manually powered treadmill.

6. The manually powered treadmill of claim 1, further comprising a braking system coupled to the frame and configured to selectively resist the rotational movement of the running belt.

7. The manually powered treadmill of claim 6, wherein the braking system utilizes friction to apply a variable amount of force to resist the rotational movement of the running belt.

8. A manually powered treadmill, comprising:
a frame;
a first plurality of bearings coupled to the frame;
a second plurality of bearings coupled to the frame and spaced a distance from the first plurality of bearings;
a front shaft assembly coupled to the frame;
a rear shaft assembly coupled to the frame;
a running belt at least partially supported by the first plurality of bearings and the second plurality of bearings, the running belt being at least partially disposed about the front and rear shaft assemblies, and comprising a running surface, at least a portion of which is curved; and
a safety device coupled to the frame and the running belt, wherein a portion of the safety device is at least partially supported by a housing of the safety device so that the portion of the safety device and the running belt freely rotate when the portion of the safety device rotates in a first direction of rotation relative to the housing, however, in a second direction of rotation, opposite the first direction of rotation, interference between the housing and the portion of the safety device substantially prevents rotation of the portion of the safety device and the running belt.

9. The manually powered treadmill of claim 8, wherein the portion of the safety device is a one-way bearing.

10. The manually powered treadmill of claim 8, wherein the front shaft assembly comprises a front shaft coupled to frame.

11. The manually powered treadmill of claim 10, wherein the front shaft assembly comprises at least one front running belt pulley coupled to the front shaft.

12. The manually powered treadmill of claim 8, wherein the rear shaft assembly comprises a rear shaft coupled to the frame.

13. The manually powered treadmill of claim 12, wherein the rear shaft assembly comprises at least one rear running belt pulley coupled to the rear shaft.

14. The manually powered treadmill of claim 8, wherein the rear shaft assembly comprises at least one rear running belt pulley and the front shaft assembly comprises at least one front running belt pulley.

15. The manually powered treadmill of claim 14, wherein at least one of the at least one rear running belt pulley and the at least one front running belt pulley are formed from an electrically insulating material.

16. The manually powered treadmill of claim 8, further comprising at least one support foot coupled to the frame, wherein the at least one support foot is adjustable to enable an adjustment of the relative vertical incline of at least a portion of the manually powered treadmill in relation to a surface supporting the manually powered treadmill.

17. The manually powered treadmill of claim 8, wherein each of the first and second pluralities of bearings define a curved top profile and wherein the curved top profile substantially corresponds to at least a portion of the curved portion of the running surface.

18. The manually powered treadmill of claim 8, wherein the frame includes a left side member, a right side member spaced a distance from the left side member, and at least one cross-member extending between the left side member and the right side member.

19. The manually powered treadmill of claim 18 wherein the first plurality of bearings are coupled the left side member and the second plurality of bearings are coupled to the right side member.

20. A manually powered treadmill, comprising:
a frame;
at least one front running belt pulley coupled to the frame;
at least one rear running belt pulley coupled to the frame and spaced a distance from the at least one front running belt pulley;
a plurality of bearings coupled to the frame;
a running belt at least partially supported by the plurality of bearings and at least partially supported by at least one of the at least one front running belt pulley and the at least one rear running belt pulley, wherein the running belt includes a running surface, at least a portion of which is curved; and
a safety device coupled to the running belt, wherein a portion of the safety device is at least partially supported by a housing of the safety device so that the portion of the safety device and the running belt freely rotate when the portion of the safety device rotates in a first direction of rotation relative to the housing, however, in a second direction of rotation, opposite the first direction of rotation, interference between the housing and the portion of the safety device substantially prevents rotation of the portion of the safety device and the running belt.

LIFECORE Ex. 1001, p. 44

21. The manually powered treadmill of claim 20, wherein at least one of the at least one rear running belt pulley and the at least one front running belt pulley are formed from an electrically insulating material.

22. The manually powered treadmill of claim 20, further comprising a front shaft coupled to frame, the front shaft being adapted to support the at least one front running belt pulley.

23. The manually powered treadmill of claim 20, further comprising a rear shaft coupled to frame, the rear shaft being adapted to support the at least one rear running belt pulley.

24. The manually powered treadmill of claim 20, wherein the portion of the safety device is a one-way bearing.

25. The manually powered treadmill of claim 20, further comprising a braking system coupled to the frame and configured to selectively resist the rotational movement of the running belt.

26. The manually powered treadmill of claim 25, wherein the braking system utilizes friction to apply a variable amount of force to resist the rotational movement of the running belt.

27. A method, comprising:
providing a manually powered treadmill, the manually powered treadmill having a frame with a front end and a rear end;
providing a plurality of bearings coupled to the frame, wherein the plurality of bearings define at least a portion of a curved top profile;
disposing a running belt on the plurality of bearings such that the curved top profile of plurality of bearings define at least a portion of a curved running surface of the running belt;
providing a safety device coupled to the frame and the running belt, the safety device having a first element at least partially supported by a housing of the safety device;
permitting rotation of the running belt in a first direction by freewheeling of the first element of the safety device relative to the housing; and
resisting rotation of the running belt in a second direction opposite the first direction by restricting rotation of the first element via interference between the housing and the first element of the safety device.

28. A method according to claim 27, further comprising providing for a selective application of a braking force to resist the rotational movement of the running belt in the first direction.

29. A method according to claim 27, further comprising providing for the adjustment of the vertical incline of at least a portion of the running surface.

30. A manually powered treadmill, comprising:
a frame having a front end and a rear end positioned opposite the front end;
a front shaft coupled to the frame proximate the front end;
a rear shaft coupled to the frame proximate the rear end;
a plurality of bearings coupled to the frame;
a running belt at least partially supported by the plurality of bearings, wherein the running belt comprises a curved running surface; and
a safety device coupled to the frame and the running belt, the safety device having a first rotatable element and a second rotatable element, wherein at least one of the first and second rotatable elements are adapted for rotation relative to the frame;
wherein the running belt and one of the first and second rotatable elements of the safety device freely rotate in a first direction of rotation relative to the other of the

first and second rotatable elements of the safety device, but interference between the safety device and at least one of the first and second rotatable elements substantially prevents rotation in a second direction of rotation, opposite the first direction of rotation, of the running belt and the one of the first and second rotatable elements relative to the other of the one of the first and second rotatable elements.

31. The manually powered treadmill of claim 30, wherein the frame includes a left side member, a right side member, and at least one cross-member extending between the left side member and the right side member, wherein the plurality of bearings includes a first plurality of bearings coupled to a left-side of the frame and a second plurality of bearings coupled to a right-side of the frame.

32. The manually powered treadmill of claim 31, wherein the first plurality of bearings and the second plurality of bearings each at least partially define a curved top profile, wherein the curved top profile substantially corresponds to at least a portion of the curved running surface.

33. The manually powered treadmill of claim 30, wherein the first and second rotatable elements of the safety device at least partly form a one-way bearing.

34. The manually powered treadmill of claim 30, further comprising at least one support foot coupled to the frame, wherein the at least one support foot is adjustable to enable an adjustment of the relative vertical incline of at least a portion of the manually powered treadmill in relation to a surface supporting the manually powered treadmill.

35. The manually powered treadmill of claim 30, further comprising a braking system coupled to the frame and configured to selectively resist the rotational movement of the running belt.

36. The manually powered treadmill of claim 35, wherein the braking system utilizes friction to apply a variable amount of force to resist the rotational movement of the running belt.

37. A manually powered treadmill, comprising:
a frame;
a first plurality of bearings coupled to the frame;
a second plurality of bearings coupled to the frame and spaced a distance from the first plurality of bearings;
a front shaft assembly coupled to the frame;
a rear shaft assembly coupled to the frame;
a running belt at least partially supported by the first plurality of bearings and the second plurality of bearings, the running belt being at least partially disposed about the front and rear shaft assemblies, and comprising a running surface, at least a portion of which is curved; and
a safety device coupled to the frame and the running belt, the safety device having a first rotatable element and a second rotatable element, wherein at least one of the first and second rotatable elements are adapted for rotation relative to the frame;
wherein one of the first and second rotatable elements of the safety device and the running belt freely rotate relative to the other of the one of the first and second rotatable elements of the safety device in a first direction of rotation relative to the frame, however, in a second direction of rotation, opposite the first direction of rotation, interference between the safety device and at least one of the first rotatable element and the second rotatable element substantially prevents rotation of the running belt and the one of the first and second rotatable elements relative to the other of the one of the first and second rotatable elements.

**LIFECORE Ex. 1001, p. 45**

**38**. The manually powered treadmill of claim **37**, wherein the first and second rotatable elements of the safety device at least partly form a one-way bearing.

**39**. The manually powered treadmill of claim **37**, wherein the front shaft assembly comprises a front shaft coupled to frame.

**40**. The manually powered treadmill of claim **39**, wherein the front shaft assembly comprises at least one front running belt pulley coupled to the front shaft.

**41**. The manually powered treadmill of claim **37**, wherein the rear shaft assembly comprises a rear shaft coupled to the frame.

**42**. The manually powered treadmill of claim **41**, wherein the rear shaft assembly comprises at least one rear running belt pulley coupled to the rear shaft.

**43**. The manually powered treadmill of claim **37**, wherein the rear shaft assembly comprises at least one rear running belt pulley and the front shaft assembly comprises at least one front running belt pulley.

**44**. The manually powered treadmill of claim **43**, wherein at least one of the at least one rear running belt pulley and the at least one front running belt pulley are formed from an electrically insulating material.

**45**. The manually powered treadmill of claim **37**, further comprising at least one support foot coupled to the frame, wherein the at least one support foot is adjustable to enable an adjustment of the relative vertical incline of at least a portion of the manually powered treadmill in relation to a surface supporting the manually powered treadmill.

**46**. The manually powered treadmill of claim **37**, wherein the running belt is at least partially supported by the first plurality of bearings and the second plurality of bearings.

**47**. The manually powered treadmill of claim **46**, wherein each of the first and second pluralities of bearings define a curved top profile and wherein the curved top profile substantially corresponds to at least a portion of the curved portion of the running surface.

**48**. The manually powered treadmill of claim **37**, wherein the frame includes a left side member, a right side member spaced a distance from the left side member, and at least one cross-member extending between the left side member and the right side member.

**49**. The manually powered treadmill of claim **48**, wherein the first plurality of bearings are coupled the left side member and the second plurality of bearings are coupled to the right side member.

**50**. A manually powered treadmill, comprising:

a frame;

at least one front running belt pulley coupled to the frame;

at least one rear running belt pulley coupled to the frame and spaced a distance from the at least one front running belt pulley;

a plurality of bearings coupled to the frame;

a running belt at least partially supported by the plurality of bearings and at least partially supported by at least one of the at least one front running belt pulley and the at least one rear running belt pulley, wherein the running belt includes a running surface, at least a portion of which is curved;

a safety device coupled to the frame and the running belt, the safety device having a first rotatable element and a second rotatable element, wherein at least one of the first and second rotatable elements are adapted for rotation relative to the frame;

wherein one of the first and second rotatable elements of the safety device and the running belt freely rotate in a first direction of rotation relative to the frame, however, in a second direction of rotation, opposite the first direction of rotation, interference between the safety device and at least one of the first rotatable element and the second rotatable element substantially prevents rotation of the one of the first and second rotatable elements of the safety device and the running belt relative to the frame.

**51**. The manually powered treadmill of claim **50**, wherein at least one of the at least one rear running belt pulley and the at least one front running belt pulley are formed from an electrically insulating material.

**52**. The manually powered treadmill of claim **50**, further comprising a front shaft coupled to frame, the front shaft being adapted to support the at least one front running belt pulley.

**53**. The manually powered treadmill of claim **50**, further comprising a rear shaft coupled to frame, the rear shaft being adapted to support the at least one rear running belt pulley.

**54**. The manually powered treadmill of claim **50**, wherein the first and second rotatable elements of the safety device at least partly form a one-way bearing.

**55**. The manually powered treadmill of claim **50**, further comprising a braking system coupled to the frame and configured to selectively resist the rotational movement of the running belt.

**56**. The manually powered treadmill of claim **55**, wherein the braking system utilizes friction to apply a variable amount of force to resist the rotational movement of the running belt.

**57**. A method, comprising:

providing a manually powered treadmill, the manually powered treadmill having a frame with a front end and a rear end;

providing a plurality of bearings coupled to the frame, wherein the plurality of bearings define at least a portion of a curved top profile;

disposing a running belt on the plurality of bearings such that the curved top profile of plurality of bearings define at least a portion of a curved running surface of the running belt;

providing a safety device coupled to the frame and to the running belt, the safety device having a first rotatable element and a second rotatable element, wherein at least one of the first and second rotatable elements are adapted for rotation relative to the frame;

permitting rotation of one of the first and second rotatable elements of the safety device and the running belt in a first direction of rotation; and

substantially preventing rotation in a second direction, opposite the first direction, of the running belt and the one of the first and second rotatable elements by interference between the safety device and at least one of the first rotatable element and the second rotatable element.

**58**. A method according to claim **57**, further comprising providing for selective application of a braking force to resist the rotational movement of the running belt in the first direction.

**59**. A method according to claim **57**, further comprising providing for the adjustment of the vertical incline of at least a portion of the running surface.

* * * * *

LIFECORE Ex. 1001, p. 46

**CERTIFICATE OF COMPLIANCE WITH
TYPE-VOLUME LIMITATIONS**

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

 X   the filing has been prepared using a proportionally-spaced typeface and includes 13,209 words.

_____ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

_____ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Dated: April 7, 2025                    Respectfully submitted,

                                        _/s/Kadie M. Jelenchick_____

                                        Kadie M. Jelenchick
                                        FOLEY & LARDNER LLP
                                        777 East Wisconsin Avenue
                                        Milwaukee, Wisconsin 53202
                                        (414) 271-2400
                                        kjelenchick@foley.com

                                        *Attorneys for Appellant*
                                        *Woodway USA, Inc.*